PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

Nos. 11-3301 and 11-3426
———

ZF MERITOR, LLC;
MERITOR TRANSMISSION CORPORATION,
Appellants, No. 11-3426

v.

EATON CORPORATION,
Appellant, No. 11-3301
———

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-06-cv-00623)
District Judge:  Honorable Sue L. Robinson
———

Argued June 26, 2012
Before:  FISHER and GREENBERG, *Circuit Judges*,
and OLIVER,[*] *District Judge*.

[*] The Honorable Solomon Oliver, Jr., Chief Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

(Filed: September 28, 2012 )

Caeli A. Higney
Thomas G. Hungar
Theodore B. Olson (Argued)
Cynthia E. Richman
Geoffrey C. Weien
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W., 9th Floor
Washington, DC  20036

Erik T. Koons
William K. Lavery
Joseph A. Ostoyich
Baker Botts
1299 Pennsylvania Avenue, N.W.
The Warner
Washington, DC  20004

Donald E. Reid
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
          *Counsel for Eaton Corporation*

Jay N. Fastow (Argued)
Dickstein Shapiro
1633 Broadway
New York, NY  10019

2

Robert B. Holcomb
Adams Holcomb
1875 Eye Street. N.W., Suite 810
Washington, DC  20006

Christopher H. Wood
1489 Steele Street, Suite 111
Denver, CO  80206
        *Counsel for ZF Meritor, LLC and
        Meritor Transmission Corp.*

Michael S. Tarringer
Cafferty Faucher
1717 Arch Street, Suite 3610
Philadelphia, PA  19103
        *Counsel for American Antitrust
        Institute*

―――――

OPINION OF THE COURT
―――――

FISHER, *Circuit Judge*.

This case arises from an antitrust action brought by ZF Meritor, LLC ("ZF Meritor") and Meritor Transmission Corporation ("Meritor") (collectively, "Plaintiffs") against Eaton Corporation ("Eaton") for allegedly anticompetitive practices in the heavy-duty truck transmissions market.  The practices at issue are embodied in long-term agreements

between Eaton, the leading supplier of heavy-duty truck transmissions in North America, and every direct purchaser of such transmissions. Following a four-week trial, a jury found that Eaton's conduct violated Section 1 and Section 2 of the Sherman Act, and Section 3 of the Clayton Act. Eaton filed a renewed motion for judgment as a matter of law, arguing that its conduct was *per se* lawful because it priced its products above-cost. The District Court disagreed, reasoning that notwithstanding Eaton's above-cost prices, there was sufficient evidence in the record to establish that Eaton engaged in anticompetitive conduct—specifically that Eaton entered into long-term *de facto* exclusive dealing arrangements—which foreclosed a substantial share of the market and, as a result, harmed competition. We agree with the District Court and will affirm the District Court's denial of Eaton's renewed motion for judgment as a matter of law.

We are also called upon to address several other issues. Although the jury returned a verdict in favor of Plaintiffs on the issue of liability, prior to trial, the District Court granted Eaton's motion to exclude the damages testimony of Plaintiffs' expert. The District Court also denied Plaintiffs' request for permission to amend the expert report to include alternate damages calculations. Consequently, the issue of damages was never tried and no damages were awarded. Plaintiffs cross-appeal from the District Court's order granting Eaton's motion to exclude and the District Court's subsequent denial of Plaintiffs' motion for clarification. For the reasons set forth below, we will affirm the District Court's orders to the extent that they excluded Plaintiffs' expert's testimony based on the damages

4

calculations in his initial expert report, but reverse to the extent that the District Court denied Plaintiffs' request to amend the report to submit alternate damages calculations. Finally, although the District Court awarded no damages, it did enter injunctive relief against Eaton. On appeal, Eaton argues that Plaintiffs lack standing to seek injunctive relief because they are no longer in the heavy-duty truck transmissions market, and have expressed no concrete desire to re-enter the market. We agree and will vacate the District Court's order issuing injunctive relief.

## I. BACKGROUND

### A. Factual Background

#### 1. Market Background

The parties agree that the relevant market in this case is heavy-duty "Class 8" truck transmissions ("HD transmissions") in North America. Heavy-duty trucks include 18-wheeler "linehaul" trucks, which are used to travel long distances on highways, and "performance" vehicles, such as cement mixers, garbage trucks, and dump trucks. There are three types of HD transmissions: three-pedal manual, which uses a clutch to change gears; two-pedal automatic; and two-or-three-pedal automated mechanical, which engages the gears mechanically through electronic controls. Linehaul and performance transmissions, which comprise over 90% of the

5

market, typically use manual or automated mechanical transmissions.[1]

There are only four direct purchasers of HD transmissions in North America: Freightliner, LLC ("Freightliner"), International Truck and Engine Corporation ("International"), PACCAR, Inc. ("PACCAR"), and Volvo Group ("Volvo"). These companies are referred to as the Original Equipment Manufacturers ("OEMs"). The ultimate consumers of HD transmissions, truck buyers, purchase trucks from the OEMs. Truck buyers have the ability to select many of the components used in their trucks, including the transmissions, from OEM catalogues called "data books." Data books list the alternative component choices, and include a price for each option relative to the "standard" or "preferred" offerings. The "standard" offering is the component that is provided to the customer unless the customer expressly designates another supplier's product, while the "preferred" or "preferentially-priced" offering is the lowest priced component in data book among comparable products. Data book positioning is a form of advertising, and standard or preferred positioning generally means that customers are more likely to purchase that supplier's components. Although customers may, and sometimes do, request components that are not published in a data book, doing so is often cumbersome and increases the cost of the

---

[1] A third category of heavy-duty trucks, "specialty" vehicles, such as fire trucks, typically use automatic transmissions.

6

component. Thus, data book positioning is essential in the industry.

Eaton has long been a monopolist in the market for HD transmissions in North America.[2] It began making HD transmissions in the 1950s, and was the only significant manufacturer until Meritor entered the market in 1989 and began offering manual transmissions primarily for linehaul trucks. By 1999, Meritor had obtained approximately 17% of the market for sales of HD transmissions, including 30% for linehaul transmissions. In mid-1999, Meritor and ZF Friedrichshafen ("ZF AG"), a leading supplier of HD transmissions in Europe, formed the joint venture ZF Meritor, and Meritor transferred its transmissions business into the joint venture.[3] Aside from Meritor, and then ZF Meritor, no significant external supplier of HD transmissions has entered the market in the past 20 years.[4]

One purpose of the ZF Meritor joint venture was to adapt ZF AG's two-pedal automated mechanical

---

[2] At trial, Eaton disputed that it was a monopolist, but on appeal, does not challenge the jury's finding that it possessed monopoly power in the HD transmissions market in North America.

[3] ZF AG is not a party to this lawsuit.

[4] "External" transmission sales do not include transmissions manufactured by Volvo Group for use in its own trucks.

transmission, ASTronic, which was used exclusively in Europe, for the North American market. The redesign and testing took 18 months, and ZF Meritor introduced the adapted ASTronic model into the North American market in 2001 under the new name FreedomLine. FreedomLine was the first two-pedal automated mechanical transmission to be sold in North America.[5] When FreedomLine was released, Eaton projected that automated mechanical transmissions would account for 30-50% of the market for all HD transmission sales by 2004 or 2005.

## 2. Eaton's Long-Term Agreements

In late 1999 through early 2000, the trucking industry experienced a 40-50% decline in demand for new heavy-duty trucks. Shortly thereafter, Eaton entered into new long-term agreements ("LTAs") with each OEM. Although long-term supply contracts were not uncommon in the industry, and were also utilized by Meritor in the 1990s, Eaton's new LTAs were unprecedented in terms of their length and coverage of the market. Eaton signed LTAs with every OEM, and each LTA was for a term of at least five years.

Although the LTAs' terms varied somewhat, the key provisions were similar. Each LTA included a conditional rebate provision, under which an OEM would only receive rebates if it purchased a specified percentage of its

---

[5] Eaton did not produce a two-pedal automated mechanical transmission at the time, and would not fully release one until 2004.

requirements from Eaton.[6]  Eaton's LTA with Freightliner, the largest OEM, provided for rebates if Freightliner purchased 92% or more of its requirements from Eaton.[7] Under Eaton's LTA with International, Eaton agreed to make an up-front payment of $2.5 million, and any additional rebates were conditioned on International purchasing 87% to 97.5% of its requirements from Eaton.  The PACCAR LTA provided for an up-front payment of $1 million, and conditioned rebates on PACCAR meeting a 90% to 95% market-share penetration target.  Finally, Eaton's LTA with Volvo provided for discounts if Volvo reached a market-share penetration level of 70% to 78%.[8]  The LTAs were not true

---

[6] We will refer to these as "market-share" discounts or "market-penetration" discounts.  It is important to distinguish such discounts from quantity or volume discounts.  Quantity discounts provide the buyer with a lower price for purchasing a specified minimum quantity or volume from the seller.  In contrast, market-share discounts grant the buyer a lower price for taking a specified minimum percentage of its purchases from the seller.  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 768, at 169 (3d ed. 2008).

[7] In 2003, Freightliner and Eaton modified the agreement from a fixed 92% goal to a sliding scale, which entitled Freightliner to different rebates at different market-penetration levels.

[8] The share penetration targets in the Volvo LTA were lower because Volvo also manufactured transmissions for use in its own trucks.  The commitment to Eaton, plus Volvo's

9

requirements contracts because they did not expressly require the OEMs to purchase a specified percentage of their needs from Eaton. However, the Freightliner and Volvo LTAs gave Eaton the right to terminate the agreements if the share penetration goals were not met. Additionally, if an OEM did not meet its market-share penetration target for one year, Eaton could require repayment of all contractual savings.

Each LTA also required the OEM to publish Eaton as the standard offering in its data book, and under two of the four LTAs, the OEM was required to remove competitors' products from its data book entirely. Freightliner agreed to exclusively publish Eaton transmissions in its data books through 2002, but reserved the right to publish ZF Meritor's FreedomLine through the life of the agreement. In 2002, Freightliner and Eaton revised the LTA to allow Freightliner to publish other competitors' transmissions, but the revised LTA provided that Eaton had the right to "renegotiate the rebate schedule" if Freightliner chose to publish a competitor's transmission. Subsequently, Freightliner agreed to a request by Eaton to remove FreedomLine from all of its data books. Eaton's LTA with International also required that International list exclusively Eaton transmissions in its electronic data book. International did, however, publish ZF Meritor's manual transmissions in its printed data book. The Volvo and PACCAR LTAs did not require that Eaton products be the exclusive offering, but did require that Eaton products be listed as the preferred offering. Both Volvo and

own manufactured products, accounted for more than 85% of Volvo's needs.

10

PACCAR continued to list ZF Meritor's products in their data books. In the 1990s, Meritor's products were listed in all OEM component data books, and in some cases, had preferred positioning.

The LTAs also required the OEMs to "preferential price" Eaton transmissions against competitors' equivalent transmissions. Eaton claims that it sought preferential pricing to ensure that its low prices were passed on to truck buyers. However, there were no express requirements in the LTAs that savings be passed on to truck buyers (i.e., that Eaton's prices be reduced) and there is evidence that the "preferential pricing" was achieved by both lowering the prices of Eaton's products and raising the prices of competitors' products. Eaton notes that it was "common" for price savings to be passed down to truck buyers, and a Volvo executive testified that some of the savings from Eaton products were passed down while others were kept to improve profit margins. Plaintiffs, however, emphasize that according to an email sent by Eaton to Freightliner, the Freightliner LTA required that ZF Meritor's products be priced at a $200 premium over equivalent Eaton products. Likewise, International agreed to an "artificial[] penal[ty]" of $150 on all of ZF Meritor's transmissions as of early 2003, and PACCAR imposed a penalty on customers who chose ZF Meritor's products.

Finally, each LTA contained a "competitiveness" clause, which permitted the OEM to purchase transmissions from another supplier if that supplier offered the OEM a lower price or a better product, the OEM notified Eaton of the competitor's offer, and Eaton could not match the price or quality of the product after good faith efforts. The parties

11

dispute the significance of the "competitiveness" clauses. Eaton maintains that Plaintiffs were free to win the OEMs' business simply by offering a better product or a lower price, while Plaintiffs argue and presented testimony from OEM officials that, due to Eaton's status as a dominant supplier, the competitiveness clauses were effectively meaningless.

### 3. Competition under the LTAs and Plaintiffs' Exit from the Market

After Eaton entered into its LTAs with the OEMs, ZF Meritor shifted its marketing focus from the OEM level to a strategy targeted at truck buyers. Also during this time period, both ZF Meritor and Eaton experienced quality and performance issues with their transmissions. For example, Eaton's Lightning transmission, which was an initial attempt by Eaton to compete with FreedomLine, was "not perceived as a good [product]" and was ultimately taken off the market. ZF Meritor's FreedomLine and "G Platform" transmissions required frequent repairs, and in 2002 and 2003, ZF Meritor faced millions of dollars in warranty claims.

During the life of the LTAs, the OEMs worked with Eaton to develop a strategy to combat ZF Meritor's growth. On Eaton's urging, the OEMs imposed additional price penalties on customers that selected ZF Meritor products, "force fed" Eaton products to customers, and sought to persuade truck fleets using ZF Meritor transmissions to shift to Eaton transmissions. At all times relevant to this case, Eaton's average prices were lower than Plaintiffs' average prices, and on several occasions, Plaintiffs declined to grant price concessions requested by OEMs. Although Eaton's

12

prices were generally lower than Plaintiffs' prices, Eaton never priced at a level below its costs.

By 2003, ZF Meritor determined that it was limited by the LTAs to no more than 8% of the market, far less than the 30% that it had projected at the beginning of the joint venture. ZF Meritor officials concluded that the company could not remain viable with a market share below 10% and therefore decided to dissolve the joint venture. After ZF Meritor's departure, Meritor remained a supplier of HD transmissions and became a sales agent for ZF AG to ensure continued customer access to the FreedomLine. However, Meritor's market share dropped to 4% by the end of fiscal year 2005, and Meritor exited the business in January 2007.

## B. Procedural History

On October 5, 2006, Plaintiffs filed suit against Eaton in the U.S. District Court for the District of Delaware, alleging that Eaton used unlawful agreements in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; acted unlawfully to maintain a monopoly, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and entered into illegal restrictive dealing agreements, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14. Specifically, Plaintiffs alleged that Eaton "used its dominant position to induce all heavy duty truck manufacturers to enter into *de facto* exclusive dealing contracts with Eaton," and that such agreements foreclosed Plaintiffs from over 90% of the market for HD transmission sales. Plaintiffs sought treble damages, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and

13

injunctive relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

On February 17, 2009, Plaintiffs' expert, Dr. David DeRamus ("DeRamus"), submitted a report on both liability and damages. On May 11, 2009, Eaton filed a motion, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude DeRamus's testimony. The District Court ruled that DeRamus would be allowed to testify regarding liability, but excluded DeRamus's testimony on the issue of damages on the basis that his damages opinion failed the reliability requirements of *Daubert* and the Federal Rules of Evidence. *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663 (D. Del. 2009). Plaintiffs filed a motion for clarification, requesting that DeRamus be allowed to testify to alternate damages calculations based on other data in his expert report, or in the alternative, seeking permission for DeRamus to amend his expert report to present his alternate damages calculations. The District Court decided to defer resolution of the damages issue and bifurcate the case.

The parties proceeded to trial on liability. On October 8, 2009, after a four-week trial, the jury returned a complete verdict for Plaintiffs, finding that Eaton had violated Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act. Following the verdict, Plaintiffs asked the District Court to set a damages trial, but no damages trial was set at that time. On October 30, 2009, Plaintiffs supplemented their earlier motion for clarification, incorporating additional arguments based on developments at trial.

14

On November 3, 2009, Eaton filed a renewed motion for judgment as a matter of law, or in the alternative, for a new trial. Eaton's principal argument was that Plaintiffs failed to establish that Eaton engaged in anticompetitive conduct because Plaintiffs did not show, nor did they attempt to show, that Eaton priced its transmissions below its costs. Sixteen months later, on March 10, 2011, the District Court denied Eaton's motion, reasoning that Eaton's prices were not dispositive, and that there was sufficient evidence for a jury to conclude that Eaton's conduct unlawfully foreclosed competition in a substantial portion of the HD transmissions market. *ZF Meritor LLC v. Eaton Corp.*, 769 F. Supp. 2d 684 (D. Del. 2011).

On August 4, 2011, the District Court denied Plaintiffs' motion for clarification, and denied Plaintiffs' request to allow DeRamus to amend his expert report to include alternate damages calculations. The same day, the District Court entered an order awarding Plaintiffs $0 in damages. On August 19, 2011, the District Court entered an injunction prohibiting Eaton from "linking discounts and other benefits to market penetration targets," but stayed the injunction pending appeal. Eaton filed a timely notice of appeal and Plaintiffs filed a timely cross-appeal.

## II.  JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1337. We have appellate jurisdiction under 28 U.S.C. § 1291.

15

We exercise plenary review over an order denying a motion for judgment as a matter of law. *LePage's Inc. v. 3M*, 324 F.3d 141, 145 (3d Cir. 2003) (en banc). A motion for judgment as a matter of law should be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Id.* at 145-46 (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). We review questions of law underlying a jury verdict under a plenary standard of review. *Id.* at 146 (citing *Bloom v. Consol. Rail Corp.*, 41 F.3d 911, 913 (3d Cir. 1994)). Underlying legal questions aside, "[a] jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict." *Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1265 (3d Cir. 1994).

We review a district court's decision to exclude expert testimony for abuse of discretion. *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 445 (3d Cir. 2003). To the extent the district court's decision involved an interpretation of the Federal Rules of Evidence, our review is plenary. *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000). We also review a district court's decisions regarding discovery and case management for abuse of discretion. *United States v. Schiff*, 602 F.3d 152, 176 (3d Cir. 2010); *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817-18 (3d Cir. 1982).

We review legal conclusions regarding standing de novo, and the underlying factual determinations for clear

16

error. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 253 (3d Cir. 2005).

## III.  DISCUSSION

### A.  Effect of the Price-Cost Test

The most significant issue in this case is whether Plaintiffs' allegations under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act are subject to the price-cost test or the "rule of reason" applicable to exclusive dealing claims.  Under the rule of reason, an exclusive dealing arrangement will be unlawful only if its "probable effect" is to substantially lessen competition in the relevant market. *Tampa Elec. Coal Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-29 (1961); *United States v. Dentsply Int'l*, 399 F.3d 181, 191 (3d Cir. 2005); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110 (3d Cir. 1992).  In contrast, under the price-cost test, to succeed on a challenge to the defendant's pricing practices, a plaintiff must prove "that the [defendant's] prices are below an appropriate measure of [the defendant's] costs." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993).[9]

---

[9] Although Plaintiffs brought claims under three statutes (Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act), our analysis regarding the applicability of the price-cost test is the same for all of Plaintiffs' claims. In order to establish an actionable antitrust violation, a plaintiff must show both that the defendant engaged in anticompetitive conduct and that the plaintiff suffered

17

antitrust injury as a result. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339-40 (1990). Because a lack of anticompetitive conduct precludes a finding of antitrust injury, the key question for us is whether Eaton engaged in anticompetitive conduct. *See id.* at 339 ("Antitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct.").

Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act each include an anticompetitive conduct element, although each statute articulates that element in a slightly different way. Under Section 1 of the Sherman Act, a plaintiff must establish that the defendant was a party to a contract, combination or conspiracy that "imposed an unreasonable restraint on trade." 15 U.S.C. § 1; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314-15 (3d Cir. 2010). Under Section 2, a plaintiff must demonstrate that the defendant willfully acquired or maintained its monopoly power in the relevant market. 15 U.S.C. § 2; *United States v. Grinnell Corp.*, 384 U.S. 564, 570-71 (1966). "A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits." *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (en banc) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985)). Finally, Section 3 of the Clayton Act makes it unlawful for a person to enter into an exclusive dealing contract where the effect of such an agreement is to substantially lessen competition or create a monopoly. 15 U.S.C. § 14.

18

Eaton urges us to apply the price-cost test, arguing that Plaintiffs failed to establish that Eaton engaged in anticompetitive conduct or that Plaintiffs suffered an antitrust injury because Plaintiffs did not prove—or even attempt to prove—that Eaton priced its transmissions below an appropriate measure of its costs. We decline to adopt Eaton's unduly narrow characterization of this case as a "pricing practices" case, i.e., a case in which price is the clearly predominant mechanism of exclusion. Plaintiffs consistently argued that the LTAs, in their entirety, constituted *de facto* exclusive dealing contracts, which improperly foreclosed a substantial share of the market, and thereby harmed competition. Accordingly, as we will discuss below, we must evaluate the legality of Eaton's conduct under the rule of reason to determine whether the "probable effect" of such conduct was to substantially lessen competition in the HD transmissions market in North America. *Tampa Elec.*, 365 U.S. at 327-29. The price-cost test is not dispositive.

### 1. Law of Exclusive Dealing

Exclusive dealing claims may be brought under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. *LePage's*, 324 F.3d at 157. Additionally, the Supreme Court has held that the price-cost test is not confined to any one antitrust statute, and applies to pricing practices claims under the Sherman Act, the Clayton Act, and the Robinson-Patman Act. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-23 (1993); *Atl. Richfield*, 495 U.S. at 339-40. Thus, regardless of which test applies, that test is applicable to each of Plaintiffs' claims.

19

An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time. Herbert Hovenkamp, *Antitrust Law* ¶ 1800a, at 3 (3d ed. 2011). The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition. *Dentsply*, 399 F.3d at 191. Generally, a prerequisite to any exclusive dealing claim is an agreement to deal exclusively. *Tampa Elec.*, 365 U.S. at 326-27; *see Dentsply*, 399 F.3d at 193-94; *Barr Labs.*, 978 F.2d at 110 & n.24.[10] An express exclusivity requirement, however, is not necessary, *LePage's*, 324 F.3d at 157, because we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement "in the real world." *Dentsply*, 399 F.3d at 191, 194. Thus, *de facto* exclusive dealing claims are cognizable under the antitrust laws. *LePage's*, 324 F.3d at 157.

Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition. *Race Tires Am., Inc. v. Hoosier Racing*

---

[10] Evidence of an agreement is expressly required under Section 1 of the Sherman Act and Section 3 of the Clayton Act. *See* 15 U.S.C. §§ 1 and 14. However, an agreement is not necessarily required under Section 2 of the Sherman Act, which can provide a vehicle for challenging a dominant firm's unilateral imposition of exclusive dealing on customers. *See* 15 U.S.C. § 2; Herbert Hovenkamp, *Antitrust Law* ¶ 1821a, at 183 (3d ed. 2011).

*Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("[I]t is widely recognized that in many circumstances, [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all.") (quoting *E. Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 8 (1st Cir. 2004)). For example, "[i]n the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand." *Standard Oil Co. v. United States*, 337 U.S. 293, 306 (1949). From the seller's perspective, an exclusive dealing arrangement with customers may reduce expenses, provide protection against price fluctuations, and offer the possibility of a predictable market. *Id.* at 306-07; *see also Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 n.17 (8th Cir. 1987) (explaining that exclusive dealing contracts can help prevent dealer free-riding on manufacturer-supplied investments to promote rival's products). As such, competition to be an exclusive supplier may constitute "a vital form of rivalry," which the antitrust laws should encourage. *Race Tires*, 614 F.3d at 83 (quoting *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004)).

However, "[e]xclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods[.]" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring), *abrogated on other grounds* by *Ill. Tool Works Inc. v. Indep.*

21

*Ink, Inc.*, 547 U.S. 28 (2006); *Barry Wright*, 724 F.2d at 236 (explaining that "under certain circumstances[,] foreclosure might discourage sellers from entering, or seeking to sell in, a market at all, thereby reducing the amount of competition that would otherwise be available").  Exclusive dealing arrangements are of special concern when imposed by a monopolist.  *See Dentsply*, 399 F.3d at 187 ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist.").  For example:

> [S]uppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival.  A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets.  Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, at 64 (2d ed. 2002).  In some cases, a dominant firm may be able to foreclose rival suppliers from a large enough portion of the market to deprive such rivals of the opportunity to achieve the minimum economies of scale necessary to compete.  *Id.*; *see LePage's*, 324 F.3d at 159.

Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason.  *Tampa Elec.*, 365 U.S. at 327.  The

22

legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition. *Id.* at 328; *Barr Labs.*, 978 F.2d at 110. In conducting this analysis, courts consider not only the percentage of the market foreclosed, but also take into account "the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *Barr Labs.*, 978 F.2d at 110-11 (quoting *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1251-52 n.75 (3d Cir. 1975)). As the Supreme Court has explained:

> [I]t is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Tampa Elec.*, 365 U.S. at 329. In other words, an exclusive dealing arrangement is unlawful only if the "probable effect" of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals. *Id.*; *Dentsply*, 399 F.3d at 191 ("The test [for determining anticompetitive effect] is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit.").

23

There is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant, *Tampa Elec.*, 365 U.S. at 329; *Race Tires*, 614 F.3d at 74-75; *LePage's*, 324 F.3d at 158, substantial foreclosure, *Tampa Elec.*, 365 U.S. at 327-28; *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001), contracts of sufficient duration to prevent meaningful competition by rivals, *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 81 (2d Cir. 1999); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997), and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects, *Race Tires*, 614 F.3d at 75; *Dentsply*, 399 F.3d at 194; *Barr Labs.*, 978 F.2d at 111. Courts will also consider whether there is evidence that the dominant firm engaged in coercive behavior, *Race Tires*, 614 F.3d at 77; *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1062 (3d Cir. 1978), and the ability of customers to terminate the agreements, *Dentsply*, 399 F.3d at 193-94. The use of exclusive dealing by competitors of the defendant is also sometimes considered. *Standard Oil*, 337 U.S. at 309, 314; *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007).

### 2. Brooke Group *and the Price-Cost test*

We turn now to some fundamental principles regarding predatory pricing claims and the price-cost test. "Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 117 (1986);

*see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n.8 (1986); *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1198 (3d Cir. 1995). The Supreme Court has expressed deep skepticism of predatory pricing claims. *See Cargill*, 479 U.S. at 121 n.17 ("Although the commentators disagree as to whether it is ever rational for a firm to engage in such conduct, it is plain that the obstacles to the successful execution of a strategy of predation are manifold, and that the disincentives to engage in such a strategy are accordingly numerous.") (citations omitted); *Matsushita*, 475 U.S. at 589 ("[P]redatory pricing schemes are rarely tried, and even more rarely successful.") (citations omitted). In the typical predatory pricing scheme, a firm reduces the sale price of its product to below-cost, intending to drive competitors out of the business. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318 (2007). Then, once competitors have been eliminated, the firm raises its prices to supracompetitive levels. *Id.* For such a scheme to make economic sense, the firm must recoup the losses suffered during the below-cost phase in the supracompetitive phase. *Id.*; *see Matsushita*, 475 U.S. at 589 (explaining that success under such a scheme is "inherently uncertain" because the firm must sustain definite short-term losses, but the long-run gain depends on successfully eliminating competition).

In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. at 222-24, the Supreme Court fashioned a two-part test that reflected this "economic reality." *Weyerhaeuser*, 549 U.S. at 318. The Court held that, to succeed on a predatory pricing claim, the plaintiff must

prove: (1) "that the prices complained of are below an appropriate measure of [the defendant's] costs"; and (2) that the defendant had "a dangerous probability . . . of recouping its investment in below-cost prices." *Brooke Grp.*, 509 U.S. at 222-24 (citations omitted). We are concerned only with the first requirement, which has become known as the price-cost test. In adopting the price-cost test, the Court rejected the notion that above-cost prices that are below general market levels or below the costs of a firm's competitors are actionable under the antitrust laws. *Id.* at 223. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels [i.e., above-cost], they do not threaten competition." *Id.* (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990)). Low, but above-cost, prices are generally procompetitive because "the exclusionary effect of prices above a relevant measure of cost [generally] reflects the lower cost structure of the alleged predator, and so represents competition on the merits[.]" *Id.*; *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for 'the protection of competition, not competitors.'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). The Court acknowledged that there may be situations in which above-cost prices are anticompetitive, but stated that it "is beyond the practical ability of a judicial tribunal" to ascertain whether above-cost pricing is anticompetitive "without courting intolerable risks of chilling legitimate price-cutting." *Brooke Grp.*, 509 U.S. at 223 (citing Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 714.2, 714.3 (Supp. 2002)). "To hold that the antitrust laws protect competitors from the loss of profits due to [above-cost] price competition

26

would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result." *Id.* (quoting *Cargill*, 479 U.S. at 116). Significantly, because "[c]utting prices in order to increase business often is the very essence of competition . . . , [i]n cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are 'especially costly, because they chill the very conduct that antitrust laws are designed to protect.'" *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009) (quoting *Matsushita*, 475 U.S. at 594) (additional citations omitted).

### 3. Effect of the Price-Cost Test on Plaintiffs' Exclusive Dealing Claims

Eaton argues that principles from the predatory pricing case law apply in this case because Plaintiffs' claims are, at their core, no more than objections to Eaton offering prices, through its rebate program, which Plaintiffs were unable to match. Eaton contends that Plaintiffs have identified nothing, other than Eaton's pricing practices, that incentivized the OEMs to enter into the LTAs, and because price was the incentive, we must apply the price-cost test. We acknowledge that even if a plaintiff frames its claim as one of exclusive dealing, the price-cost test may be dispositive. Implicit in the Supreme Court's creation of the price-cost test was a balancing of the procompetitive justifications of above-cost pricing against its anticompetitive effects (as well as the anticompetitive effects of allowing judicial inquiry into above-cost pricing), and a conclusion that the balance always tips in favor of allowing above-cost pricing practices to stand. *See linkLine*, 555 U.S. at 451; *Brooke Grp.*, 509 U.S. at 223.

27

Thus, in the context of exclusive dealing, the price-cost test may be utilized as a specific application of the "rule of reason" when the plaintiff alleges that price is the vehicle of exclusion. *See, e.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060-63 (8th Cir. 2000).

Here, Eaton argues that the price-cost test is dispositive, and therefore that Plaintiffs' claims must fail because Plaintiffs failed to show that the market-share rebates offered by Eaton pursuant to the LTAs resulted in below-cost prices. We do not disagree that predatory pricing principles, including the price-cost test, would control if this case presented solely a challenge to Eaton's pricing practices.[11]

---

[11] Despite the arguments of *amicus curiae*, the American Antitrust Institute, our decision in *LePage's v. 3M* does not indicate otherwise. In *LePage's*, we declined to apply the price-cost test to a challenge to a bundled rebate scheme, reasoning that such a scheme was better analogized to unlawful tying than to predatory pricing. *See* 324 F.3d at 155. In that case, the plaintiff (LePage's) was the market leader in sales of "private label" (store brand) transparent tape. *Id.* at 144. As LePage's market share fell, it brought suit against 3M, alleging that 3M, which manufactured Scotch tape, some private label tape, and a number of other products, leveraged its monopoly power over Scotch brand tape and other products to monopolize the private label tape market. *Id.* at 145. Specifically, LePage's challenged 3M's multi-tiered bundled rebate program, which offered progressively higher rebates when customers increased purchases across 3M's different product lines. *Id.* The rebate

programs also set customer-specific target growth rates. *Id.* at 154. The sizes of the rebates were linked to the number of product lines in which the targets were met; if a customer failed to meet the target for any one product, it would lose the rebates across all product lines. *Id.* LePage's could not offer these discounts because it did not sell the same diverse array of products as 3M. *Id.* at 155.

Relying on *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), 3M argued that its bundled rebate program was lawful because the rebates never resulted in below-cost pricing. We disagreed, reasoning that the principal anticompetitive effect of 3M's bundled rebates was analogous to an unlawful tying arrangement: when offered by a monopolist, the rebates "may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." *LePage's*, 324 at 155.

For several reasons, we interpret *LePage's* narrowly. Most important, in light of the analogy drawn in *LePage's* between bundled rebates and unlawful tying, which "cannot exist unless two separate product markets have been linked," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984), *abrogated on other grounds* by *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006), *LePage's* is inapplicable where, as here, only one product is at issue and the plaintiffs have not made any allegations of bundling or tying. The reasoning of *LePage's* is limited to cases in which a single-product producer is excluded through a bundled rebate

29

program offered by a producer of multiple products, which conditions the rebates on purchases across multiple different product lines. Accordingly, we join our sister circuits in holding that the price-cost test applies to market-share or volume rebates offered by suppliers within a single-product market. *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 452 (6th Cir. 2007); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1061 (8th Cir. 2000); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983).

Additionally, several of the bases on which we distinguished *Brooke Group* have been undermined by intervening Supreme Court precedent, which counsels caution in extending *LePage's*. For example, we indicated in *LePage's*, 324 F.3d at 151, that *Brooke Group* might be confined to the Robinson-Patman Act, but the Supreme Court has made clear that the standard adopted in *Brooke Group* also applies to predatory pricing claims under the Sherman Act. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318 n.1 (2007). Additionally, *LePage's*, 324 F.3d at 151-52, suggested that *Brooke Group* is not applicable in cases involving monopolists, but the Supreme Court has since applied *Brooke Group*'s price-cost test to claims against a monopolist, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009), and a monopsonist, *Weyerhaeuser*, 549 U.S. at 320-25. Finally, we observed in *LePage's* that, in the years following *Brooke Group*, the Supreme Court had only cited the case four times (and for unrelated propositions), but since *LePage's*, the Court has reaffirmed and extended *Brooke Group*. *See*

30

The lesson of the predatory pricing case law is that, generally, above-cost prices are not anticompetitive, and although there may be rare cases where above-cost prices are anticompetitive in the long run, it is "beyond the practical ability" of courts to identify those rare cases without creating an impermissibly high risk of deterring legitimate procompetitive behavior (i.e., price-cutting). *linkLine*, 555 U.S. at 452; *Weyerhaeuser*, 549 U.S. at 318-19; *Brooke Grp.*, 509 U.S. at 223. These principles extend to above-cost discounting or rebate programs, which condition the discounts or rebates on the customer's purchasing of a specified volume or a specified percentage of its requirements from the seller. *See NicSand*, 507 F.3d at 451-52 (applying price-cost test to a challenge to up-front payments offered by a supplier to several large retailers on the basis that such payments were "nothing more than 'price reductions offered to the buyers for the exclusive right to supply a set of stores under multi-year contracts'"); *Concord Boat*, 207 F.3d at 1060-63 (applying price-cost test to volume discounts and market-share discounts offered by a manufacturer); *Barry Wright*, 724 F.2d at 232 (applying the price-cost test to uphold discounts linked to a requirements contract); *see also*

---

*linkLine*, 555 U.S. at 447-48; *Weyerhaeuser*, 549 U.S. at 325. In doing so, the Court emphasized the importance of *Brooke Group* in light of "developments in economic theory and antitrust jurisprudence," and downplayed the significance of seemingly inconsistent circuit court antitrust precedent from the 1950s and 1960s, some of which we referenced in *LePage's. See linkLine*, 555 U.S. at 452 n.3.

*Race Tires*, 614 F.3d at 79 ("[I]t is no more an act of coercion, collusion, or [other anticompetitive conduct] for [a supplier] . . . to offer more money to [a customer] than it is for such [a] supplier[] to offer the lowest . . . prices.").

Moreover, a plaintiff's characterization of its claim as an exclusive dealing claim does not take the price-cost test off the table. Indeed, contracts in which discounts are linked to purchase (volume or market share) targets are frequently challenged as *de facto* exclusive dealing arrangements on the grounds that the discounts induce customers to deal exclusively with the firm offering the rebates. Hovenkamp ¶ 1807a, at 132. However, when price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects. *See Brooke Grp.*, 509 U.S. at 223; *Concord Boat*, 207 F.3d at 1062 (noting that there is always a legitimate business justification for lowering prices: attempting to attract additional business).

In each of the cases relied upon by Eaton, the Supreme Court applied the price-cost test, regardless of the way in which the plaintiff cast its grievance, because pricing itself operated as the exclusionary tool. For example, in *Cargill, Inc. v. Monfort of Colorado, Inc.*, the plaintiff argued that a proposed merger between vertically integrated firms violated Section 7 of the Clayton Act because the result of the merger would have been to substantially lessen competition or create a monopoly. 479 U.S. at 114. The plaintiff offered, as a theory of antitrust injury, that it faced a threat of lost profits stemming from the possibility that the defendant, after the

32

merger, would lower its prices to a level at or above-cost. *Id.* at 114-15. The plaintiff claimed that it would have to respond by lowering its prices, which would cause it to suffer a loss in profitability. *Id.* at 115. The Supreme Court held that such a theory did not present a cognizable antitrust injury, reasoning that "the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued [above-cost] competition." *Id.* at 116.

*Atlantic Richfield Co. v. USA Petroleum Co.* involved an allegation that a vertical price-fixing agreement was unlawful under Section 1 of the Sherman Act. 495 U.S. at 331. In that case, the plaintiff was an independent retail marketer of gasoline, which bought gasoline from major petroleum companies for resale under its own name. *Id.* The defendant was an integrated oil company, which sold directly to consumers through its own stations, and sold indirectly through brand dealers. *Id.* Facing competition from independent marketers like the plaintiff, the defendant adopted a new marketing strategy, under which it encouraged its dealers to match the retail prices offered by independents by offering discounts and reducing the dealers' costs. *Id.* at 331-32. The plaintiff brought suit under the Sherman Act, alleging that the defendant conspired with its dealers to sell gasoline at below-market levels. *Id.* at 332. The district court granted summary judgment for the defendant on the basis that the plaintiff had not shown that the defendant engaged in predatory pricing, and thus had not shown any antitrust injury. *Id.* at 333. The U.S. Court of Appeals for the Ninth Circuit reversed, *USA Petroleum Co. v. Atl. Richfield Co.*, 859 F.2d 687, 693 (9th Cir. 1988), reasoning that a showing

of predatory pricing was not necessary to establish antitrust injury; rather, the antitrust laws were designed to ensure that market forces alone determine what goods and services are offered, and at what price they are sold, and thus, an antitrust injury could result from a disruption in the market. The Supreme Court disagreed, explaining that where a firm (or a group of firms) lowers prices pursuant to a vertical agreement, but maintains those prices above predatory levels, any business lost by rivals cannot be viewed as an anticompetitive consequence of the agreement. *Atl. Richfield*, 495 U.S. at 337. "A firm complaining about the harm it suffers from nonpredatory price competition is really claiming that it is unable to raise prices." *Id.* at 337-38.

In *Brooke Group*, the plaintiff and the defendant were competitors in the cigarette market in the early 1980s. 509 U.S. at 212. At that time, demand for cigarettes in the United States was declining and the plaintiff, once a major force in the industry, had seen its market share drop to 2%. *Id.* at 214. In response, the plaintiff developed a line of generic cigarettes, which were significantly cheaper than branded cigarettes. *Id.* The plaintiff promoted the generic cigarettes at the wholesale level by offering rebates that increased with the volume of cigarettes ordered. *Id.* Losing volume and profits on its branded products, the defendant entered the generic cigarette market. *Id.* at 215. At the retail level, the suggested price of the defendant's generic cigarettes was the same as that of the plaintiff's cigarettes, but the defendant's volume discounts to wholesalers were larger. *Id.* The plaintiff responded by increasing its wholesale rebates, and a price war ensued. *Id.* at 216. Subsequently, the plaintiff filed

34

a complaint against the defendant under the Robinson-Patman Act, 15 U.S.C. § 13(a), alleging that the defendant's volume rebates amounted to unlawful price discrimination. *Id.* The plaintiff explained that it would have been unable to reduce its wholesale rebates without losing substantial market share. *Id.* Accordingly, because the "essence" of the plaintiff's claim was that its "rival ha[d] priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market," the plaintiff had an obligation to show that the defendant's prices were below its costs. *Id.* at 222.

Here, in contrast to *Cargill*, *Atlantic Richfield*, and *Brooke Group*, Plaintiffs did not rely solely on the exclusionary effect of Eaton's prices, and instead highlighted a number of anticompetitive provisions in the LTAs. Plaintiffs alleged that Eaton used its position as a supplier of necessary products to persuade OEMs to enter into agreements imposing *de facto* purchase requirements of roughly 90% for at least five years, and that Eaton worked in concert with the OEMs to block customer access to Plaintiffs' products, thereby ensuring that Plaintiffs would be unable to build enough market share to pose any threat to Eaton's monopoly. Therefore, because price itself was not the clearly predominant mechanism of exclusion, the price-cost test cases are inapposite, and the rule of reason is the proper framework within which to evaluate Plaintiffs' claims.

We recognize that Eaton's rebates were part of Plaintiffs' case. DeRamus testified about the exclusionary effect of the rebates, OEM officials testified that Eaton offered lower prices, and Plaintiffs' counsel stated in oral

35

argument that part of the reason ZF Meritor could not increase sales above a certain level was that "the OEMs were trying to hit those [share-penetration] targets to get their money from Eaton." Eaton's post-rebate prices were attractive to the OEMs, and Eaton's low prices may, in fact, have been an inducement for the OEMs to enter into the LTAs. That fact is not irrelevant, as it may help explain why the OEMs agreed to otherwise unfavorable terms and it may help to rebut an argument that the agreements were inefficient. Hovenkamp ¶ 1807b, at 134. However, contrary to Eaton's assertions, that fact is not dispositive.

Plaintiffs presented considerable evidence that Eaton was a monopolist in the industry and that it wielded its monopoly power to effectively force every direct purchaser of HD transmissions to enter into restrictive long-term agreements, despite the inclusion in such agreements of terms unfavorable to the OEMs and their customers. Significantly, there was considerable testimony that the OEMs did not want to remove ZF Meritor's transmissions from their data books, but that they were essentially forced to do so or risk financial penalties or supply shortages. Several OEM officials testified that exclusive data book listing was not a common practice in the industry and, in fact, it was probably detrimental to customers. An email between Freightliner employees stated: "From a customer perspective, publishing [ZF Meritor's] product is probably the right thing to do and [it] should never have been taken out of the book. It is a good product with considerable demand in the marketplace." The email went on to conclude, however, that including ZF Meritor's products would not be "prudent" because it would jeopardize

36

Freightliner's relationship with Eaton. Eaton itself even acknowledged that the OEMs were dissatisfied. Internal Eaton correspondence reveals that PACCAR complained that the LTAs were preventing it from promoting a competitive product (FreedomLine), which was being demanded by truck buyers. In fact, PACCAR felt that Eaton was holding it "hostage."

Plaintiffs also introduced evidence that not only were the rebates conditioned on the OEMs meeting the market penetration targets, but so too was Eaton's continued compliance with the agreements. As one OEM executive testified, if the market penetration targets were not met, the OEMs "would have a big risk of cancellation of the contract, price increases, and shortages if the market [was] difficult." Eaton was a monopolist in the HD transmissions market, and even if an OEM decided to forgo the rebates and purchase a significant portion of its requirements from another supplier, there would still have been a significant demand from truck buyers for Eaton products. Therefore, losing Eaton as a supplier was not an option.

Accordingly, this is not a case in which the defendant's low price was the clear driving force behind the customer's compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price. *Compare Concord Boat*, 207 F.3d at 1063 (in deciding to apply price-cost test, noting that customers were free to walk away at any time and did so when the defendant's competitors offered better discounts), *with Dentsply*, 399 F.3d at 189-96 (applying exclusive dealing analysis where the defendant threatened to refuse to continue

37

dealing with customers if customers purchased rival's products, and no customer could stay in business without the defendant's products).  Rather, Plaintiffs introduced evidence that compliance with the market penetration targets was mandatory because failing to meet such targets would jeopardize the OEMs' relationships with the dominant manufacturer of transmissions in the market.  *See Dentsply*, 399 F.3d at 194 (noting that "[t]he paltry penetration in the market by competitors over the years has been a refutation of" the theory that a competitor could steal the defendant's customers by offering a better deal or a lower price "by tangible and measurable results in the real world"); *id.* at 195 (explaining that an exclusivity policy imposed by a dominant firm is especially troubling where it presents customers with an "all-or-nothing" choice).

Although the Supreme Court has created a safe harbor for above-cost discounting, it has not established a *per se* rule of non-liability under the antitrust laws for *all* contractual practices that involve above-cost pricing.  *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2007) (stating that the Supreme Court's predatory pricing decisions have not "go[ne] so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct[,] the plaintiff must prove that those prices were below cost").  Nothing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful.  We decline to impose such an unduly simplistic and mechanical rule because to do so would place a significant portion of

anticompetitive conduct outside the reach of the antitrust laws without adequate justification.

"[T]he means of illicit exclusion, like the means of legitimate competition, are myriad." *Microsoft*, 253 F.3d at 58; *LePage's*, 324 F.3d at 152 ("'Anticompetitive conduct' can come in too many different forms, and is too dependent on context, for any court or commentator ever to have enumerated all the varieties.") (quoting *Caribbean Broad Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). The law has long recognized forms of exclusionary conduct that do not involve below-cost pricing, including unlawful tying, *Jefferson Parish*, 446 U.S. at 21; *Standard Oil*, 337 U.S. at 305-06, enforcement of a legal monopoly provided by a patent procured through fraud, *LePage's*, 324 F.3d at 152 (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965)), refusal to deal, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601-02 (1985); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973), exclusive dealing, *Tampa Electric*, 365 U.S. at 327; *Dentsply*, 399 F.3d at 184, and other unfair tortious conduct targeting competitors, *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002); *Int'l Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980).

Despite Eaton's arguments to the contrary, we find nothing in the Supreme Court's recent predatory pricing decisions to indicate that the Court intended to overturn decades of other precedent holding that conduct that does not result in below-cost pricing may nevertheless be anticompetitive. Rather, as we explained above, *Brooke*

39

*Group* and the cases preceding it each involved an allegation that the defendant's pricing itself operated as the exclusionary tool. *See Brooke Grp.*, 509 U.S. at 212-22; *Atl. Richfield*, 495 U.S. at 331-38; *Cargill*, 409 U.S. at 114-16. Eaton places particular emphasis on two recent cases, arguing that such cases demonstrate the Supreme Court's willingness to extend the price-cost test beyond the traditional predatory pricing context. However, neither of these cases suggests that the price-cost test applies to the exclusive dealing claims at issue in our case.

In *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. at 315, 320, the Supreme Court applied the price-cost test to a case involving an allegation of predatory bidding by a monopsonist.[12] In a predatory bidding scheme, a purchaser of inputs bids up the market price of a critical input to such high levels that rival buyers cannot survive, and as a result acquires or maintains monopsony power. *Id.* Then, "if all goes as planned," once rivals have been driven out, the predatory bidder will reap monopsonistic profits to offset the losses that it suffered during the high-bidding stage. *Id.* at 321. Therefore, the Court explained, predatory pricing and predatory bidding claims are "analytically similar." *Id.* "Both claims involve the

---

[12] Monopsony power is market power on the buy (or input) side of the market. *Weyerhaeuser*, 549 U.S. at 320. "As such, a monopsony is to the buy side of the market what a monopoly is to the sell side[.]" *Id.* (citing Roger Blair & Jeffrey Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 301, 320 (1991)).

deliberate use of unilateral pricing measures for anticompetitive purposes." *Id.* at 322. Moreover, the Court noted, bidding up input prices, like lowering costs, is often "the very essence of competition." *Id.* at 323 (citing *Brooke Grp.*, 509 U.S. at 226). "Just as sellers use output prices to compete for purchasers, buyers use bid prices to compete for scarce inputs. There are myriad legitimate reasons—ranging from benign to affirmatively procompetitive—why a buyer might bid up input prices." *Id.* Furthermore, high bidding will often benefit consumers because it will likely lead to the firm's acquisition of more inputs, which will generally lead to the manufacture of more outputs, and an increase in outputs generally results in lower prices for consumers. *Id.* at 324. Accordingly, the Supreme Court adopted a variation of the price-cost test for allegations of predatory bidding: "[a] plaintiff must prove that the alleged predatory bidding led to below-cost pricing of the predator's outputs." *Id.* at 325. In other words, the firm's predatory bidding must have caused the cost of the relevant output to increase above the revenues generated by the sale of such output. *Id.*

In *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, the Supreme Court relied, in part, on the price-cost test to hold that the plaintiffs' price-squeezing claim was not cognizable under the Sherman Act. 555 U.S. at 457. In that case, the plaintiffs alleged that the defendant, an integrated firm that sold inputs at wholesale and sold finished goods at retail, drove its competitors out of the market by raising the wholesale price while simultaneously lowering the retail price. *Id.* at 442. The Court held that, pursuant to *Verizon Communications Inc. v. Trinko, LLP*, 540 U.S. at

41

409-10, the wholesale claim was not cognizable because the defendant had no antitrust duty to deal with its competitors at the wholesale level, and pursuant to *Brooke Group*, the retail claim was not cognizable because the defendant's retail prices were above cost. *linkLine*, 555 U.S. at 457. As to the retail claim, the Court explained that "recognizing a price-squeeze claim where the defendant's retail price remains above cost would invite the precise harm" the price-cost test was designed to avoid: a firm might refrain from aggressive price competition to avoid potential antitrust liability. *Id.* at 451-52. Recognizing that the plaintiffs were trying to combine two non-cognizable claims into a new form of antitrust liability, the Court explained that "[t]wo wrong claims do not make one that is right." *Id.* at 457.

Contrary to Eaton's argument, neither *Weyerhaeuser* nor *linkLine* stands for the proposition that the price-cost test applies here. *Weyerhaeuser* established the straightforward principle that the exercise of market power on prices for the purpose of driving out competitors should be judged by the same standard, whether such power is exercised on the input or output side of the market. *See* 549 U.S. at 321, 325. And *linkLine* did no more than hold that two antitrust theories cannot be combined to form a new theory of antitrust liability. *See* 555 U.S. at 457. The plaintiffs' retail-level claim in *linkLine* was a traditional pricing practices claim, and therefore indistinguishable from the pricing practices claims

in *Brooke Group*, *Atlantic Richfield*, and *Cargill*.  555 U.S. at 451-52, 457.[13]

---

[13] Eaton also relies heavily on the Supreme Court's statement in *Atlantic Richfield v. USA Petroleum Co.* that price-cost principles apply "regardless of the type of antitrust claim involved."  495 U.S. at 340.  When read in context, however, it is clear that this statement means that the price-cost test applies regardless of the statute under which a pricing practices claim is brought, not that the price-cost applies regardless of the type of anticompetitive conduct.

In *Atlantic Richfield*, the plaintiffs argued that no showing of below-cost pricing was required to establish antitrust injury for a claim of illegal price-fixing under Section 1 of the Sherman Act because the price agreement itself was illegal, and any losses that stem from such an agreement, by definition, flow from that which makes the defendant's conduct unlawful.  *Id.* at 338.  The Supreme Court rejected that argument, reasoning that although price-fixing is unlawful under Section 1, a plaintiff does not suffer antitrust injury unless it is adversely affected by an anticompetitive aspect of the defendant's conduct, and "in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect."  *Id.* at 339 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977)) (additional citations omitted).  It was in this in context, in rejecting an argument that Section 1 was somehow exempt from the price-cost test, that the Supreme Court made the broad statement that it has "adhered to . . . [price-cost]

43

In contrast to the price-cost test line of cases, here, Plaintiffs do not allege that price itself functioned as the exclusionary tool. As such, we conclude that the price-cost test is not adequate to judge the legality of Eaton's conduct. Although prices are unlikely to exclude equally efficient rivals unless they are below-cost, exclusive dealing arrangements can exclude equally efficient (or potentially equally efficient) rivals, and thereby harm competition, irrespective of below-cost pricing. *See Dentsply*, 399 F.3d at 191. Where, as here, a dominant supplier enters into *de facto* exclusive dealing arrangements with every customer in the

principle[s] regardless of the type of antitrust claim involved." *See id.* at 340.

The Court's discussion following this statement supports our interpretation. The Court went on to explain that, for purposes of determining whether a plaintiff has suffered antitrust injury in a pricing practices case, Section 1 is no different than, for example, the plaintiff's allegation in *Cargill, Inc. v. Monfort of Colorado, Inc.* that the defendants' unlawful merger under Section 7 of the Clayton Act caused antitrust injury. *Id.* at 340 (citing *Cargill*, 479 U.S. at 116) ("To be sure, the source of the price competition in the instant case was an agreement allegedly unlawful under § 1 of the Sherman Act rather than a merger in violation of § 7 of the Clayton Act. But that difference is not salient."). Moreover, *Atlantic Richfield* was decided before *LePage's* and we did not interpret the "regardless of the type of antitrust claim involved" language as mandating the application of the price-cost test to 3M's bundled rebates.

market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand. *See id.* at 191, 194. Therefore, Eaton's attempt to characterize this case as a pricing practices case, subject to the price-cost test, is unavailing. We hold that, instead, the rule of reason from *Tampa Electric* and its progeny must be applied to evaluate Plaintiffs' claims.

## B. Proof of Anticompetitive Conduct and Antitrust Injury

We turn now to Eaton's contention that even leaving aside the price-cost test, Plaintiffs failed to prove that Eaton's LTAs were anticompetitive or that they caused antitrust injury to Plaintiffs. The rule of reason governs Plaintiffs' claims under Section 1 and Section 2 of the Sherman Act, and Section 3 of the Clayton Act. *See LePage's*, 324 F.3d at 157 & n.10 (explaining that exclusive dealing claims are cognizable under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, and evaluated under the same rule of reason); *see also* Section III.A, *supra*, at n.9. Under the rule of reason, an exclusive dealing arrangement is anticompetitive only if its "probable effect" is to substantially lessen competition in the relevant market, rather than merely disadvantage rivals. *Tampa Elec.*, 365 U.S. at 328-29.

In addition to establishing a statutory violation, a plaintiff must demonstrate that it suffered antitrust injury. *Race Tires*, 614 F.3d at 75. To establish antitrust injury, the plaintiff must demonstrate: "(1) harm of the type the antitrust

45

laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Id.* at 76 (quoting *Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993)) (additional citation omitted).

Our inquiry on appeal has several components. First, we examine whether the LTAs could reasonably be viewed as exclusive dealing arrangements, despite the fact that the LTAs covered less than 100% of the OEMs' purchase requirements and contained no express exclusivity provisions. Second, because the unique characteristics of the HD transmissions market bear heavily on our inquiry, we review Eaton's monopoly power, the concentrated nature of the market, and the ability of a monopolist in Eaton's position to engage in coercive conduct. Third, we discuss the anticompetitive effects of the various provisions in the LTAs, and consider Eaton's procompetitive justifications for the agreements. Finally, we consider whether Plaintiffs established that they suffered antitrust injury as a result of Eaton's conduct.

### *1.* De Facto *Partial Exclusive Dealing*

A threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing. Eaton argues that Plaintiffs' claims must fail because the LTAs were not "true" exclusive dealing arrangements in that they did not contain express exclusivity requirements, nor did they cover 100% of the OEMs' purchases. Neither contention is persuasive because *de facto* partial exclusive dealing

46

arrangements may, under certain circumstances, be actionable under the antitrust laws.[14]

First, the law is clear that an express exclusivity requirement is not necessary because *de facto* exclusive dealing may be unlawful. *Tampa Elec.*, 365 U.S. at 326; *Dentsply*, 399 F.3d at 193; *LePage's*, 324 F.3d at 157. For example, in *United States v. Dentsply International, Inc.*, we held that transactions which were "technically only a series of independent sales" could form the basis for an exclusive dealing claim because the large share of the market held by the defendant and its conduct in excluding competitors, "realistically made the arrangements . . . as effective as those in written contracts." 399 F.3d at 193 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 n.9 (1984)). Likewise, in *LePage's*, we held that bundled rebates and discounts offered to major suppliers were designed to and did

---

[14] Our dissenting colleague objects to the phrase "de facto partial exclusive dealing" as constituting a creative neologism that "distorts the English language" and infrequently appears in a search of an online legal database. Dissenting Op., Part II. "De facto partial exclusive dealing" is certainly a neologism, but it also accurately represents that an exclusive dealing claim does not require a contract that imposes an express exclusivity obligation, *Tampa Elec.*, 365 U.S. at 326; *Dentsply*, 399 F.3d at 193; *LePage's*, 324 F.3d at 157, nor a contract that covers 100% of the buyer's needs, *Tampa Elec.*, 365 U.S. at 328 ("[T]he competition foreclosed by the contract must be found to constitute a *substantial share* of the relevant market.") (emphasis added).

operate as exclusive dealing arrangements, despite the lack of any express exclusivity requirements. 324 F.3d at 157-58.

Here, there was sufficient evidence from which a jury could infer that, although the LTAs did not expressly require the OEMs to meet the market penetration targets, the targets were as effective as mandatory purchase requirements. *See Tampa Elec.,* 365 U.S. at 326 (noting that "even though a contract does 'not contain specific agreements not to use the (goods) of a competitor,' if 'the practical effect is to prevent such use,' it comes within the condition of [Section 3] as to exclusivity") (citing *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 457 (1922)); *Dentsply*, 399 F.3d at 193-94. Evidence presented at trial indicated that not only were lower prices (rebates) conditioned on the OEMs meeting the market-share targets, but so too was Eaton's continued compliance with the LTAs. For example, Eaton's LTAs with Freightliner, the largest OEM, and Volvo explicitly gave Eaton the right to terminate the agreements if the market-share targets were not met. And despite the fact that Eaton did not actually terminate the agreements on the rare occasion when an OEM failed to meet its target, the OEMs believed that it might.[15] Critically, due to Eaton's position as the dominant supplier, no OEM could satisfy customer demand without at least some Eaton products, and therefore no OEM could afford to lose Eaton as a supplier. Accordingly, we agree with the District Court that a jury could have concluded

---

[15] In 2003, for example, PACCAR failed to meet its market penetration target, and although Eaton withdrew all contractual savings, it did not terminate the agreement.

that, under the circumstances, the market penetration targets were as effective as express purchase requirements "because no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market." *ZF Meritor*, 769 F. Supp. 2d at 692.

Second, an agreement does not need to be 100% exclusive in order to meet the legal requirements of exclusive dealing. We acknowledge that "partial" exclusive dealing is rarely a valid antitrust theory. *See Barr Labs.*, 978 F.2d at 110 n.24 ("An agreement affecting less than all purchases does not amount to true exclusive dealing.") (citation omitted); *Concord Boat*, 207 F.3d at 1044, 1062-63 (noting that the defendant's discount program, which conditioned incremental discounts on customers purchasing 60-80% of their needs from the defendant, did not constitute exclusive dealing because customers were not required to purchase all of their requirements from the defendant, and in fact, could purchase up to 40% of their requirements from other sellers without foregoing the discounts); *Magnus Petroleum Co. v. Skelly Oil Co.*, 599 F.2d 196, 200-01 (7th Cir. 1979) (holding that contract requiring buyer to purchase a fixed quantity of goods that amounted to roughly 60-80% of its needs was not unlawful "[b]ecause the agreements contained no exclusive dealing clause and did not require [the buyer] to purchase any amounts of [the defendant's product] that even approached [its] requirements") (citations omitted). Partial exclusive dealing agreements such as partial requirements contracts and contracts stipulating a fixed dollar or quantity amount are generally lawful because market foreclosure is only partial, and competing sellers are not prevented from selling to the

49

buyer. *See Concord Boat*, 207 F.3d at 1062-63; *Magnus Petroleum*, 599 F.2d at 200-01.

However, we decline to adopt Eaton's view that a requirements contract covering less than 100% of the buyer's needs can *never* be an unlawful exclusive dealing arrangement. *See Eastman Kodak*, 504 U.S. at 466-67 ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."). "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns*, 540 U.S. at 411. Therefore, just as "total foreclosure" is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer. *See Dentsply*, 399 F.3d at 191. The legality of such an arrangement ultimately depends on whether the agreement foreclosed a substantial share of the relevant market such that competition was harmed. *Tampa Elec.*, 365 U.S. at 326-28.

In our case, although the market-share targets covered less than 100% of the OEMs' needs, a jury could nevertheless find that the LTAs unlawfully foreclosed competition in a substantial share of the HD transmissions market. *See id.* There are only four direct purchasers of HD transmissions in North America, and Eaton, long the dominant supplier in the industry, entered into long-term agreements with each of them. *Compare Concord Boat*, 207 F.3d at 1044 (noting the defendant was the market leader, but there were at least ten other competing manufacturers). Each LTA imposed a market-penetration target of roughly 90% (with the exception of Volvo, which manufactured some of its own transmissions

50

for use in its own trucks), which we explained above, could be viewed as a requirement that the OEM purchase that percentage of its requirements from Eaton. Although no agreement was completely exclusive, the foreclosure that resulted was no different than it would be in a market with many customers where a dominant supplier enters into complete exclusive dealing arrangements with 90% of the customer base. Under such circumstances, the lack of complete exclusivity in each contract does not preclude Plaintiffs' *de facto* exclusive dealing claim.[16]

### 2. *Market Conditions in HD Transmissions Market*

Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present. *See Tampa Elec.*, 365 U.S. at 329; *Race Tires*, 614 F.3d at 77-78; *LePage's*, 324 F.3d at 159. For example, if the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals. *Tampa Elec.*, 365 U.S. at 329; *Dentsply*, 399 F.3d at 187. Here, the jury

---

[16] Additionally, the District Court instructed the jury that Plaintiffs did not allege "actual" exclusive dealing, but instead alleged that "the long-term supply contracts with defendant, in effect, committed the OEMs to purchase at least a substantial share of their transmissions from defendant." The District Court defined such an arrangement as a "'de facto' exclusive dealing contract." Eaton does not challenge this instruction on appeal.

found that Eaton possessed monopoly power in the HD transmissions market, and Eaton does not contest that finding on appeal.

A hard look at the nature of the market in which the parties compete is equally important. *Tampa Elec.*, 365 U.S. at 329. An exclusive dealing arrangement is most likely to present a threat to competition in a situation in which the market is highly concentrated, such that long-term contracts operate to "foreclose so large a percentage of the available supply or outlets that entry" or continued operation in "the concentrated market is unreasonably constricted." *Race Tires*, 614 F.3d at 76 (quoting *E. Food Servs.*, 357 F.3d at 8); *see Dentsply*, 399 F.3d at 184 (noting that the relevant market was "marked by a low or no-growth potential" and the defendant had long dominated the industry with a 75-80% market share). Here, the HD transmissions market had long been dominated by Eaton. Except for Meritor's production of manual transmissions in the 1990s and the ZF Meritor joint venture, no significant external supplier has entered the market for the last twenty years. A jury could certainly infer that Eaton's dominance over the OEMs created a barrier to entry that any potential rival manufacturer would have to confront. *See Concord Boat*, 207 F.3d at 1059 ("If entry barriers to new firms are not significant, it may be difficult for even a monopoly company to control prices through some type of exclusive dealing arrangement because a new firm or firms easily can enter the market to challenge it [but] [i]f there are significant entry barriers . . . , a potential competitor would have difficulty entering.") (citations omitted). The record shows that the barriers to entry in the North American

HD transmission market are especially high:  HD transmissions are expensive to produce; transmissions developed for other geographic markets must be substantially modified for the North American market; and all HD transmission sales must pass through the highly concentrated intermediate market in which the OEMs operate.  Eaton's theory that ZF Meritor or any new HD transmissions manufacturer would be able to "steal" an Eaton customer by offering a superior product at a lower price "simply has not proved to be realistic."  *Dentsply*, 399 F.3d at 194 (citation omitted); *compare NicSand*, 507 F.3d at 454 (in finding exclusive dealing arrangements lawful, noting that the *plaintiff* was the market leader, and lost business due to a new entrant's competition).  "The paltry penetration in the market by competitors over the years has been a refutation of [Eaton's] theory by tangible and measurable results in the real world."  *Dentsply*, 399 F.3d at 194; *see Microsoft*, 253 F.3d at 55 (noting importance of significant barriers to entry in maintaining monopoly power, in spite of the plaintiffs' self-imposed problems).

Although we generally "assume that a customer will make [its] decision only on the merits," *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 133 (3d Cir. 2005) (quoting *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524-25 (5th Cir. 1999)), a monopolist may use its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice.  *See Race Tires*, 614 F.3d at 77 (noting that coercion "has played a key, if sometimes unexplored, role" in antitrust law); *Dentsply*, 399 F.3d at 184 (observing that the defendant

53

"imposed" an exclusivity policy on its customers); *LePage's*, 324 F.3d at 159 (explaining that because 3M occupied a dominant position in several different product markets, it was able to effectively force customers in the "private label" tape market to deal with 3M exclusively, despite the plaintiff's competitiveness in that market). A highly concentrated market, in which there is one (or a few) dominant supplier(s), creates the possibility for such coercion. And here, there was evidence that Eaton leveraged its position as a supplier of necessary products to coerce the OEMs into entering into the LTAs. Plaintiffs presented testimony from OEM officials that many of the terms of the LTAs were unfavorable to the OEMs and their customers, but that the OEMs agreed to such terms because without Eaton's transmissions, the OEMs would be unable to satisfy customer demand.[17]

---

[17] Eaton emphasizes that the OEMs are multi-billion dollar companies (or at least owned by multi-billion dollar parent companies), and therefore claims that the OEMs dictated terms to Eaton – not the other way around. Significantly, in *United States v. Dentsply International, Inc.*, we found coercion even though the relationship between the customers and the defendant was not totally one-sided. 399 F.3d 181, 185 (3d Cir. 2005) (noting that the defendant considered bypassing dealers and selling directly to customers but abandoned that strategy out of fear that dealers might retaliate by refusing to buy other products manufactured by the defendant). Moreover, even assuming that the evidence could support a conclusion that the OEMs had more power in the relationship, the fact that two reasonable conclusions

54

Accordingly, this case involves precisely the combination of factors that we explained would be present in the rare case in which exclusive dealing would pose a threat to competition. *See Race Tires*, 614 F.3d at 76.

### 3. Sufficiency of the Evidence: Anticompetitive Conduct

We turn now to a discussion of whether there was sufficient evidence for a jury to conclude that Eaton engaged in anticompetitive conduct. Our inquiry in a sufficiency of the evidence challenge is limited to determining whether, "viewing the evidence in the light most favorable to the [winner at trial] and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citation omitted). Eaton argues that even under the extraordinarily deferential standard, there was insufficient evidence for a reasonable jury to conclude that Eaton engaged in conduct that harmed competition. Guided by the principles set forth in Section III.A.1, *supra*, we disagree.

### i. Extent of Foreclosure

First, the extent of the market foreclosure in this case was significant. "The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, 'the opportunities for other[s] . . . to enter

could be drawn from the evidence does not make the jury's adoption of Plaintiffs' view unreasonable.

55

into or remain in that market must be significantly limited.'" *Microsoft*, 253 F.3d at 69 (citing *Tampa Elec.*, 365 U.S. at 328). Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching "the critical level necessary" to pose a real threat to the defendant's business. *Dentsply*, 339 F.3d at 191. Here, Eaton entered into long-term agreements with every direct purchaser in the market, and under each agreement, imposed what could be viewed as mandatory purchase requirements of at least 80%, and up to 97.5%. The OEMs generally met these targets, which, as Plaintiffs' expert testified, resulted in approximately 15% of the market remaining open to Eaton's competitors by 2003.[18] *See LePage's*, 324 F.3d at 159 (noting that foreclosure of 40% to 50% is usually required to establish an exclusive

---

[18] ZF Meritor's expert, Dr. David DeRamus, testified at trial that Eaton's market share was consistently above 80% from 2000 through 2007. Later in his testimony, DeRamus concluded that Eaton's increased market share from 2000 to 2007 was the result of the LTAs. Furthermore, DeRamus showed that ZF Meritor's market share percentages in the linehaul transmissions market (i.e., the only portion of the overall HD transmissions market in which ZF Meritor competed), dropped from 32% to 24% between 2000 and 2002, and dropped even further from 24% to 12% between 2002 and 2003, before ultimately falling to 0% in 2007. DeRamus concluded that the loss of ZF Meritor's linehaul transmissions market share and its eventual exit from the market were due to Eaton's conduct and, specifically, the LTAs.

dealing violation under Section 1 of the Sherman Act (citing *Microsoft*, 253 F.3d at 70)).  From 2000 through 2003, Plaintiffs' overall market share ranged from 8-14%, and by 2005, Plaintiffs' market share had dropped to 4%.

### ii.  Duration of LTAs

Second, the LTAs were not short-term agreements, which would present little threat to competition.  *See*, *e.g.*, *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1173 (9th Cir. 1988) (upholding exclusive dealing arrangement of "short duration"); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (noting that exclusive dealing contracts of less than one year are presumptively lawful); *Barry Wright*, 724 F.2d at 237 (citing two-year term in upholding requirements contract). Rather, each LTA was for a term of at least five years, and the PACCAR LTA was for a seven-year term.[19]  *See FTC v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 393-96 (1953) (upholding contracts of one year or less, but condemning contract terms ranging from two to five years). Although long exclusive dealing contracts are not *per se* unlawful, "[t]he significance of any particular contract duration is a function of both the number of such contracts and market share covered by the exclusive-dealing contracts." Hovenkamp ¶ 1802g, at 98.  Here, Eaton entered into long-term contracts with *every* direct purchaser in the market, which locked up over 85% of the market for at least five

---

[19] Eaton and Freightliner revised their original LTA to increase the duration to ten years.

57

years. Although long-term agreements had previously been used in the HD transmissions industry, it was unprecedented for a supplier to enter into contracts of such duration with the entire customer base.

Eaton acknowledges, as it must, the unprecedented length of the LTAs, but maintains that the LTAs were not anticompetitive because they were easily terminable. *See*, *e.g.*, *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 111 (2d Cir. 2002) (finding challenged contracts lawful, in part, because they were terminable at will); *Omega Envtl.*, 127 F.3d at 1164 (noting easy terminability of agreements). Each LTA included a "competitiveness" clause, which permitted the OEM to purchase from another supplier or terminate the agreement if another supplier offered a better product or a lower price. However, Plaintiffs presented evidence that any language giving OEMs the right to terminate the agreements was essentially meaningless because Eaton had assured that there would be no other supplier that could fulfill the OEMs' needs or offer a lower price. Thus, a jury could very well conclude that "in spite of the legal ease with which the relationship c[ould] be terminated," the OEMs had a strong economic incentive to adhere to the terms of the LTAs, and therefore were not free to walk away from the agreements and purchase products from the supplier of their choice. *Dentsply*, 399 F.3d at 194.

iii. Additional Anticompetitive Provisions in LTAs

Third, the LTAs were replete with provisions that a reasonable jury could find anticompetitive. To begin, a jury could have found that the data book provisions were

58

anticompetitive in that they limited the ability of ZF Meritor to effectively market its products, and limited the ability of truck buyers to choose from a full menu of available transmissions. *See id.* (discussing anticompetitive effect of limitations on customer choice). Eaton downplays the significance of the data book provisions, arguing that truck buyers always remained free to request unlisted transmissions, and ZF Meritor remained free to market directly to truck buyers. However, the mere existence of potential alternative avenues of distribution, without "an assessment of their overall significance to the market," is insufficient to demonstrate that Plaintiffs' opportunities to compete were not foreclosed. *Id.* at 196. An OEM's data book was the "most important tool" that any buyer selecting component parts for a truck would use. If a product was not listed in a data book, it was "a disaster for the supplier." Although truck buyers could request unpublished components, doing so involved additional transaction costs, and in practice, meant that truck buyers were far more likely to select a product listed in the data book. *See id.* at 193 (explaining that the key question was not whether alternative distribution methods allowed a competitor to "survive" but whether the alternative methods would "pose[] a real threat" to the defendant's monopoly) (citing *Microsoft*, 253 F.3d at 71). Additionally, prior to the LTAs, it was not common practice for one supplier to be given exclusive data book listing. Historically, data books had included all product offerings, including Meritor transmissions, and the OEMs acknowledged that removing ZF Meritor products, especially FreedomLine, from the data books was "from a customer perspective," the wrong thing to do so because they were

59

"good product[s] with considerable demand in the marketplace."

A jury could also have found that the "preferential pricing" provisions in the LTAs were anticompetitive. Although it was "common" for price savings to be passed down to truck buyers in the form of lower prices, and there are indications that at least some of the savings from Eaton transmissions were indeed passed down, there is also evidence that the preferential prices were achieved by artificially increasing the prices of Plaintiffs' products.

Additionally, the jury could have determined that the "competitiveness" clauses were of little practical import because Eaton's conduct ensured that no rival would be able to offer a comparable deal. There was also evidence that the competitiveness clauses were met with stiff resistance by Eaton.

### iv. Anticompetitive Effects vs. Procompetitive Effects

Finally, the only procompetitive justification offered by Eaton on appeal is that the LTAs were crafted to meet customer demand to reduce prices, as well as engineering and support costs. *See Barr Labs.*, 978 F.2d at 111 (explaining that courts must "evaluate the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market") (citations omitted). In response to the economic downturn in the heavy-duty trucking industry in the late 1990s and early 2000s, each OEM sought to negotiate lower prices, and some sought to reduce the number of suppliers. During this time, oversupply

60

was a problem, as were low truck prices, and an unavailability of drivers. It appears that Eaton responded well to the downturn; despite persistent quality control problems and a relatively late introduction of two-pedal automated mechanical transmissions, the company cut costs and increased market share.

However, no OEM ever asked Eaton to be a sole supplier, and there was considerable testimony from OEM officials that it was in an OEM's interest to have multiple suppliers. Although long-term agreements offering market-share or volume discounts had been used in the industry in the past (for transmissions and for other truck components), OEM executives consistently testified that Eaton's new LTAs represented a substantial departure from past practice. For example, the longest supply agreements Freightliner and Volvo had ever signed previously were for two-year terms. Likewise, OEM officials testified that the provisions in the LTAs requiring exclusive data book listing and "preferential pricing" were not common. Critically, there was considerable evidence from which a jury could infer that the primary purpose of the LTAs was not to meet customer demand, but to take preemptive steps to block potential competition from the new ZF Meritor joint venture. Eaton devised the unprecedented LTAs only after Meritor formed the joint venture with ZF AG, which Eaton viewed as a "serious competitor." Eaton feared that the ZF Meritor joint venture would put Eaton's "[North American] position at risk" by introducing a new product (FreedomLine) for which there was significant customer demand, but for which Eaton did not produce a comparable alternative.

61

In sum, the LTAs included numerous provisions raising anticompetitive concerns and there was evidence that Eaton sought to aggressively enforce the agreements, even when OEMs voiced objections.[20] Accordingly, we hold that there was more than sufficient evidence for a jury to conclude that the cumulative effect of Eaton's conduct was to adversely affect competition.[21]

---

[20] Judge Greenberg, in dissent, objects that our rule of reason analysis fails to consider that Eaton's prices were above cost. Dissenting Op., Part II. However, contrary to this objection, and even though ZF Meritor does not contend that Eaton's prices operated as an exclusionary tool, we do not view Eaton's prices as irrelevant to the rule of reason analysis. Rather than analyzing the alleged exclusionary provisions in a vacuum, we analyze these provisions in the larger context of the LTAs as a whole, and we recognize that Eaton maintained above-cost prices. We conclude that ZF Meritor presented sufficient evidence for the jury to find that, even though not every provision was exclusionary, the LTAs as a whole functioned as exclusive dealing agreements that adversely affected competition.

[21] It is worth noting that despite Eaton's contention that Plaintiffs' higher prices and quality problems led to their decline in market share, the OEMs felt differently. In 2002, a Freightliner executive wrote: "[t]his is a dangerous situation. We have already killed Meritor's transmission business. It is just a matter of time before they close their doors." Likewise, a 2006 Volvo presentation states: "With all its OEM customers, Eaton has established long term supply contracts

### 4. *Sufficiency of the Evidence: Antitrust Injury*

Having concluded that there was sufficient evidence from which a jury could determine that the LTAs functioned as unlawful exclusive dealing agreements, we have no difficulty concluding that there was likewise sufficient evidence that Plaintiffs suffered antitrust injury. *See Atl. Richfield*, 495 U.S. at 344 (explaining that a plaintiff suffers antitrust injury if its injury "stems from a competition-*reducing* aspect or effect of the defendant's behavior"). Eaton's conduct unlawfully foreclosed a substantial share of the HD transmissions market, which would otherwise have been available for rivals, including Plaintiffs. ZF Meritor exited the market in 2003, followed by Meritor in 2006, because they could not maintain high enough market shares to remain viable. A jury could certainly conclude that Plaintiffs' inability to grow was a direct result of Eaton's exclusionary conduct.

## C. Expert Testimony

### 1. *Expert Testimony on Liability*

Eaton raises two challenges to the District Court's decision to admit DeRamus's testimony on liability. First, Eaton argues that DeRamus failed to employ any recognized or reliable economic test for determining whether Eaton's

---

. . . [which] ha[ve] led to . . . Eaton's only North American competitor, Meritor, [being] gradually marginalized to its current market position with a 10% market share."

conduct harmed competition and caused antitrust injury. Second, Eaton contends that DeRamus's opinion was contradicted by the facts. We disagree with both contentions.[22]

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, the district court acts as a "gatekeeper" to ensure that "the expert's opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *In re Paoli R.R. Yard PCB Litig. (Paoli II)*, 35 F.3d 717, 741 (3d Cir.

_____

[22] Eaton also argues that DeRamus's testimony was contrary to law because he did not employ a price-cost test. However, as we explained above, no price-cost test was required in this case.

1994)).  Here, as the District Court noted, DeRamus relied on the exclusionary nature of the LTAs to form his opinion.  He defined the relevant market, determined whether Eaton has monopoly power, and engaged in an analysis of Eaton's conduct, taking into account market conditions and the extent of the exclusive dealing.  He examined the effect of the LTAs on prices and consumer choice, and considered whether foreclosure of the market could be attributed to factors other than the LTAs, such as market conditions or quality issues with Plaintiffs' products.  We find no error in the District Court's acceptance of DeRamus's methodologies as reliable under Rule 702.  *See LePage's*, 324 F.3d at 154-64 (analyzing exclusive dealing by looking to many of the same factors considered by DeRamus).

Eaton also argues that DeRamus's opinion was contradicted by the facts.  "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."  *Brooke Grp.*, 509 U.S. at 242; *Phila. Newspapers*, 51 F.3d at 1198.  In an antitrust case, an expert opinion generally must "incorporate all aspects of the economic reality" of the relevant market.  *Concord Boat*, 207 F.3d at 1057.  Here, the District Court properly rejected Eaton's argument that DeRamus's testimony should have been excluded on the basis that it was contradicted by other facts.  Eaton's argument on this point really amounts to nothing more than a complaint that DeRamus did not adopt Eaton's view of the case.  The District Court correctly noted that, although some of DeRamus's testimony may have been

contradicted by other evidence, including the testimony of Eaton's expert, the existence of conflicting evidence was not a basis on which to exclude DeRamus's testimony. The respective credibility of Plaintiffs' and Eaton's experts was a question for the jury to decide. *LePage's*, 324 F.3d at 165. DeRamus was extensively cross-examined and Eaton presented testimony from its own expert, who opined that the LTAs had no anticompetitive effect. In the end, the jury apparently found DeRamus to be more credible. "[Eaton]'s disappointment as to the jury's finding of credibility does not constitute an abuse of discretion by the District Court in allowing [DeRamus's] testimony." *Id.* at 166.

## 2. *Expert Testimony on Damages*

In their cross-appeal, Plaintiffs argue that the District Court erred in excluding DeRamus's testimony on the issue of damages. The core of DeRamus's damages analysis was one page (titled "Five Year Product Line Profit and Loss") of ZF Meritor's Revised Strategic Business Plan ("SBP") for fiscal years 2002 through 2005, which was presented to ZF Meritor's Board of Directors in November 2000.[23] The District Court determined that, although DeRamus used methodologies regularly employed by economists, his opinion nevertheless failed the reliability requirements of *Daubert* and the Federal Rules of Evidence because the underlying data

---

[23] The SBP contained a five-year forecast of profit and loss estimates based on estimated unit sales, unit prices, manufacturing costs, operating expenses, and other considerations.

was not sufficiently reliable. The District Court acknowledged that experts often rely on business plans in forming damages estimates, but concluded that DeRamus's reliance on the SBP in this case was improper because he did not know either the qualifications of the individuals who prepared the SBP estimates or the assumptions upon which the estimates were based. Plaintiffs filed a motion for clarification, which asked the District Court to allow DeRamus to testify based on his existing expert report to damages estimates independent of the SBP, or, in the alternative, to allow him to amend his report to include the alternate damages estimates. The District Court did not resolve the damages issue at that time, and bifurcated the case. After the trial on liability, Plaintiffs supplemented their pre-trial motion for clarification, adding several new arguments based on developments at trial, and renewing their request that DeRamus be allowed to testify based on alternate calculations. The District Court denied Plaintiffs' motion and awarded $0 in damages.

Our inquiry on appeal is two-fold. Initially, we must determine whether the District Court erred in excluding the expert opinion of DeRamus on the basis that it was not sufficiently reliable. Then, we must consider whether the District Court abused its discretion in denying Plaintiffs' request to allow DeRamus to testify to alternative damages calculations. We will address these issues in turn.

i. DeRamus's original damages calculations

First, we will consider Plaintiffs' contention that the District Court erred in determining that DeRamus's damages

opinion was not sufficiently reliable. Federal Rule of Evidence 702, as amended in 2000 to incorporate the standards set forth in *Daubert*, imposes an obligation upon a district court to ensure that expert testimony is not only relevant, but reliable. Fed. R. Evid. 702; *Paoli II*, 35 F.3d at 744. As we have made clear, "the reliability analysis [required by *Daubert*] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999); *see also id.* ("Not only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules."). As we explain below, the District Court did not abuse its discretion by finding that DeRamus's damages estimate, which was based heavily on the SPB projections, bore insufficient indicia of reliability to be submitted to a jury.

To determine the damages suffered by Plaintiffs as a result of Eaton's anticompetitive conduct, DeRamus conducted a two-part analysis. He computed Plaintiffs' lost profits for the period between 2000 and 2009, as well as the lost enterprise value of Plaintiffs' HD transmissions business. To calculate Plaintiffs' lost profits, DeRamus first estimated the incremental revenues that Plaintiffs would have earned "but for" Eaton's anticompetitive conduct, and then subtracted from that figure the incremental cost that Plaintiffs would have had to incur to achieve such incremental sales.

Ordinarily, such an approach would be appropriate because "an expert may construct a reasonable offense-free

68

world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities." *LePage's*, 324 F.3d at 165 (citations omitted). However, the District Court's primary criticism of DeRamus's report was that *he* did not construct an offense-free world based on actual financial data, but instead relied on a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based. In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-95; *Paoli II*, 35 F.3d at 748 n.18 ("Arguably, [third-party estimates] that an expert relies on are not his underlying data, but rather the data that went into the [third-party estimates] in the first place are his underlying data.").

Plaintiffs contend that DeRamus's reliance on the SBP estimates was appropriate because a company's internal financial projections, like those in the SBP, are regularly and reasonably relied upon by economists in formulating opinions regarding a company's performance in an offense-free world. Plaintiffs are certainly correct that "internal projections for future growth" often serve as legitimate bases for expert opinions. *See LePage's*, 324 F.3d at 165; *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (2d Cir. 1970) (holding that damages testimony was admissible because the financial projections on which the testimony was based "were the product of deliberation by experienced businessmen charting

their future course").  Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections.  As such, experts frequently use a plaintiff's business plan to estimate the plaintiff's expected profits in the absence of the defendant's misconduct.  *See Litigation Services Handbook: The Role of the Financial Expert* 24:13 (4th ed. 2007).  However, there is no *per se* rule of inclusion where an expert relies on a business plan; district courts must perform a case-by-case inquiry to determine whether the expert's reliance on the business plan in a given case is reasonable.  *See Heller*, 167 F.3d at 155.

Here, the District Court concluded that the SBP could not serve as a reliable basis for DeRamus's opinion because he was unaware of the qualifications of the individuals who prepared the document, or the assumptions on which the estimates were based.  Plaintiffs argue that these factual findings are contradicted by the record.  Admittedly, the record indicates that DeRamus did not, as the District Court suggested, blindly accept the SBP estimates without question.  DeRamus was aware that the SBP had been presented to ZF Meritor's Board of Directors, and that it was revised several times to "address and resolve queries management had about the reasonableness of the assumptions, projections, [and] forecasts."  He also knew that the Board had relied on the SBP in making business decisions.  Moreover, ZF Meritor's former president testified that he "did not submit SBPs to management for review unless [he] believed the projections, forecasts, and assumptions therein to be reliable."

70

However, contrary to Plaintiffs' assertions, these excerpts from the record do not contradict the District Court's ultimate findings. The record amply supports the District Court's concern that, although DeRamus was generally aware of the circumstances under which the SBP was created and the purposes for which it was used, he lacked critical information that would be necessary for Eaton to effectively cross-examine him. An expert's "lack of familiarity with the methods and the reasons underlying [someone else's] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination." *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993); *compare Autowest*, 434 F.2d at 566 (holding that projections of company officials were admissible where such officials "set out at length the bases from which they derived their figures, and consequently, [the opposing party] was able to cross-examine them vigorously"). Here, DeRamus knew that the SBP was presented to the Board by experienced management professionals, but he did not know who initially calculated the SBP figures. He did not know whether the SBP projections were calculated by ZF Meritor management, lower level employees at ZF Meritor, or came from some outside source. Nor did DeRamus know the methodology used to create the SBP or the assumptions on which the SBP's price and volume estimates were based.[24]

---

[24] As the District Court noted, it is especially important for an expert to identify and justify the assumptions underlying financial projections when dealing with a new company. Here, although Meritor had been in the HD

71

Under the deferential abuse of discretion standard, we will not disturb a district court's decision to exclude testimony unless we are left with "a definite and firm conviction that the court below committed a clear error of judgment." *In re TMI Litig.*, 193 F.3d 613, 666 (3d Cir. 1999) (citation omitted). Plaintiffs cannot clear that high hurdle. Accordingly, we conclude that the District Court acted within its discretion in determining that one page of financial projections for a nascent company, the assumptions underlying which were relatively unknown, did not provide "good grounds," *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590), for DeRamus to generate his damages estimate. *Compare LePage's*, 324 F.3d at 165 (noting that plaintiff's expert considered the defendant's internal projections for growth, but also closely examined the market conditions, including the past performance of competitors).

Plaintiffs raise two additional challenges to the District Court's exclusion of DeRamus's testimony. First, Plaintiffs contend that because the SBP was admitted into evidence at trial, Rule 703 does not provide a basis for exclusion. However, this argument is based on the flawed assumption that the District Court excluded DeRamus's testimony under Rule 703, rather than Rule 702. Plaintiffs assume that because the District Court stated that "DeRamus manipulated the SBP using methodologies employed by economists," *ZF Meritor*, 646 F. Supp. 2d at 667, the District Court necessarily

transmissions industry for over a decade, ZF Meritor was offering a brand new line of transmissions that had never before been sold in the North American market.

concluded that Rule 702, which focuses on methodologies, was satisfied. However, the District Court explicitly stated that "the fundamental query" was "whether the [SBP] estimates pass[ed] the reliability requirements of Rules 104, 702, and 703." *Id.* Although it is not entirely clear from the District Court's opinion which rule the District Court relied upon in finding DeRamus's testimony inadmissible, we may affirm evidentiary rulings on any ground supported by the record, *Hughes v. Long*, 242 F.3d 121, 122 n.1 (3d Cir. 2001), and we conclude that DeRamus's opinion was properly excluded because it failed the reliability requirements of Rule 702.[25]

Plaintiffs' suggestion that the reasonableness of an expert's reliance on facts or data to form his opinion is somehow an inappropriate inquiry under Rule 702 results

---

[25] We base our affirmance of the District Court's decision entirely on the fact that DeRamus's opinion failed Rule 702, and do not decide whether Rule 703 provides an additional basis for exclusion. We note, however, that Plaintiffs' argument that Rule 703 somehow constrains a district court's ability to conduct an assessment of reliability under Rule 702 is misplaced. After all, a piece of evidence may be relevant for one purpose, and thus admissible at trial, but not be the type of information that can form the basis of a reliable expert opinion. As the District Court stated, "the fact that [a piece of evidence] [i]s part of [the] plaintiffs' 'story' does not mean, ipso facto," that an expert opinion relying on such evidence is admissible. *ZF Meritor LLC v. Eaton Corp.*, 800 F. Supp. 2d 633, 637 (D. Del. 2011).

from an unduly myopic interpretation of Rule 702 and ignores the mandate of *Daubert* that the district court must act as a gatekeeper. *See Daubert*, 509 U.S. at 589; *Heller*, 167 F.3d at 153 ("While 'the focus, of course, must be solely on principles and methodology, not on the conclusions that they generate,' a district court must examine the expert's conclusions in order to determine whether they could reliably flow from the facts *known* to the expert and the methodology used.") (emphasis added) (quoting *Daubert*, 509 U.S. at 595). Where proffered expert testimony's "factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592). A district court's inquiry under Rule 702 is "a flexible one" and must be guided by the facts of the case. *Daubert*, 509 U.S. at 591, 594. Here, the District Court's analysis fell squarely within its flexible gatekeeping function under *Daubert* and Rule 702. *See Kumho Tire Co.* 526 U.S. at 149; *Paoli II*, 35 F.3d at 748 n.18; *see also Elcock*, 233 F.3d at 754 (explaining that an expert's testimony regarding damages must be based on a sufficient factual foundation); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and not supported by the record.").

Second, Plaintiffs argue that the District Court did not provide fair notice that it intended to exclude DeRamus's testimony under Federal Rule of Evidence 703. Again, this

74

argument rests on the flawed assumption that the District Court relied solely on Rule 703. However, even assuming the District Court mistakenly believed that its Rule 702 reliability analysis actually fell under Rule 703, Plaintiffs' notice argument would still be meritless. A district court must give the parties "an adequate opportunity to be heard on evidentiary issues." *In re Paoli R.R. Yard PCB Litig. (Paoli I)*, 916 F.2d 829, 854 (3d Cir. 1990). Here, there was extensive briefing regarding DeRamus's damages opinion, much of which focused on Eaton's argument that DeRamus's reliance on the SBP was improper. The District Court held not one, but two *in limine* hearings, in which DeRamus testified for several hours. *Compare id.* at 854-55 (holding that the district court did not give the plaintiffs an adequate opportunity to be heard where it failed to conduct an *in limine* hearing and denied oral argument on the evidentiary issues). As such, Plaintiffs were well aware of, and had ample opportunity to be heard on, the question of whether DeRamus's reliance on the SBP rendered his testimony inadmissible.

ii. Alternate damages calculations

The District Court's opinion excluding DeRamus's damages testimony focused exclusively on DeRamus's damages estimates based on the SBP projections regarding ZF Meritor's market share and profit margin. However, his expert report also set forth market-share estimates based on an econometric model. The econometric model did not consider the SBP, but instead used economic variables, such as the number of heavy-duty trucks built and sold in the North American market, an index of consumer confidence in the

75

United States, the average wholesale price of oil in the United States, and interest rates. The model also considered ZF Meritor's market share from the previous month "in order to capture market dynamics."

To reach his ultimate damages estimate, DeRamus averaged several damages calculations, each of which used a different combination of inputs for market share and profit margin. Following the District Court's order excluding DeRamus's testimony due to his reliance on the SBP, Plaintiffs filed a motion for clarification, asking the District Court to allow DeRamus to calculate damages using the same methodologies from his expert report, but using data independent of the SBP. Specifically, Plaintiffs proposed several revisions to DeRamus's damages estimate. First, Plaintiffs indicated that DeRamus could revise his "Eaton Operating Profit Method," which used as principal inputs the SBP estimates for market share and Eaton's actual operating profits for profit margin. Plaintiffs stated that DeRamus had recalculated lost profits using the same methodology, but replacing the market-share data from the SBP with market-share data from his econometric model. Second, Plaintiffs explained that DeRamus could similarly revise his "Econometric Method" of calculating lost profits, which used the econometric model for market share, and data from the SBP for profit margin. He could use the same methodology and replace the profit margin data from the SBP with profit

76

margin data from Plaintiffs' actual sales data from 1996 through 2000.[26]

Noting that all of the data necessary for DeRamus's recalculations were already in the expert report, Plaintiffs requested that DeRamus be able to testify to the alternate calculations using the existing expert report. Allowing DeRamus to testify to alternate damages numbers without amending his expert report would have left Eaton without advance notice of the new calculations, and thus would have been improper. As such, the District Court did not err in ruling that DeRamus could not testify to new calculations *based on the existing expert report*. However, the District Court's refusal to allow DeRamus to amend his expert report presents a much more difficult question, one that we will explore in depth.

Before beginning our analysis, it is necessary to provide some context regarding the procedural history because the way in which the damages issue was handled by the District Court is significant to our determination that the District Court abused its discretion. After the District Court granted Eaton's motion to exclude DeRamus's damages testimony, it granted leave for Plaintiffs to file a motion for clarification to identify damages calculations in DeRamus's expert report that were not based on the SBP. On September

---

[26] Although the District Court did not address DeRamus's lost enterprise value calculations, Plaintiffs indicated in their motion for clarification that DeRamus could make similar revisions to those calculations.

77

9, 2009, ten days before trial was set to begin, Plaintiffs filed the motion, acknowledging that new calculations would be required, but submitting that all of the necessary data was already in the report. The next day, the District Court held a pretrial conference, in which it considered Plaintiffs' motion, and determined that it had two options: to "basically punt" on the damages issue and bifurcate the case, or to allow Plaintiffs' new damages theory to go forward and allow Eaton to depose DeRamus to examine his new theories. The District Court concluded that the "cleanest" option was to defer the damages issue, bifurcate, and proceed to trial on liability. That way, the District Court stated, the damages issue would only need to be resolved if "the jury c[ame] back with a plaintiffs' verdict, which [was] [up]held on appeal." In opting to defer a decision on damages, the District Court noted that it "did not . . . at the moment, have the time to parse [DeRamus's report] as carefully" as would be necessary to satisfactorily address the parties' arguments regarding damages.

The jury delivered its verdict on liability on October 8, 2009, and the District Court entered judgment in favor of Plaintiffs on October 14. Two days later, Plaintiffs requested that the District Court set a trial on damages. Eaton opposed Plaintiffs' request, asserting that the judgment on liability was a final appealable decision. Although the District Court apparently agreed with Eaton initially, stating that it "d[id] not intend to address damages until liability has been finally resolved by the Third Circuit," the District Court subsequently issued an amended judgment, which stated that because damages had not been resolved, there was no final

78

appealable order under Federal Rule of Civil Procedure 54(b). On November 3, 2009, Eaton filed its renewed motion for judgment as a matter of law or a new trial. The District Court did not rule on the motion until March 2011.[27]

Following the District Court's denial of Eaton's motion, Plaintiffs renewed their request for a damages trial. On July 25, 2011, the District Court held a status conference, in which it heard arguments on whether the liability issue was appealable as a judgment on fewer than all claims under Rule 54(b). Although the District Court initially indicated that it would proceed under Rule 54(b), and once again defer resolution of the damages issue, after both parties agreed that the judgment on liability was not appealable under Rule 54(b) (and that it was unlikely that this Court would grant an interlocutory appeal), the District Court acknowledged that it would "need to go back to the papers and see how I extract myself from the procedural morass that I put myself in." The District Court then signaled the way in which it would extract itself, stating "so let's assume that I am going to resurrect a motion that is two years old [Plaintiffs' September 3, 2009 motion for clarification], and let's assume that I deny it, and we're left with the situation we have now. At that point, would it make sense to have a cross-appeal on liability, on the *Daubert* decision, and get it up to the Third Circuit?"

---

[27] It is unclear from the record why sixteen months passed between Eaton's motion and the District Court's decision on the motion.

Several days later, on August 4, 2011, the District Court issued a memorandum opinion and order denying Plaintiffs' motion for clarification, and awarding $0 in damages. The District Court's entire analysis of Plaintiffs' request to modify DeRamus's report consisted of one paragraph. The District Court concluded that allowing Plaintiffs to amend DeRamus's expert report "would be tantamount to reopening expert discovery" because DeRamus would need to be deposed again and Eaton would have to prepare another rebuttal expert report. The District Court also noted that, when it granted leave for Plaintiffs to move for clarification, leave was granted only for Plaintiffs to show that DeRamus's report *already* contained an alternate damages calculation, and that Plaintiffs' motion requested permission to submit *additional* damages calculations. Therefore, the District Court concluded, "[a]t this stage of the litigation," it would not give Plaintiffs an opportunity to modify their damages estimate.

We provide this extensive review of the procedural history to make a basic point: while we appreciate the District Court's attempt to conserve judicial resources and refrain from addressing the damages issue unless absolutely necessary, it is apparent from the record that Plaintiffs' request for permission to submit alternative damages calculations was given little more than nominal consideration. We are mindful that the District Court has considerable discretion in matters regarding expert discovery and case management, and a party challenging the district court's conduct of discovery procedures bears a "heavy burden." *In re Fine Paper*, 685 F.2d at 817-18 ("We will not interfere

80

with a trial court's control of its docket 'except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant.'") (citation omitted); *see Schiff*, 602 F.3d at 176. Under Federal Rule of Civil Procedure 26(a)(2), a party is required to disclose an expert report containing "a *complete* statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added). Any additions or changes to the information in the expert report must be disclosed by the time the party's pretrial disclosures are due. Fed. R. Civ. P. 26(e)(2). Here, Plaintiffs were required to make all mandatory disclosures six months before trial, including all damages calculations. The damages estimates in DeRamus's report were found to be unreliable, and Plaintiffs sought, after the date by which discovery disclosures were due, to modify the estimates to reflect reliance on different data. Ordinarily, we will not disrupt a district court's decision to deny a party's motion to add information to an expert report under such circumstances. *Schiff*, 602 F.3d at 176; *In re Fine Paper*, 685 F.3d at 817. A plaintiff omits evidence necessary to sustain a damages award at its own risk. *See Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 504 (3d Cir. 1993).

However, exclusion of critical evidence is an "extreme" sanction, and thus, a district court's discretion is not unlimited. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997); *see also E.E.O.C. v. Gen. Dynamics Corp.*, 999 F.2d 113, 116 (5th Cir. 1993) (explaining that a continuance, as opposed to exclusion, is the "preferred means" of dealing with a party's attempt to offer new

evidence after the time for discovery has closed). There are indeed times, even when control of discovery is at issue, that a district court will "exceed[] the permissible bounds of its broad discretion." *Drippe v. Tobelinski*, 604 F.3d 778, 783 (3d Cir. 2010). In *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977), *overruled on other grounds* by *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), we set forth five factors that should be considered in deciding whether a district court's exclusion of evidence as a discovery sanction constitutes an abuse of discretion. Here, although the District Court's decision was not a discovery sanction nor an exclusion of proffered evidence, but rather an exercise of discretion to control the discovery process and a refusal to allow submission of additional evidence, we find the *Pennypack* factors instructive, and thus they will guide our inquiry. *See Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.*, 109 F.3d 739, 744-45 (Fed. Cir. 1997) (applying factors similar to those set forth in *Pennypack* to evaluate whether a district court erred in denying the plaintiff's motion to supplement its expert report with additional data); *see also Hunt v. Cnty. of Orange*, 672 F.3d 606, 616 (9th Cir. 2012) (applying similar factors to determine whether the district court abused its discretion in denying a motion to amend a pretrial order).

In considering whether the District Court abused its discretion in denying Plaintiffs' request to submit alternate damages calculations, we will consider: (1) "the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified" or the excluded evidence would have been offered; (2) "the ability of that party to cure

the prejudice"; (3) the extent to which allowing such witnesses or evidence would "disrupt the orderly and efficient trial of the case or of other cases in the court"; (4) any "bad faith or willfulness in failing to comply with the court's order"; and (5) the importance of the excluded evidence. *Pennypack*, 559 F.2d at 904-05. The importance of the evidence is often the most significant factor. *See Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 302 (3d Cir. 1991); *Pennypack*, 559 F.2d at 904 (observing "how important [the excluded] testimony might have been and how critical [wa]s its absence").

Applying the *Pennypack* factors to this case, we conclude that the District Court abused its discretion in denying Plaintiffs' request to allow DeRamus to submit his alternate damages estimates. As to the first and second factors, Eaton would not have suffered substantial prejudice if DeRamus were allowed to amend his expert report. DeRamus's new calculations will be based on data from the initial report, which Eaton has been aware of for nearly three years, and DeRamus will employ methodologies that the District Court has already recognized as being regularly and reliably applied by economists. As Plaintiffs noted in their motion for clarification, it would be "a straightforward matter of arithmetic" to substitute data from the econometric model and actual sales data for the SBP projections. For this reason, the District Court's concern that granting Plaintiffs' request would be "tantamount to reopening discovery" seems unfounded. Although Eaton will have to respond to new calculations, it will not have to analyze any new data, or challenge any new methodologies. Moreover, Plaintiffs

83

specifically set forth in their motion for clarification the changes that DeRamus would make, and because the changes only involved the substitution of inputs, Eaton would not be unfairly surprised by the new damages estimates.

As to the third *Pennypack* factor, allowing DeRamus to submit additional damages calculations will not disrupt the orderly and efficient flow of the case. In fact, our ruling on the liability issues and remand to the District Court to resolve damages is precisely what the District Court and the parties envisioned all along. Eaton, well aware of the District Court's desire to have this Court determine the liability issues before setting a damages trial, suggested that the best way to accomplish the District Court's objective was to amend the JMOL order to include "zero damages and no injunctive relief." As the District Court stated at the July 25, 2011 status conference, "[t]he way I handle complex litigation generally, when I bifurcate, is that I enter a final judgment pursuant to Rule 54(b) . . . and once the Circuit Court determines liability, if there is a reason to have a damages trial, we have a damages trial." Thus, it cannot seriously be a surprise to any of the parties that they will once again be required to address damages in this case. Additionally, Eaton repeatedly states in its brief that Plaintiffs seek to reopen discovery "on the eve of trial." Although that may have been true when Plaintiffs' original motion for clarification was filed, it is no longer true. Trial ended in October 2009 and thus, when the District Court finally ruled on Plaintiffs' motion, there was no longer any time-crunch problem. Any concern that granting Plaintiffs' motion would prevent Eaton from being able to effectively prepare to address DeRamus's new damages estimates at trial

84

is no longer relevant, nor is there any risk that granting Plaintiffs' motion would excessively delay a trial on liability.

As to the fourth factor, there is no evidence of any bad faith on the part of Plaintiffs. However, under this fourth factor, we may also consider the Plaintiffs' justifications for failing to include alternative damages calculations in the event calculations based on the SBP were found to be insufficient. *See Pennypack*, 559 F.2d at 905; *Gen. Dynamics Corp.*, 999 F.2d at 115-16. Given that DeRamus's report already included the data necessary to develop alternate damages estimates, he could very easily have provided such estimates. Plaintiffs have provided no persuasive explanation for his failure to do so, other than that he believed his existing estimates were sufficiently reliable. It is not the district court's responsibility to help a party correct an error or a poor exercise of judgment, and thus, Plaintiffs' conscious choice to rely so heavily on data that was ultimately found to be unreliable weighs against a finding of abuse of discretion. This is especially true in a case such as this, where the party submitting the flawed expert report is a large corporation with significant resources represented by highly competent counsel.

However, perhaps the most important factor in this case is the critical nature of the evidence, and the consequences if permission to amend is denied. Expert testimony is necessary to establish damages in an antitrust case. As such, without additional damages calculations, it is clear that Plaintiffs will be unable to pursue damages, despite the fact that they won at the liability stage. *Compare Gen. Dynamics Corp.*, 999 F.2d at 116-17 (finding an abuse of

85

discretion in the district court's exclusion of expert testimony, in part, because the total exclusion of such testimony "was tantamount to a dismissal of the [plaintiff's] . . . claim"), *with Sowell*, 926 F.2d at 302 (finding no abuse of discretion in district court's exclusion of proffered expert testimony, in large part, because "the record [was] totally devoid of any indication of . . . how th[e] testimony might have bolstered [the plaintiff's] case," and thus, there was "no basis whatever for believing that the admission of expert testimony would have influenced the outcome of th[e] case"). The District Court's decision therefore would clearly influence the outcome of the case. *See Sowell*, 926 F.2d at 302.

Significantly, in the antitrust context, a damages award not only benefits the plaintiff, it also fosters competition and furthers the interests of the public by imposing a severe penalty (treble damages) for violation of the antitrust laws. *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972) ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. . . . In enacting these laws, Congress had many means at its disposal to penalize violators. It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected. Instead, Congress chose to permit all persons to sue to recover three times their actual damages . . . . By [so doing], Congress encouraged these persons to serve as 'private attorneys general.'") (citations omitted); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 655 (1985) ("A claim under the antitrust laws is not merely a

86

private matter. The Sherman Act is designed to promote the national interest in a competitive economy . . . .") (quotation omitted). Thus, if Plaintiffs are not able to pursue damages, not only will they be unable to recover for the antitrust injury Eaton caused, the policy of deterring antitrust violations through the treble damages remedy will also be frustrated. *See Paoli II*, 35 F.3d at 750 ("[T]he likelihood of finding an abuse of discretion is affected by the importance of the district court's decision to the outcome of the case and the effect it will have on important rights.").

In sum, after weighing the *Pennypack* factors and taking into account the circumstances under which Plaintiffs' motion for clarification was ultimately denied, we conclude that the District Court abused its discretion in not permitting Plaintiffs to submit alternate damages calculations.[28]

---

[28] We express no opinion as to the reliability or admissibility of DeRamus's alternate damages calculations. That is a matter left to the District Court on remand. However, we note that Plaintiffs' motion for clarification only sought to include damages calculations based on data already in the expert report, and that fact is crucial to our holding that prejudice to Eaton can be easily cured. Nothing in our opinion should be read as requiring the District Court to allow Plaintiffs to bring in entirely new data for the revised damages estimates.

## D. Article III Standing to Seek Injunctive Relief

Finally, we turn to Eaton's contention that Plaintiffs lack standing to seek injunctive relief. Eaton argues that Plaintiffs' complete withdrawal from the HD transmissions market in 2006 and their failure to present evidence showing anything more than a mere possibility that they will reenter the market precludes a finding of Article III standing as to injunctive relief. Although the District Court did not directly address standing, it noted in a footnote that, "[w]hile [P]laintiffs are no longer in business and are unable to directly benefit from an injunction, here, an injunction is appropriate because of the public's interest in robust competition and the possibility that [P]laintiffs may one day reenter the market." *ZF Meritor LLC v. Eaton Corp.*, 800 F. Supp. 2d 633, 639 (D. Del. 2011). We agree with Eaton that this determination was improper, and we will therefore vacate the injunction issued by the District Court.[29]

---

[29] Even though Meritor was still technically in the HD transmissions business at the time the complaint in this case was filed, it is still appropriate to frame this issue as one of standing, rather than one of mootness. Plaintiffs' complaint, which was filed on October 5, 2006, stated that Meritor intended to exit the HD transmissions business in January 2007, and did not indicate any intent to reenter. Thus, even at the time the complaint was filed, Plaintiffs could not demonstrate the requisite likelihood of future injury sufficient to confer standing. *See Davis v. F.E.C.*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the

A plaintiff bears the burden of establishing that he has Article III standing for each type of relief sought. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). In order to have standing to seek injunctive relief, a plaintiff must show: (1) that he is under a threat of suffering "'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury. *Id.* (citing *Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). Even if the plaintiff has suffered a previous injury due to the defendant's conduct, the equitable remedy of an injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Accordingly, a plaintiff may have standing to pursue

_____

outcome when the suit was filed.") (citations omitted); *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (citation omitted). Moreover, even if we treated this as a mootness question, our conclusion would remain the same.

89

damages, but lack standing to seek injunctive relief. *Lyons*, 461 U.S. at 105.

For example, in *City of Los Angeles v. Lyons*, the plaintiff sued the city, seeking damages, injunctive relief, and declaratory relief, for an incident in which he was allegedly choked by police officers. *Id.* at 97. The Supreme Court held that, although the plaintiff clearly had standing to seek damages, he lacked standing to seek injunctive relief because he failed to establish a "real and immediate threat" that he would again be stopped by the police and choked. *Id.* at 105. "Absent a sufficient likelihood that he [would] again be wronged in a similar way, [the plaintiff] [was] no more entitled to an injunction than any other citizen of Los Angeles." *Id.* at 111. Likewise, in *Summers v. Earth Island Institute*, the Court held that an organization lacked standing to enjoin the application of Forest Service regulations in national parks where its members expressed only a "vague desire" to return to the affected parks. 555 U.S. at 496. "Such some-day intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of . . . actual or imminent injury." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)) (internal marks omitted); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2559-60 (2011) (noting that employees who no longer worked for Wal-Mart lacked standing to seek injunctive or declaratory relief against Wal-Mart's employment practices).

Applying those principles to our case, we hold that Plaintiffs lack standing to seek an injunction. They clearly have standing to seek damages based on Eaton's violation of

the antitrust laws while ZF Meritor and Meritor were competitors. However, the ZF Meritor joint venture operationally dissolved in 2003, Meritor stopped manufacturing HD transmissions in 2006, and Meritor has expressed no concrete desire to revive the joint venture or otherwise reenter the market. The sole evidence in the record of Meritor's future intentions is found in one page of trial testimony, in which a Meritor official stated that there had been internal discussions at the company about the possibility of reentry, but that no decision had been made. The official testified that Meritor "continue[d] to monitor the performance of the products that are in the marketplace[,] . . . ha[d] a very thorough understanding of how the products [we]re working[,] . . . and [was] actively considering what [its] alternatives might be." He explained, however, that upon any attempt to reenter, Meritor would be confronted with the "same obstacle that caused the dissolution of the joint venture."[30]

As the District Court acknowledged, this evidence establishes no more than a "possibility" that Meritor might one day reenter the market. Where the District Court went

_____

[30] In a post-trial status conference, the District Court asked Plaintiffs' counsel why an injunction would be appropriate given that Plaintiffs were no longer in the business. Plaintiffs' counsel could give no more concrete information about Plaintiffs' plans than the witness, stating simply that, if Eaton's conduct was enjoined, "a different set of calculations" would apply to Plaintiffs' discussions regarding reentry into the market.

wrong, however, was in concluding that such a possibility is sufficient to confer Article III standing for injunctive relief. *See McCray v. Fidelity Nat'l Ins. Co.*, 682 F.3d 229, 242-43 (3d Cir. 2012) ("Allegations of possible future injury are not sufficient to satisfy Article III.") (internal marks and citation omitted). Plaintiffs were required to set forth sufficient facts to show that they were entitled to prospective relief, including that they were "*likely* to suffer future injury." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (citation omitted) (emphasis added); *see McCray*, 682 F.3d at 243 (explaining that "a threatened injury must be certainly impending and proceed with a high degree of certainty") (internal marks and citation omitted). Absent a showing that they are likely to reenter the market and again be confronted with Eaton's exclusionary practices, Plaintiffs were "no more entitled to an injunction" than any other entity that has considered the possibility of entering the HD transmissions market. *Lyons*, 461 U.S. at 111. "Vague" assertions of desire, "without any descriptions of concrete plans," are insufficient to support a finding of actual or imminent injury. *See Summers*, 555 U.S. at 496. Although Plaintiffs claim that they might again enter the market, such a decision "w[ould] be their choice, and what that choice may be is a matter of pure speculation at this point." *McNair*, 672 F.3d at 225.

Plaintiffs seem to suggest that there is a lower threshold for standing in antitrust cases.[31] However,

---

[31] Specifically, Plaintiffs argue that the appropriate standard is found in Section 16 of the Clayton Act, which provides that any person "shall be entitled to sue for and have

Plaintiffs confuse the doctrines of constitutional standing and antitrust standing. Although the doctrines often overlap in practice, they are, in fact, distinct. *Sullivan v. D.B. Invs., Inc.*, 667 F.3d 273, 307 (3d Cir. 2011). Regardless of any additional requirements applicable to a particular type of action, a plaintiff must *always* demonstrate that a justiciable case or controversy exists sufficient to invoke the jurisdiction of the federal courts. *Id.* Plaintiffs' failure to do so here renders any inquiry into antitrust (statutory) standing unnecessary. *See Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 225 (3d Cir. 1998).

We agree with the District Court that there are strong public policy reasons for issuing an injunction in this case. However, the fact that there may be strong public policy reasons for enjoining Eaton's behavior does not mean that Plaintiffs are the appropriate party to seek such an injunction. Standing is a constitutional mandate, *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 152 (3d Cir. 1999), and the consequences that flow from a finding of lack of standing here, although concerning, cannot affect our analysis.[32]

injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief . . . is granted by courts of equity." 15 U.S.C. § 26.

[32] Because we conclude that Plaintiffs lack standing to pursue injunctive relief, we need not address Plaintiffs' argument that the District Court erred by refusing to allow them to address the scope of injunctive relief.

93

# IV. CONCLUSION

First, we hold that Plaintiffs' claims are not subject to the price-cost test, and instead must be analyzed as *de facto* exclusive dealing claims under the rule of reason. Second, we conclude that Plaintiffs presented sufficient evidence to support the jury's finding that Eaton engaged in anticompetitive conduct and that Plaintiffs suffered antitrust injury as a result. Third, we find no error in the District Court's decision to admit DeRamus's testimony on the issue of liability. Fourth, we hold that the District Court properly exercised its discretion in excluding DeRamus's damages testimony based on his expert report, but we conclude that the District Court abused its discretion by preventing DeRamus from submitting alternate damages calculations based on data already included in his initial report. Finally, we hold that Plaintiffs lack standing to pursue injunctive relief, and therefore, we will vacate the injunction issued by the District Court. We will remand to the District Court for further proceedings consistent with this opinion.

<u>Greenberg, Circuit Judge</u>, dissenting

Notwithstanding the majority's thoughtful and well-crafted opinion, I respectfully dissent as I would reverse the District Court's order that it entered following its opinion reported at <u>ZF Meritor LLC v. Eaton Corp.</u>, 769 F. Supp. 2d 684 (D. Del 2011), denying Eaton's motion for judgment as a matter of law. Although the majority opinion recites in detail the factual background of this case, I nevertheless also set forth its factual predicate as I believe the inclusion of certain additional facts demonstrates even more clearly than the facts the majority sets forth why Eaton was entitled to judgment as a matter of law.[1]

## I. FACTS

A. The HD Transmission Market

The parties stipulated before the District Court and do not now dispute that the relevant product market in this case is heavy-duty ("HD") truck transmissions and that the relevant geographic market is the United States, Canada, and Mexico, the so-called "NAFTA market." On appeal, Eaton does not dispute

---

[1] Throughout this dissent I use the same standard of review that the majority sets forth. Thus while I am exercising plenary review of the order denying the motion for a judgment as a matter of law within that review I am being deferential to the jury verdict.

that it possessed monopoly power in that market during the events relevant to this case.

HD trucks include linehaul trucks, the familiar 18-wheelers used to travel long distances on highways, and performance trucks used on unfinished terrain or to carry heavy loads, such as cement mixers, garbage trucks, and dump trucks. There are three types of HD truck transmissions: manual, automatic, and automated mechanical.

As the majority indicates, the NAFTA HD truck transmission market functions in the following way. Original Equipment Manufacturers ("OEMs") construct HD trucks. There were four OEMs during the period relevant to this dispute: Freightliner Trucks ("Freightliner"); International Truck and Engine Corporation ("International"); PACCAR; and Volvo Group ("Volvo"). OEMs provide the purchasers of HD trucks with "data books" that list HD truck component part options, including transmissions, and thereby allow the customer to select from various options for certain parts of the HD trucks.

The data books list one option as the "standard" offering with which OEMs will fit the truck unless the customer selects otherwise. Additionally, the component part listed in the data book as the lowest-priced option is referred to as the so-called "preferred" or "preferentially-priced" option.[2] For obvious

---

[2]"Standard" and "preferred" positioning are not the same thing. See J.A. at 2546 (PACCAR and Eaton's LTA) (stating that PACCAR will list Eaton's product "as Standard Equipment and the Preferred Option," whereas "'Standard Equipment' means

2

reasons, positioning as the standard or preferred component part option in a data book can be beneficial and a form of promotion of the parts that the component part manufacturers supply. Evidence adduced at trial, which I explore further below, shows that OEMs decide which component parts to list as standard or preferred based, at least in part, on their determination of which component part is the most advantageous option for them to supply in terms of such factors as cost of supply pricing as to the OEMs and the availability and performance of the product. Consequently, the OEMs and component part manufacturers negotiate with respect to data book positioning.

Data books, however, are not the exclusive means of advertising HD truck transmissions or other parts nor do they restrict the truck purchasers' choices. Component suppliers, such as appellees[3] and Eaton, market directly to purchasers, and purchasers of HD trucks can and do request unpublished options that are not listed in the data books.

B. The Parties and Market Conditions

During the 1950s, Eaton began manufacturing transmissions for HD trucks, and eventually it developed a full

---

the equipment that is provided to a customer unless the customer expressly designates another supplier's product" and "'Preferred Option' means the lowest priced option in the Data Book for comparable products").

[3] I refer to the plaintiffs as appellees even though they are also appellants in these consolidated appeals.

3

product line of transmissions in a range of speeds and styles. Prior to 1989, Eaton was the only domestic manufacturer of HD truck transmissions. In 1989, however, Meritor entered the market with 9- and 10-speed HD manual transmissions for linehaul trucks. But, unlike Eaton, Meritor did not offer nor did it develop at any point a full product line of HD truck transmissions. Nevertheless, by 1999 Meritor had obtained approximately 18% of the market for sales of HD truck transmissions in North America.

In 1999, Meritor entered into a joint venture with ZF Freidrichshafen ("ZF AG"), a large German company that previously had not sold HD truck transmissions in North America. The joint venture, called ZF Meritor ("ZFM"), sought to adapt for the NAFTA market ZF AG's "ASTronic" transmission, a linehaul 12-speed, 2-pedal, automated mechanical transmission. Meritor transferred its transmission business to ZFM, and ZFM introduced the ASTronic (renamed the "FreedomLine" for the NAFTA market) to these new markets around February 2001. At that time, Eaton did not have a two-pedal automated mechanical transmission and did not intend to release one until 2004. Appellees believe that the FreedomLine was technically superior to other HD truck transmissions available.

In late 1999, during the same time period that appellees formed ZFM, there was a severe economic downturn in the NAFTA market area that caused a sharp decline of HD truck orders. By 2001, around the time ZFM introduced the FreedomLine, HD truck orders had fallen by approximately 50%, with demand plummeting from more than 300,000 new

4

HD truck orders per year to roughly 150,000 orders.

C. The Long-Term Agreements

In the 1980s and 1990s, Eaton entered into supply agreements with each of the four OEMs. These agreements set the prices for Eaton's transmissions and offered volume discounts to the OEMs, i.e., discounted prices based on the OEMs' purchase of a certain quantity of transmissions. Appellees do not allege that these agreements violated the antitrust laws. Beginning in late 2000, however, Eaton entered into new supply agreements with all four of the OEMs. Those agreements, to which the parties refer as long-term agreements ("LTAs"), are at the core of the present dispute.

Eaton's LTAs offered the OEMs rebates based on market-share targets. The discounts thus provided the OEMs with lower prices on Eaton's transmissions conditioned on their purchase of a certain percentage of their transmission needs from Eaton. Although the LTAs' terms varied, all of the LTAs at issue were consistent in two respects.

First, the LTAs were not explicitly exclusive-dealing contracts: each OEM remained free to buy parts from any other HD transmission manufacturer, including ZFM, and none of the LTAs conditioned Eaton's payment of rebates on an OEM's purchase of 100% of its transmission needs from it. Second, each LTA contained a so-called "competitiveness clause" that permitted the OEM to exclude an Eaton product from the share target and to terminate its LTA altogether if another manufacturer offered transmissions of better quality or lower

5

price. Because the LTAs are at the crux of ZFM's claims, I review those four contracts and the circumstances of their formation in some detail.

1.  Freightliner

As of 1998, both Eaton and Meritor had respective three-year supply agreements with Freightliner, the largest of the OEMs. Meritor's agreement provided that it would reduce the price of its component parts if Freightliner listed Meritor's parts as standard in its data book, while, as I have mentioned, Eaton's agreement provided volume-discount rebates to Freightliner.

In October 2000, Freightliner notified Meritor, which by then had evolved into ZFM with respect to its transmission business, that Eaton had offered it 10-speed transmissions at a price significantly lower than Meritor's price, Eaton was offering certain transmissions that Meritor did not have available, and Eaton's transmissions were superior to Meritor's in price and technology. Pursuant to a provision in Meritor's supply agreement that required Meritor to remain competitive with respect to its products in terms of quality and technology, Freightliner notified Meritor that it had 90 days within which to match Eaton's inventory or Freightliner would delete Meritor's noncompetitive products from the agreement. Though Meritor disputed Freightliner's contention it did not make a counteroffer or offer to match Eaton's inventory.

Soon thereafter, in November 2000, Eaton entered into a five-year LTA with Freightliner, one of the four contracts that appellees challenge. The LTA provided rebates ranging from

6

$200 to $700, contingent on a 92% share target for Eaton's transmissions and clutches, an additional truck component that Eaton manufactured. In 2003, Eaton and Freightliner amended the LTA by adopting a sliding scale that entitled Freightliner to varying lower rebates if it met lower market-share targets beginning at 86.5% and going up to 90.5%.

In exchange for the discounted prices, the LTA required Freightliner to list Eaton's transmissions as the "preferred" option in its data book. Significantly, however, Freightliner "reserve[d] the right to publish" the FreedomLine transmission "through the life of the agreement at normal retail price levels." J.A. at 1948. The LTA also provided that in 2002 Freightliner would publish Eaton's transmissions and clutches in its data book exclusively, but the parties amended that provision in 2001 to allow Freightliner to continue to publish Eaton's competitors' products. From 2002 onwards, Freightliner did not list ZFM's manual transmissions but it continued to list ZFM's other transmissions from 2000 to 2004. In 2004, however, Freightliner removed the FreedomLine from its data books because Meritor[4] had refused to pay a $1,250 rebate it had promised to Freightliner on that product and because Freightliner had experienced reliability issues with ZFM's products. See id. at 3725 (letter from Freightliner representative to Meritor representative (Feb. 10, 2004)) ("Freightliner is outraged at ArvinMeritor in the handling of the FreedomLine transmissions price changes. It is totally unacceptable that

_____

[4]As explained below, ZFM dissolved in December of 2003, and thus Meritor was handling sales of the FreedomLine transmission in the NAFTA market as of 2004.

ArvinMeritor would commit to price protection, and then seek to renege on that commitment.").

Under the LTA, Eaton had the right to terminate the agreement if Freightliner did not meet its share targets. In 2002, however, even though Freightliner did not meet the 92% share target, Eaton did not terminate the agreement. In 2003, the parties amended the LTA so that it would last for a total of ten years, extending the agreement to 2010.

2. International

Eaton entered into a five-year LTA with International in July 2000. A representative from International stated that International entered into the LTA because it made "good business sense," id. at 1532, inasmuch as the LTA provided the lowest purchase price for International and there was "greater customer preference and brand recognition for the Eaton product," id. at 1528.

In return, Eaton provided a $2.5 million payment to International, $1 million of which was payable in cash or in cost-savings initiatives. The LTA provided sliding scale rebates of 0.35% to 2% beginning at a market share of 80% and up to 97.5% and above. It also provided for sliding rebates based on a market share of Eaton's clutches. For current truck models, International agreed to list Eaton's transmission as the preferred option, and for future models, it agreed to publish Eaton's transmissions exclusively.[5] Notwithstanding the latter

_____

[5]International already had listed Eaton as the standard option as

8

provision, International continued to list ZFM's manual transmissions in its printed data book.

### 3. PACCAR

In July 2000, Eaton entered into a seven-year LTA with PACCAR. A PACCAR representative stated that PACCAR agreed to the market-share rebates because it "ma[d]e long term economic sense and it ha[d] a total value as to PACCAR." Id. at 1555. The PACCAR representative indicated that the "total value" concept incorporated such considerations as the "lower cost" provided by the LTAs, "providing a full product line of . . . transmissions," "providing product during periods of peak demand and ensuring the product is available," "warranty provisions," and "aftermarket supply." Id. at 1555-56.

The representative indicated that PACCAR was in discussions with ZFM regarding a supply agreement but ultimately it declined to enter into an agreement with ZFM because, apart from Eaton's more appealing offer, ZFM suffered from negative considerations such as ZFM's restricted output of its products, "massive transmission failure in the marketplace that caused market unacceptance of their transmissions earlier," and ZFM's lack of a full product line. Id. at 1557, 1562. Additionally, PACCAR "always [paid] . . . a higher cost [for a ZFM product] than a comparable Eaton product, independent of the rebate," particularly for the FreedomLine, which, according

of 1996 because, according to an International representative, Eaton provided the greatest value to International. See J.A. at 1533.

9

to the PACCAR representative, was "by design, a more expensive product" because of its European origins. Id. at 1558-59. In this regard, the representative stated that Eaton's rebates were not "the only thing that made them competitive." Id. at 1562.

Under the LTA, Eaton provided price reductions, a $1 million payment, firm pricing for seven years, and engineering and marketing support. PACCAR also could obtain rebates ranging from 2% to 3% in exchange for meeting 90% to 95% market share targets in both transmissions and clutches. In exchange, PACCAR was required to list Eaton as the standard and preferred option in its data book. At all times PACCAR continued to list ZFM's transmissions in its data book.

4. Volvo

Eaton entered into a five-year LTA with Volvo in October 2002. A Volvo representative stated that Volvo entered into the LTA because it represented "the best overall value for Volvo" in terms of "price, delivery, quality manufacturing, and logistics." Id. at 1430. Indeed, another Volvo representative stated that "[p]ricing was significantly better with Eaton [even] excluding rebates." Id. at 1295; see id. at 1293, 1296 (the same representative estimating the savings to Volvo from the LTA with Eaton to be about 12% to 15% excluding the rebates and stating that Volvo's motivation in entering the LTA was "purely dollars, dollars and cents"). Volvo was in discussions with ZFM to sign a supply agreement, but ultimately it did not do so in large part because of ZFM's "inability to have a complete product offering of all transmissions." Id. at 1431.

10

The LTA provided sliding scale rebates of 0.5% to 1.5% originally set at 65% market share, and, as of 2004, a 70% to 78% market share. Eaton had the option of terminating the LTA if its market share at Volvo fell below 68%. In turn, Volvo agreed to position Eaton's transmissions and clutches as the standard and preferred offering. Volvo continued to list in its data books both ZFM's and Volvo's own transmissions that it manufactured only for installation in its own trucks.[6]

D. ZFM's Business and Exit from the Market

As of July 2000, before Eaton signed any of the challenged LTAs, ZFM had lost nearly 20% of its market share in transmissions, its share declining from 16.1% to 13%. Minutes from a ZFM Board of Directors meeting held in July 2000 reveal that ZFM's President, Richard Martello, identified a number of factors that caused ZFM's falling market position, including:

> (i) poor product quality image, (ii) a decrease in Ryder business, (iii) turnover in the [c]ompany's sales organization, (iv) an increase in sales of Eaton Autoshift, (v) the push towards 13-speed transmissions, especially by Freightliner, (vi) the multi-year fleet business lost due to competitive

[6]Eaton also entered into an LTA with the OEM Mack Trucks that same month. Volvo had acquired Mack Trucks in 2001, and it appears that the LTAs are substantively the same. Accordingly, I refer only to the Volvo LTA.

11

equalization cutbacks in early 1999 and (vii) controlled distribution.

J.A. at 3235.

Some explanation will illuminate Mr. Martello's observations. "Competitive equalization" payments are incentives a component manufacturer provides directly to truck purchasers for them to select its products from a data book. ZFM's internal documents, included in the trial record, demonstrate that "[d]uring the peak periods of production between March 1999 and September 1999, Meritor reduced [competitive equalization] payment[s] on deals trying to reduce the incentive [to] 'war' with Eaton" but Eaton "continued . . . to buy business when Meritor declined deals." Id. at 3028. "Controlled distribution" refers to the practice of purposefully limiting the quantity of a product available to the market — a practice that ZFM identified as the cause of it losing "various deals" due to ZFM's "lack of product" availability. Id. at 3030. The reference to ZFM's decrease in "Ryder business" appears to refer to the fact that ZFM lost the business of the OEM previously known as Mack-Ryder due to ZFM's controlled distribution practices. See id.

In that same meeting, Mr. Martello also observed that there were "significant forces in favor of direct drive, fully automated transmissions," including:

> (i) major engine changes in October 2002 due to emissions standards changes, (ii) continued driver shortages, (iii) continued upward pressure on fuel

12

prices, (iv) market pressure on 'guaranteed cost of operation' sales incentives and (v) continued technician shortages.

Id. at 3236. Significantly, as I already have noted, the FreedomLine was an automated mechanical transmission, not a fully automated transmission.

Mr. Martello also noted that the industry was turning away from the component part manufacturers' traditional focus on advertising directly to truck purchasers as an incentive for them to select their component part, so-called "pull" advertising, to focus instead on "the creation of closer relationships with the OEMs." Id. Along this line, Mr. Martello observed that the OEMs desired to have "single source, full product line suppliers" in an effort to reduce costs. See id. Additionally, Mr. Martello noted that OEMs were resistant to the prospect of engineering new products, such as the FreedomLine, into their trucks, and that, as sales of HD trucks declined, component part manufacturers provided rapidly increasing sales incentives to the OEMs. See id. To overcome these obstacles and increase ZFM's market share, Mr. Martello "recommended that a full line of automated products be released at every OEM and that [ZFM] develop a full [HD] product line." Id. at 3237.

Notwithstanding ZFM's awareness of the declining HD truck market, after the 2000 meeting ZFM refused to lower its prices despite certain OEMs' repeated requests that it do so. See, e.g., id. at 3596 (letter from Chris Benner, ZFM, to Paul D. Barkus, International (Sept. 19, 2002)) (stating ZFM's refusal to lower prices despite International's June 2002 request that it do

13

so); id. at 1537-38 (deposition testimony of Paul D. Barkus, International) (indicating that ZFM refused International's request that ZFM lower its prices in December 2001); id. at 3953 (ZFM Board minutes) ("Board did not agree with providing any price decreases to Volvo/Mack."). To the contrary, at the end of 2003, ZFM raised the price of the FreedomLine by roughly 25%, an increase that caused significant consternation among the OEMs. Moreover, ZFM did not develop a full HD truck transmission product line as Mr. Martello had recommended. Furthermore, as the majority notes, at least two of ZFM's transmissions, including its flagship transmission, the FreedomLine, experienced significant performance problems resulting in frequent repairs, and, in 2002 and 2003, ZFM faced significant warranty claims on its products amounting to millions of dollars in potential liability.

Notwithstanding the trouble it experienced in 2000, ZFM experienced growth in some areas. From 2001 to 2003, the FreedomLine transmission went from comprising 0% of the linehaul market to 6% of the linehaul market, and between 2000 and 2003, ZFM's market share of linehaul HD truck transmissions increased at three of the four OEMs. From July 2000 to October 2003, ZFM's share of the total HD transmission market ranged between 8% and 14%.

In spite of its gains, ZFM believed that Eaton's LTAs limited ZFM's potential market share to approximately 8% of the transmission market, not the 30% that it had expected to gain as a result of the joint venture and which it needed to achieve for the venture to be a viable business. In December 2003, on the basis of that calculation, ZFM was dissolved. Following ZFM's

14

dissolution, Meritor returned to the transmission business it had conducted before entering into the joint venture. In 2006, however, Meritor exited the HD truck transmission business entirely.

E. Eaton's Pricing

At trial, appellees did not allege or introduce any evidence that Eaton priced its transmissions below any measure of cost during the relevant time period, and, on appeal, appellees do not contend that Eaton's prices were below cost. Furthermore, at all times relevant to the present dispute, Eaton's average transmission prices to the OEMs were lower than ZFM's average prices to the OEMs. In other words, the OEMs paid more to purchase and supply ZFM's transmissions to the truck purchasers than they paid for Eaton's transmissions. In particular, ZFM priced its FreedomLine significantly above the price of Eaton's transmissions.

## II. ANALYSIS

Although it frames the question differently, as the majority recognizes the central question that emerges in this appeal is what effect, if any, does appellees' failure to allege, much less prove, that Eaton engaged in below-cost pricing have on its claims? Eaton, of course, contends that the effect is dispositive, arguing that Supreme Court precedent requires that courts apply the price-cost test of <u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 113 S.Ct. 2578

15

(1993), in any case in which a plaintiff challenges a defendant's pricing practices.[7]  Appellees challenged Eaton's pricing practices, namely, its market-share discounts, but because appellees did not introduce evidence that Eaton engaged in below-cost pricing, Eaton contends that appellees did not establish that they suffered antirust injury nor did they show that by adopting the LTAs Eaton violated the antitrust laws.[8]

---

[7]Under the Brooke Group price-cost test, a firm must first establish that the defendant's prices "are below an appropriate measure of its . . . costs," and second, it must show that the defendant "had a reasonable prospect [under § 1 of the Sherman Act], or, under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices."  509 U.S. at 223-24, 113 S.Ct. at 2587-88.

[8]Apart from meeting the requirements of Article III standing, an antitrust plaintiff seeking monetary or injunctive relief must show that it has suffered antitrust injury, i.e., an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes [the] defendant['s] acts unlawful."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977).  Although courts often conflate the antitrust injury requirement with the determination of whether the defendant's conduct violated the antitrust laws, this approach is erroneous as the antitrust injury requirement assumes the defendant's conduct was unlawful (and thus anticompetitive) and asks whether the anticompetitive aspect of the unlawful conduct is the cause of plaintiff's injury.  See Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 275 n.2

16

Appellees, of course, contend that their failure to show that Eaton engaged in below-cost pricing is entirely irrelevant to the success or failure of their claims. Appellees claim that the obligation to show below-cost pricing applies only where a

(3d Cir. 1999) ("The District Court erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section 1 of the Sherman Act . . . ."); see also Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 447-48 (2d Cir. 2005) (explaining that anticompetitive effects of defendant's behavior "are classic 'rule of reason' questions, distinct from the antitrust standing question") (citations omitted). Because I conclude that Eaton was entitled to judgment as a matter of law as there was insufficient evidence for the jury's conclusion that Eaton violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, I do not address whether appellees satisfied the antitrust injury requirement. Accord L.A.P.D., Inc. v. Gen. Elec. Corp., 132 F.3d 402, 404 (7th Cir. 1997) ("Because LAPD adequately alleges injury in fact and thus has standing under Article III, however, we may bypass the antitrust-injury issue to go straight to the merits."); Hairston v. Pac. 10 Conference, 101 F.3d 1315, 1318 (9th Cir. 1996) ("[W]e need not decide whether appellants have met the requirements for antitrust standing, because they have failed to establish any violation of the antitrust laws."); Levine v. Cent. Fl. Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996) ("We need not decide whether Dr. Levine has met the requirements for standing as to any of his antitrust claims, because as to each one he has failed to establish any violation of the antitrust laws.").

17

plaintiff brings a so-called "predatory pricing" claim.[9]  In this regard, appellees contend that they were not required to show that Eaton engaged in below-cost pricing because they did not bring a "predatory pricing" claim.  In fact, appellees explicitly disavow any allegation that Eaton engaged in below-cost pricing and instead contend that the LTAs, including the market-share rebates they contained, amounted to unlawful de facto exclusive dealing agreements.[10]

The majority appears to split the difference between the parties' two positions.  The majority concludes that the Brooke

---

[9]A firm engages in "predatory pricing" when it cuts its prices below an appropriate measure of cost to force competitors out of the market or to deter potential entrants from entering the market.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n.8, 106 S.Ct. 1348, 1355 n.8 (1986).  "The success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain."  Id. at 589, 106 S.Ct. at 1357 (emphasis in original).  Due to the inherently speculative nature of such an undertaking, "predatory pricing schemes are rarely tried, and even more rarely successful."  Id.

[10]As the leading antitrust treatise points out, "to be challenged as unlawful exclusive dealing, . . . [a] quantity discount program would necessarily involve prices above cost, else the program would not be sustainable."  Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 18.03b, at 18-70 (4th ed. 2011).

18

Group price-cost test may be dispositive in a case where a plaintiff brings a claim challenging a defendant's pricing practices[11] and alleges that price itself functioned as the exclusionary tool. I agree completely with the majority's conclusion in this regard. Thereafter, however, our paths diverge because the majority appears to conclude that where a plaintiff brings a claim of unlawful exclusive dealing against a defendant's pricing practices but does not contend that the defendant's prices operated as the exclusionary tool, the price-cost test is irrelevant and has neither dispositive nor persuasive effect.[12]

As I explain further below, while I do not believe that the Supreme Court has held that the inferior courts must impose and give dispositive effect to the Brooke Group price-cost test in every claim challenging a defendant's pricing practices, the

---

[11]Throughout this opinion I use the term "pricing practices" to encompass the variety of ways in which a firm may set its prices, including but not limited to, straightforward price cuts and conditional rebates or discounts.

[12]I recognize that the majority states that Eaton's low prices are not irrelevant to the extent they may help explain why the OEMs entered the LTAs even though the LTAs allegedly included terms that were unfavorable to the OEMs and to rebut an argument that the agreements were inefficient but the majority does not factor the circumstance that Eaton's prices were above cost into its analysis of whether the LTAs were exclusionary and anticompetitive, and I believe its failure to do so is error.

19

Court's unwavering adherence to the general principle that above-cost pricing practices are not anticompetitive and its justifications for that position lead me to conclude that this principle is a cornerstone of antitrust jurisprudence that applies regardless of whether the plaintiff focuses its claim on the price or non-price aspects of the defendant's pricing program. Thus, although the price-cost test may not bar a claim of exclusive dealing challenging a defendant's above-cost pricing practices, regardless of how a plaintiff casts its claim or the non-price elements of the pricing practices that the plaintiff identifies as the exclusionary conduct, where a plaintiff attacks a defendant's pricing practices — and to be clear that is what the market-share rebate programs at issue here are — the fact that defendant's prices were above-cost must be a high barrier to the plaintiff's success. Accordingly, I believe that we must apply the <u>Brooke Group</u> price-cost test to the present case and give that test persuasive effect in the context of our broader analysis under the antitrust laws at issue.

Allowing appellees that opportunity, the majority concludes that the plaintiffs adduced sufficient evidence at trial from which a jury reasonably could infer that the LTAs represented unlawful "de facto partial exclusive dealing."[13] In

---

[13]I cannot utilize this phrase without making the point that where a court permits a non-exclusive, non-mandatory supply agreement to morph into a mandatory exclusive-dealing contract to legitimize a plaintiff's claim of unlawful "de facto partial exclusive dealing" the court follows antitrust plaintiffs down the rabbit hole a bit too far. While "de facto partial exclusive dealing" is a creative neologism, the phrase not only distorts the

doing so, the majority concludes that despite the fact that the LTAs by their terms were not exclusive nor mandatory and despite the fact that the prices offered under them were at all times above-cost such that an equally-efficient competitor could have matched them, they were de facto partial exclusive dealing contracts because Eaton was a dominant supplier, the OEMs could not have afforded to lose Eaton as a supplier, and thus, the majority reasons, the OEMs were compelled to enter the LTAs and meet their market-share targets. The majority reaches its

English language (in what other realm would one refer to a contract as "partially exclusive"?), it takes us so far from the text of Section 3 of the Clayton Act and the actual concept of exclusive dealing that I shudder to think what will be labeled as exclusive dealing next.

The majority concedes that "partial exclusive dealing is rarely a valid antitrust theory." Typescript at 43 (internal quotation marks omitted). Indeed, the only thing rarer may be what appellees actually allege here: "de facto partial exclusive dealing." I am not aware of any Supreme Court or court of appeals precedent recognizing such a claim, and a Westlaw search of the phrase reveals only one other case recognizing the concept as a viable antitrust claim. In a sign that we truly have come full circle, that case is a class action pending in the United States District Court for the District of Delaware brought by truck purchasers against Eaton, the four OEMs, and a handful of other entities, alleging that the same LTAs at issue here violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. See Wallach v. Eaton Corp., 814 F. Supp. 2d 428, 442-43 (D. Del. 2011).

21

conclusion despite the absence of evidence in the record suggesting that Eaton would have refused to supply transmissions to the OEMs had the OEMs failed to meet the LTAs' market-share targets or that Eaton at any point coerced the OEMs into entering the LTAs or meeting the targets. For reasons I set forth more fully below, I cannot join my colleagues in this judicial reworking of the LTAs and the unbridled speculation the majority's reasoning requires to convert the LTAs into exclusive dealing contracts. Even analyzing appellees' claims under the rule of reason and the principles used to ascertain whether an exclusive-dealing arrangement is lawful and employing the deferential standard of review to which we subject jury verdicts, it is plain that the agreements could not have been and in fact were not anticompetitive.

A. The Supreme Court's Treatment of Antitrust Challenges to Pricing Practices

Beginning with Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 S.Ct. 484 (1986), the Supreme Court in a series of cases considering antitrust challenges to pricing practices has made clear that as a general matter above-cost pricing practices do not threaten competition. In Cargill, the Court considered whether Monfort, a beef-packing business, had shown antitrust injury to the end that it had standing to challenge the merger of two of its competitors that allegedly violated Section 7 of the Clayton Act. See id. at 106-09, 107 S.Ct. at 487-88. Monfort presented two theories of antitrust injury: "(1) a threat of a loss of profits stemming from the possibility that . . . . [defendant], after the merger, would lower its prices to a level at or only slightly above its costs" and "(2) a threat of being

22

driven out of business by the possibility that . . . [defendant], after the merger, would lower its prices to a level below its costs." Id. at 114, 107 S.Ct. at 491.

The Court rejected Monfort's first theory of injury, stating "the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." Id. at 116, 107 S.Ct. at 492. Because the defendant's above-cost "competition for increased market share" was not "activity forbidden by the antitrust laws" but rather constituted "vigorous competition," Monfort could not demonstrate antitrust injury under its first theory. Id. In this regard, the Court noted that "[t]o hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." Id. The antitrust laws, the Court noted, "require no such perverse result" because "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." Id. (internal quotation marks and citation omitted). The Court rejected Monfort's second claim that the defendant would engage in below-cost, i.e. predatory pricing, following the merger because Monfort had failed to raise and failed to adduce adequate proof of that claim before the district court. See id. at 118-19, 107 S.Ct. at 494.

Four years later, in Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 110 S.Ct. 1884 (1990), the Court reiterated that above-cost pricing practices generally are not anticompetitive, this time in the context of Section 1 of the

Sherman Act. In <u>Atlantic Richfield</u>, USA Petroleum Company ("USA"), an independent retail marketer of gasoline, alleged that its competitor, Atlantic Richfield Company ("ARCO"), which sold gasoline through its own stations and indirectly through dealers, violated Sections 1 and 2 of the Sherman Act through a price-fixing scheme that set gasoline prices at below-market but above-cost levels through its offer of short-term discounts, such as volume discounts, and the elimination of credit-card sales to its dealers. <u>See id.</u> at 331-32, 110 S.Ct. at 1887-88. Only USA's Section 1 claim was before the Court, <u>see id.</u> at 333 n.3, 110 S.Ct. at 1888 n.3, and the question presented was whether USA had suffered an antitrust injury by virtue of ARCO's Section 1 violation, <u>see id.</u> at 335, 110 S.Ct. at 1889. At the time, ARCO's conduct was regarded as a per se violation of Section 1. <u>See id.</u> (citing <u>Albrecht v. Herald Co.</u>, 390 U.S. 145, 88 S.Ct. 869 (1968), <u>overruled by State Oil Co. v. Khan</u>, 522 U.S. 3, 118 S.Ct. 275 (1997)).

First, the Court rejected USA's claim that it automatically satisfied the antitrust injury requirement because ARCO's conduct constituted a per se violation of Section 1. 495 U.S. at 336-37, 110 S.Ct. at 1890-91. The Court then turned to USA's alternative claim that even if it was not entitled to a presumption of injury, it had suffered injury "because of the low prices produced by the vertical restraint." <u>Id.</u> at 337, 110 S.Ct. at 1891. Rejecting this contention, the Court reasoned that "[w]hen a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence of the claimed violation." <u>Id.</u> Such injury, the Court concluded, "is not <u>antitrust</u> injury; indeed, 'cutting prices

24

in order to increase business often is the very essence of competition.'" Id. at 338, 110 S.Ct. at 1891 (emphasis in original) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 594, 106 S.Ct. 1348, 1359 (1986)).

USA argued alternatively that it was "inappropriate to require a showing of predatory pricing before antitrust injury can be established when the asserted antitrust violation is an agreement in restraint of trade illegal under § 1 of the Sherman Act, rather than an attempt to monopolize prohibited by § 2." Id. at 338, 110 S.Ct. at 1891. As the Court noted, "[p]rice fixing violates § 1, for example, even if a single firm's decision to price at the same level would not create § 2 liability" because "the price agreement itself is illegal." Id. at 338, 110 S.Ct. at 1891. USA contended that therefore it had "suffered antitrust injury even if [ARCO's] pricing was not predatory under § 2 of the Sherman Act." Id. at 339, 110 S.Ct. at 1891.

In a passage that is significant in the context of the present case, the Court also rejected that contention. It explained:

> Although a vertical, maximum-price-fixing agreement is unlawful under § 1 of the Sherman Act, it does not cause a competitor antitrust injury unless it results in predatory pricing. Antitrust injury does not arise for purposes of § 4 of the Clayton Act, until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct; in the context of pricing practices only predatory pricing has the requisite

25

> anticompetitive effect. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.

Id. at 339-40, 110 S.Ct. at 1891-92 (citations omitted and some emphasis added).

The Court observed that it had "adhered to this principle regardless of the type of antitrust claim involved." Id. at 340, 110 S.Ct. at 1892 (citing Cargill, 479 U.S. at 116, 107 S.Ct. at 492; Brunswick Corp., 429 U.S. at 487, 97 S.Ct. at 696).[14] The

---

[14]As did Cargill, Brunswick Corp. involved a competitor's antitrust challenge to an allegedly illegal acquisition under Section 7 of the Clayton Act because it would have brought a "'deep pocket' parent into a market of 'pygmies.'" 429 U.S. at 487, 97 S.Ct. at 697. The Court concluded that the plaintiff could not show antitrust injury based on the losses it would suffer from that acquisition because the aspect of the merger that made it unlawful did not cause the plaintiff's losses. See id.

The majority interprets the Supreme Court's statement it had adhered to the principle that "in the context of pricing practices only predatory pricing has the requisite anticompetitive effect" "regardless of the type of antitrust claim involved" to mean "that the price-cost test applies regardless of the statute under which a pricing practice claim is brought, not that the price-cost [test] applies regardless of the type of anticompetitive conduct." Typescript at 38 n.13. While the Supreme Court's

26

Court noted that although "the source of the price competition in [Atlantic Richfield] was an agreement allegedly unlawful under § 1 of the Sherman Act rather than a merger in violation of § 7 of the Clayton Act . . . that difference [wa]s not salient . . . [because] [w]hen prices are not predatory, any losses flowing from them cannot be said to stem from an <u>anticompetitive</u> aspect of the defendant's conduct." 495 U.S. at 340-41, 110 S.Ct. at 1892 (emphasis in original).

---

statement undoubtedly makes clear that the principle that above-cost pricing is not anticompetitive applies regardless of which provision of the antitrust laws is at issue, I believe that the Court's rather clear statement that it had adhered to this principle "regardless of the <u>type of antitrust claim involved</u>" means exactly what it says — that whether the plaintiff challenges a defendant's pricing practices in the context of a challenge to an allegedly unlawful merger or whether it does so in the context of a claim that a defendant has entered a price-fixing agreement a plaintiff cannot contend that the prices resulting from those arrangements are anticompetitive unless they are below cost. While I do not believe that the Court's statement in this regard requires that the price-cost test apply with dispositive force in every challenge to a defendant's pricing practices because there may be other elements of a defendant's conduct that are anticompetitive notwithstanding its above-cost prices, the Court's reasoning undoubtedly lends support to my conclusion that the price-cost test must factor into a court's decision when it is asked to judge the lawfulness of such a defendant's rebate program.

27

It is, of course, important to understand the significance of <u>Cargill</u> and <u>Atlantic Richfield</u> in the context of this case. <u>Cargill</u> and <u>Atlantic Richfield</u> involved the question of whether the plaintiffs had suffered antitrust injury, not whether above-cost pricing practices ever can violate Sections 1 and 2 of the Sherman Act or Section 3 of the Clayton Act. Indeed, at the time the Court decided <u>Atlantic Richfield</u>, vertical, maximum-price-fixing schemes were regarded as per se illegal under Section 1 of the Sherman Act, and the Court assumed in its analysis that even the above-cost scheme at issue in <u>Atlantic Richfield</u> was illegal under Section 1.

Nevertheless, though it was writing in the context of the antitrust injury requirement for the actions, the Court in <u>Cargill</u> and <u>Atlantic Richfield</u> forcefully rejected the notion that the above-cost pricing practices at issue threatened competition at all. <u>See Atl. Richfield</u>, 495 U.S. at 340, 110 S.Ct. at 1892 ("[S]o long as [prices] are above predatory levels, <u>they do not threaten competition</u>."); <u>Cargill</u>, 479 U.S. at 116, 107 S.Ct. at 492 (stating that Cargill's above-cost pricing practices aimed at increasing its market share was not "<u>activity forbidden by the antitrust laws</u>") (emphasis added). Because the antitrust laws at issue in this case require to fix liability on it that Eaton's behavior present a probable threat to or actually negatively impact competition in the relevant marketplace, these pronouncements are important here and should bear on our consideration of the question of whether the particular pricing practices involved in this case are anticompetitive and thus violate the antitrust laws.

Along this same line, other courts of appeals have looked

28

to Atlantic Richfield's discussion of above-cost pricing practices not only in the context of considering whether the plaintiff has demonstrated antitrust injury but also in considering whether a defendant's conduct violates the antitrust laws. See Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 902-03 (9th Cir. 2008) (relying on Atlantic Richfield, among other cases, to hold that bundled discounts are not exclusionary conduct under Section 2 of the Sherman Act unless the discounts result in below-cost pricing); Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 269 (2d Cir. 2001) (stating in the context of a challenge to a volume-discount program that "[a]s long as low prices remain above predatory levels, they neither threaten competition nor give rise to antitrust injury") (citing Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892) (emphasis added); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060-61 (8th Cir. 2000) (relying on Atlantic Richfield in concluding that defendant had not violated Section 2 through its above-cost market-share discounts). Similarly, the Supreme Court has invoked Atlantic Richfield's discussion of below-cost pricing practices in considering whether pricing practices violate the antitrust laws.

Indeed, three years after it decided Atlantic Richfield, the Court reemphasized this principle in concluding that below-cost pricing was necessary to establish liability under Section 2 of the Clayton Act in an attack on a defendant's pricing practices. In Brooke Group, Liggett, a generic cigarette manufacturer, alleged that Brown & Williamson Tobacco Corporation ("B&W") violated Section 2 of the Clayton Act when it offered below-cost price-cuts and volume rebates on "orders of very substantial size" to its wholesalers on B&W's generic cigarettes in an effort

29

to reverse decreasing sales of its branded cigarettes. 509 U.S. at 216-17, 113 S.Ct. at 2584. The Court stated that "whether the claim alleges predatory pricing under § 2 of the Sherman Act or primary-line price discrimination under the Robinson-Patman Act, . . . , a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs" and "that the competitor had a reasonable prospect, or under § 2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices." Id. at 222-24, 113 S.Ct. at 2587-88 (emphasis added). Because Liggett had failed to provide sufficient evidence that B&W had a reasonable prospect of recouping its allegedly predatory losses, the Court concluded that B&W was entitled to judgment as a matter of law. See id. at 243, 113 S.Ct. at 2598.

Importantly, in explaining the dual requirements set forth above, the Court noted that it had "rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." Id. at 223, 113 S.Ct. at 2588 (citing Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892). In this connection, the Court reiterated Atlantic Richfield's principle that "'[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition . . . regardless of the type of antitrust claim involved.'" Id. (quoting Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892). The Court observed:

As a general rule, the exclusionary effect of prices above a relevant measure of cost either

30

reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting.

509 U.S. at 223, 113 S.Ct. at 2588.

The Court again rejected an attack on above-cost pricing practices with its decision in Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 320-21, 127 S.Ct. 1069, 1075 (2007). Weyerhaeuser involved the unusual situation in which there was an allegation of "predatory bidding," meaning that a firm with monopoly buying power on the supply side drives up the price of that input to levels at which a competitor cannot compete. Id. at 320, 127 S.Ct. at 1075. Once the monopolist has caused competing buyers to exit the market for the input, "it will seek to restrict its input purchases below the competitive level, thus reduc[ing] the unit price for the remaining input[s] it purchases[,]" thereby allowing the monopolist to reap profits that will offset any losses it suffered in bidding up the input prices. Id. at 320-21, 127 S.Ct. at 1075-76. The issue was whether a plaintiff alleging that a defendant engaged in such conduct was required to demonstrate that the defendant engaged in below-cost pricing through the alleged predatory bidding on the supply side. Due to the theoretical and practical similarities between a claim of predatory pricing and a claim of predatory bidding, the Court concluded that its Brooke Group test applies to predatory bidding claims under Section 2 just as the test applies to Section

31

2 predatory pricing claims.  See id. at 325, 127 S.Ct. at 1078.

In doing so, the Court noted that in Brooke Group it had been "particularly wary of allowing recovery for above-cost price cutting because allowing such claims could, perversely, 'chil[l] legitimate price cutting,' which directly benefits consumers." Id. at 319, 127 S.Ct. at 1074 (quoting Brooke Grp., 509 U.S. at 223-24, 113 S.Ct. at 2588).  Accordingly, the Court had "specifically declined to allow plaintiffs to recover for above-cost price cutting, concluding that 'discouraging a price cut and . . . depriving consumers of the benefits of lower prices . . . does not constitute sound antitrust policy.'" Id., 127 S.Ct. at 1074-75 (quoting Brooke Grp., 509 U.S. at 224, 113 S.Ct. at 2588).

Most recently in Pacific Bell Telephone Co. v. Linkline Communications, Inc., 555 U.S. 438, 129 S.Ct. 1109 (2009), the Court extended this principle to "price squeeze" claims.  Price squeeze claims allege that a "vertically integrated firm [that] sells inputs at wholesale and also sells finished goods or services at retail" has "simultaneously raise[d] the wholesale price of inputs and cut the retail price of the finished good" thereby "squeezing the profit margins of any competitors in the retail market," and forcing the competitors to "pay more for the inputs they need . . . [and] cut their retail prices to match the other firm's prices." Id. at 442, 129 S.Ct. at 1114.  The Court noted that "[t]o avoid chilling aggressive price competition, [it] ha[d] carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low." Id. at 451, 129 S.Ct. at 1120.  It reiterated the dual requirements of Brooke Group for predatory pricing claims, and noted, once

32

more, <u>Atlantic Richfield</u>'s principle that "so long as [prices] . . . are above predatory levels, they do not threaten competition." <u>Id.</u> (quoting <u>Atl. Richfield</u>, 495 U.S. at 340, 110 S.Ct. at 1892).[15]

The Supreme Court's decisions in the above cases require that inferior courts recognize that in general above-cost pricing practices are not anticompetitive and thus do not violate the antitrust laws. Time and time again, the Court has made clear that above-cost pricing practices generally do not threaten competition in the marketplace. <u>Accord Cascade Health Solutions</u>, 515 F.3d at 901 (observing in the context of challenge to bundled discount program that <u>Brooke Group</u> and <u>Weyerhaeuser</u> "strongly suggest that, in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes"); <u>Concord Boat</u>, 207 F.3d at 1061 (stating in the context of a challenge to a market-share discount program that decisions of the Supreme Court "illustrate the general rule that above cost discounting is not anticompetitive"); <u>see also</u> <u>Khan</u>, 522 U.S. at 15, 118 S.Ct. at 282 ("Our interpretation of the Sherman Act also incorporates the notion that condemnation of practices resulting in lower prices to consumers is 'especially costly' because 'cutting prices in order to increase business often is the very essence of competition.'") (internal quotation

---

[15]An equally important facet of the Court's decision in <u>Linkline</u>, in a context quite apart from that here, was its holding that a plaintiff may not bring a Section 2 Sherman Act price-squeeze claim "when the defendant is under no antitrust obligation to sell the inputs to the plaintiff in the first place." 555 U.S. at 442, 129 S.Ct. at 1115.

33

marks and citation omitted).

As the majority notes, it is also clear that the conditional nature of the price cuts or the fact that the prices and the conditions were memorialized in the LTAs does not render the precedent that I summarize above inapplicable.[16] As noted, both Atlantic Richfield and Brooke Group involved conditional discounts of another type, namely volume rebates, and surely inasmuch as ARCO and B&W both were sophisticated companies that dealt in large-scale transactions, they certainly explained these discounts and the conditions they placed on them to the purchasers of their products whether or not they did so in writing. In any event, the purchasers necessarily knew that they were receiving the discounts when they were afforded

---

[16]As noted, in the case of PACCAR's and International's respective LTAs, Eaton provided up-front cash payments in addition to market rebates. Although these payments were not in the form of rebates, they cannot be distinguished from the market-share rebates because both practices were an avenue for Eaton ultimately to provide discounted prices to the OEMs. Accord Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 79 (3d Cir. 2010) (noting that tire manufacturer's offer of up-front payments to race sanctioning bodies to select manufacturer's tires presented no more a coercive threat than an offer of lower prices); NicSand, Inc. v. 3M Co., 507 F.3d 442, 452 (6th Cir. 2007) (en banc) (noting that defendant's cash payments to induce retailers to carry its product solely were "nothing more than price reductions offered to the buyers") (internal quotation marks and citation omitted).

34

them. These cases thus make apparent that the Court's reluctance to condemn above-cost pricing practices extends not only to direct price cuts but also to conditional pricing practices whether or not they are stated in written agreements. The principle that above-cost pricing practices generally do not threaten competition in the marketplace remains true whether the plaintiff casts its claim in the verbiage of "predatory pricing" and alleges explicitly that defendant's prices are too low or whether it realizes it cannot do so because the prices were above cost so it instead couches its challenge in the language of exclusive dealing and attacks the agreements that offer the low prices.

In practice, however, a defendant's pricing practices may include both price and non-price elements. Further, I concur in the majority's conclusion that notwithstanding the Court's strong pronouncements favoring above-cost price cuts, the Supreme Court has not held that in every case in which a plaintiff challenges a defendant's pricing practices the Brooke Group test is dispositive and the plaintiff therefore must demonstrate that there has been below-cost pricing to succeed. See Cascade Health Solutions, 515 F.3d at 901 (noting that "in neither Brooke Group nor Weyerhaeuser did the Court go so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct the plaintiff must prove that those prices were below cost").[17] But where a plaintiff contends

[17]Likewise, I concur fully with the majority's point that a firm may engage in anticompetitive conduct without engaging in below-cost pricing. The antitrust laws proscribe an array of conduct that, of course, does not require as an essential element

that a defendant's prices alone were anticompetitive, the <u>Brooke Group</u> price-cost test provides the entire legal framework necessary to evaluate that claim because the <u>Brooke Group</u> price-cost test is designed to measure whether prices are anticompetitive or not. Thus, where a plaintiff challenges a defendant's pricing practices as exclusive dealing or under any other theory of antitrust liability but in fact alleges only that the defendant's prices themselves operate as the exclusionary or anticompetitive tool, the <u>Brooke Group</u> test must apply and have dispositive effect.[18] My conclusions in this regard largely mirror

below-cost pricing. For example, tying arrangements, unlawful mergers, and price-fixing agreements, to name a few, are all practices that may violate the antitrust laws regardless of the prices resulting from such conduct. The Supreme Court has made clear, however, that where an antitrust plaintiff attacks a defendant's pricing practices, i.e. price cuts, rebates or the like, if those practices result in above-cost prices they generally do not threaten competition, regardless of the source or type of antitrust claim at issue.

[18]Appellees rely heavily on <u>LePage's Inc. v. 3M</u>, 324 F.3d 141 (3d Cir. 2003) (en banc), and contend that our decision in that case precludes the possibility that the price-cost test has any applicability outside of the predatory-pricing-claim framework. For essentially the same reasons the majority sets forth, I, too, believe that <u>LePage's</u> must be confined to its facts and in any event does not bear on the present factually-distinguishable case.

<u>LePage's</u> dealt with bundled rebates, a practice which we analogized to tying arrangements in its exclusive potential and

36

which we concluded may exclude an equally efficient but less diversified rival even if the bundled rebates resulted in above-cost prices. See 324 F.3d at 155 ("The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer."). Above-cost single-product market-share discounts, however, do not present the same putative danger of excluding an equally efficient but less diversified rival by virtue of that rival's limited production alone. For this exact reason, as I explain in further detail below, the same leading antitrust treatise upon which LePage's relied to analogize bundled rebates to tying concludes that single-product market-share discounts are more appropriately likened to straightforward price cuts and the Brooke Group price-cost test should control challenges to such programs. Thus, I concur with the majority that our reasoning in that case necessarily is limited to a single-product producer's claim that it has been excluded through a more-diversified competitor's bundled rebate program that conditioned discounts on the purchase of products that the single-product producer did not offer.

Additionally, while I believe that LePage's' bases for distinguishing Brooke Group stood on questionable grounds when we set them forth nine years ago, as the majority notes the Supreme Court's subsequent decisions have eviscerated those bases and counsel that we do not extend LePage's beyond its original parameters. Furthermore, in concluding that LePage's must be confined to its facts, I think it appropriate to point out

37

those of the majority.

Where I part from my colleagues, however, is with their conclusion that if a plaintiff challenges a defendant's pricing

that there has been considerable academic criticism of our opinion in that case. See, e.g., J. Shahar Billbary, Predatory Bundling and the Exclusionary Standard, 67 Wash. & Lee L. Rev. 1231, 1246 (Fall 2010) ("[T]he main problem with the LePage's test is that it does not investigate whether a bundled discount is pro-competitive. . . . [It] may in fact protect a less efficient competitor (as LePage's admitted to be."); Richard A. Epstein, Monopoly Dominance or Level Playing Field? The New Antitrust Paradox, 72 U. Chi. L. Rev. 49, 49, 61-72 (Winter 2005) (criticizing LePage's' reasoning and noting that the case "shows the deleterious consequences that flow from the aggressive condemnation of unilateral practices"). Moreover, another court of appeals specifically has declined to follow LePage's, see Cascade Health Solutions, 515 F.3d at 903. But perhaps most significantly, the Antitrust Modernization Commission, a statutorily-created bipartisan group tasked with evaluating the state of antitrust law and setting forth recommendations to Congress and the President for its modernization, criticized LePage's as potentially "harm[ing] consumer welfare," and proposed instead that courts adopt a three-part test modeled after Brooke Group's below-cost pricing test to evaluate the lawfulness of bundled discounts. See Antitrust Modernization Comm'n, Report and Recommendations 94-99 (2007) available at http://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf.

practices but contends that the non-price aspects of defendant's conduct, rather than the prices themselves, constituted the anticompetitive conduct, the price-cost test is no longer relevant. While the Supreme Court has not held that the price-cost test is dispositive of all claims that attack a defendant's pricing practices, it is undeniable that its reasoning in the above cases establishes that courts ought to exercise a great deal of caution before condemning above-cost pricing practices. As the majority notes, in the precedent recited above the plaintiffs grounded their claims in the allegation that defendant's prices would cause or had caused them harm. Yet the purpose of my summary and my quotation of that precedent in such detail is to bear out the fact that the Court's holdings rejecting the respective plaintiffs' challenges in those cases were grounded in the fundamental and broader principle that above-cost pricing practices, even those embodied in discount and rebate programs memorialized in written agreements, generally are not anticompetitive and it is that point that is so critical here.

I believe that it is evident that the Supreme Court's reasoning with respect to above-costs pricing applies to a plaintiff's challenge to a defendant's pricing practices even if the plaintiff claims that the non-price aspects of the defendant's practices were the actual exclusionary tactics. Regardless of what components of Eaton's rebate program that appellees identify as the anticompetitive conduct, whether it is the prices or the conditions that Eaton attached to those prices, the question the jury considered at the trial and that we face on appeal is whether Eaton's rebate program and conduct as a whole was procompetitive or anticompetitive. See LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) ("[T]he

39

courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.") (citing Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404 (1962)). Our inquiry in that regard should be an objective one that focuses on the facts of the program and our answer to that question should not turn on the circumstance that appellees had enough foresight specifically not to protest Eaton's prices.[19]

Eaton's prices were, of course, the crux of the rebate program and are an inextricable element of the LTAs. Although appellees conveniently chose to ignore Eaton's prices in formulating their claims, in light of that economic reality and the Supreme Court's mandate that the inferior courts tread lightly when asked to condemn above-cost pricing practices, the nature of those prices must bear on the question of whether Eaton's rebate program as a whole was anticompetitive or not. Accordingly, I believe that if, as here, a plaintiff attacks both the price-based and non-priced-based elements of a defendant's pricing practices, a court should apply and give persuasive effect to the Brooke Group price-cost test such that a firm's above-cost pricing practices enjoy a presumption of lawfulness regardless of how a plaintiff crafts its claim challenging the practices. This approach honors the Supreme Court's repeated admonition that

---

[19]In this regard I note that Eaton's rebate program existed in the same form, above-cost prices and all, on the day before appellees filed their claim as on the day after they filed their claim. The program did not undergo an ontological transformation because appellees had enough prudence not to challenge the price aspects of the program.

above-cost pricing practices are generally procompetitive and that inferior courts must exercise caution before condemning such practices. Furthermore, it has the added virtue of injecting a modicum of predictability into this muddled area of antitrust jurisprudence. This principle is critical in this case.

I recognize, however, that as is always true with respect to any nonconclusive presumption, there may be an exception to the presumption of lawfulness of above-cost pricing if a plaintiff challenging a defendant's above-cost pricing practices establishes that the defendant's conduct as a whole was anticompetitive notwithstanding the pricing aspect of its conduct. In this vein, I acknowledge that, as most contracts offering large-scale quantity discounts necessarily do, the LTAs had other provisions besides the reduced prices themselves, namely, the conditions Eaton attached to those reduced prices, i.e., the market-share targets and the data book placement provisions which appellees attack as anticompetitive. Applying and giving persuasive effect to the Brooke Group price-cost test would not preclude appellees from arguing that the non-price aspects of Eaton's conduct were anticompetitive even in the absence of below-cost pricing. In practice then, in a case such as this one, the Brooke Group price-cost test would operate only as one element, though a significant one, of a court's and jury's inquiry under the rule of reason.

In at least implicitly recognizing the dubious footing of an antitrust mode of analysis that hinges entirely on how a plaintiff crafts its claim, the majority states that a plaintiff may not escape the Brooke Group price-cost test simply by characterizing its claim as one of exclusive dealing but it does

41

allow the plaintiff to avoid application of the test as long as the plaintiff brings an exclusive dealing claim and contends that the non-price aspects of the agreement offering the reduced prices operated as the exclusionary tool. The result of the majority's approach is that the strong procompetitive justifications driving the Supreme Court's repeated charge that inferior courts exercise caution before condemning above-cost pricing practices suddenly disappear so long as the plaintiff is clever enough to claim that the non-price aspects of the defendant's pricing practices, not the prices themselves, were anticompetitive. I do not believe that this is the result the precedent requires or prudence counsels.

I reject the notion that a plaintiff may engage in such legalistic maneuvering in an effort to circumvent the Supreme Court's charge that a court look with a skeptical eye at attacks on above-cost pricing practices. The non-price aspects of the LTAs which appellees challenge, namely the market-share targets and the data book placement provisions, and indeed the LTAs themselves would not exist without the reduced prices that Eaton offered as an incentive for the OEMs to enter the agreements. Conceptually severing the conditions Eaton attached to those prices ignores the economic realities of this case and allows a plaintiff essentially to commandeer a court's analysis through artificial distinctions.[20] In concluding that the

---

[20]Of course, the majority in effect if not intent encourages an antitrust plaintiff challenging a defendant's above-cost pricing practices simply to avoid any mention of defendant's prices. In light of the majority's approach, it would be the rare case indeed in which a sophisticated plaintiff would bring an exclusive

42

Brooke Group price-cost test at least must have persuasive effect in a plaintiff's challenge to a defendant's pricing practices regardless of how a plaintiff casts its claim, I believe it appropriate to note that although I stand alone in this case, I nonetheless find myself in good company. The leading antitrust treatise, on which the majority also relies,[21] concludes that single-product market-share discounts that do not require exclusivity as a condition of the discount are pro-competitive and thus lawful so long as they remain above-cost. Because that treatise cogently explains why above-cost market-share

dealing claim against a defendant's above-cost pricing practices and allege that price itself functioned as the exclusionary tool for such a claim necessarily would be ill-fated under the majority's approach.

[21]The majority quotes from Areeda and Hovenkamp to explain the treatise's perspective that a dominant firm may employ exclusive-dealing contracts to preclude a young rival's expansion. I do not doubt the truth of this statement but as I note above the treatise takes the position that market-share discount programs that do not condition the discount on exclusivity, which precisely describes Eaton's program, are, in fact, not exclusive dealing contracts and should not be treated as such. Areeda and Hovenkamp suggest that where a market-share discount program conditions the discount on exclusivity the standards applicable to exclusive dealing should apply. See Fundamentals of Antitrust Law, § 18.03b, at 18-65 ("A discount conditioned on exclusivity should generally be treated as no different than an orthodox exclusive-dealing arrangement.").

43

discounts are generally not anticompetitive and do not constitute unlawful exclusive dealing, I quote it at length:

> [U]nilaterally imposed quantity discounts can foreclose the opportunities of rivals when a dealer can obtain its best discount only by dealing exclusively with the dominant firm. For example, discounts might be cumulated over lengthy periods of time, such as a calendar year, when no obvious economies result. The effect of continuously increasing discounts varies, but they can resemble exclusive dealing in extreme circumstances.

> <u>Nevertheless, quantity and market share discounts differ from exclusive dealing in important respects.</u> First, the buyer need not make any <u>ex ante</u> commitment of long duration to deal with only one firm; as soon as other advantages outweigh the discount, the buyer can switch simply by paying the nondiscounted price. The buyers can also switch if one or more other sellers can match the discount. <u>As long as the discounted price is above cost and not predatory, it can be matched by any equally efficient rival.</u>

> <u>Second, the similarity to exclusive dealing is greatest when the product in question is fungible, with buyers indifferent to all</u>

44

characteristics except price.[22]  If the product is differentiated, the buyer may wish to purchase a mixture from alternative sellers, notwithstanding one seller's progressive discount.  For example, an appliance seller who has customer demand for four brands of refrigerators is likely to stock all four, even though the seller of one offers progressive discounts for larger purchases.

The effective period over which a firm is 'locked up' by a cumulating discount may bear on competitive effects, just as contract duration in excluding dealing cases. . . .  Discounts that are aggregated over a longer period — say, over all purchases made in one year — may be more problematic.  <u>First, however, they cannot have an anticompetitive effect greater than exclusive dealing with one year contracts.</u>  Where there are multiple buyers, numerous selling opportunities will come up anew each year.  <u>Second, in the great majority of cases they exclude much less than the one-year exclusive dealing contract because an aggressive rival can steal sales by matching the cumulated discount, which will be</u>

---

[22]Of course, HD truck transmissions are not fungible products.  Indeed, this fact is an unstated premise of appellees' claims because they contend essentially that the FreedomLine was far superior to Eaton's transmissions and that its failure in the marketplace can be attributed only to Eaton's anticompetitive conduct.

the same as the dominant firm's cumulative discount obligation. Even in such a case, single-item discounts can be matched by an equally efficient rival.

For single-item discounts, no matter how measured or aggregated, injury to an equally efficient rival seems implausible. It is perhaps most plausible where there are a very small number of buyers, entry barriers into the buying market are very high, and buying requires the making of long-term commitments. In that case, aggressive discounting by the monopolist could deprive a rival of most of its patronage. Even here, however, we would hesitate to condemn a firm for making an above-cost sale that could readily be matched by an equally efficient rival. Competitive injury is not plausible when there are a large number of buyers, particularly when entry barriers into the buying market are low. As the First Circuit did in Barry Wright [Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 232 (1st Cir. 1983) (Breyer, J.)], we would test illegality by the ordinary rules applying to predatory pricing and allow all above-cost single item discounts.

Given that above-cost discounts can be matched by equally efficient rivals, anticompetitive effects are likely only when the large firm can offer a larger variety of products or

46

> services than the smaller firm does. The most
> common scenario resembles tying.

IA Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 768b, at 148-50 (2d ed. 2000) (emphasis added).

This discussion is set forth in the treatise's treatment of market-share discounts in the context of Section 2 of the Sherman Act. However, for the same reasons recited above, Areeda and Hovenkamp take the identical position in the context of Section 1 Sherman Act challenges to market-share discounts:

> One approach to [market-share discounts] . . . is to treat them as exclusive dealing contracts, with the contract period equal to the period over which purchases can be aggregated for purposes of measuring the size of the discount.
>
> . . .
>
> If exclusive dealing under equivalent structural conditions and subject to equivalent defenses were lawful, the discount arrangement should be lawful as well. <u>But the competitive impact must in fact be less because any equally efficient rival can take the customer by bidding a better price and even compensating the customer for the loss of the discount from the defendant — assuming, as we have, that the defendant's program results in above-cost prices at all discount levels</u>. . . . <u>For these reasons we suggest</u>

47

> that discounts attached merely to the quantity of good purchased, and not to exclusivity itself, be treated as lawful, and not be subjected to the laws of exclusive dealing.

> The decisions to the contrary involve situations where the defendant aggregates the discount across two or more related products, while the plaintiff produces only one or a subset of these products.

XI Areeda & Hovenkamp, Antitrust Law ¶ 1807b2, at 132-33 (citing LePage's, 324 F.3d 141) (emphasis added).[23]

The treatise's reasoning as set forth above is clear and needs little further elaboration from me. While, as noted, the law allows a plaintiff to contend that non-price aspects of a defendant's pricing practices were anticompetitive under the rule of reason notwithstanding the defendant's above-cost prices, I believe that the treatise's extraordinarily detailed economic rationale for concluding that the price-cost test is appropriate in challenges to single-product market-share discounts show that my approach is on firm footing. See also Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 232 (1st Cir. 1988) (Breyer, J.) (Above-cost prices do not "have a tendency to exclude or eliminate equally efficient competitors. Moreover, a price cut that leaves prices above incremental costs

---

[23]As I explain below, Areeda and Hovenkamp take the position that Section 3 does not encompass non-exclusive market-share discount programs.

48

was probably moving prices in the 'right' direction — towards the competitive norm."); Herbert Hovenkamp, Discounts and Exclusion, 2006 Utah L. Rev. 841, 844 (2006) ("One of the factors driving the predatory pricing rule is that, as long as prices are above the relevant measure of cost, the discounts cannot exclude an equally efficient rival. The same is true of single-product discounts.").

In sum, I reiterate that Supreme Court precedent requires that courts exercise considerable caution before condemning above-cost pricing practices and that in a challenge to a defendant's pricing practices the Brooke Group price-cost test should apply and be given persuasive effect regardless of whether a plaintiff identifies non-price elements of a defendant's conduct that it alleges were anticompetitive. Having discussed this critical point, I now turn to the question of whether under the rule of reason analysis and the standards applicable to claims of unlawful exclusive dealing appellees demonstrated that a jury could hold that Eaton violated the antitrust laws notwithstanding its above-cost prices.

B. Clayton Act Section 3 and Sherman Act Section 1 Claims[24]

---

[24]The majority collapses appellees' three claims into one analysis, and while that approach is not necessarily incorrect and the three provisions at issue overlap substantially, I believe it most prudent to address the claims separately as the provisions at issue have some distinct elements that require separate discussion.

49

Appellees contend that the LTAs were anticompetitive exclusive dealing arrangements in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. They claim that through the LTAs "Eaton engaged in de facto exclusive dealing agreements and other conduct that denied any other supplier the ability to compete for even 10% of the market." Appellees' br. at 43.

In considering this argument, I start with the principle that even explicit exclusive-dealing arrangements, which preclude a buyer from purchasing the goods of another seller, are not per se unlawful. See Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3d Cir. 2010); United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005). Indeed, "it is widely recognized that in many circumstances exclusive dealing arrangements may be highly efficient — to assure supply, price stability, outlets, investment, best efforts or the like — and pose no competitive threat at all." Races Tires, 614 F.3d at 76 (quoting E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc., 357 F.3d 1, 8 (1st Cir. 2004))

In this case, I make many more citations to the record than judges of this Court ordinarily would make in an opinion. I do so because while deference to the jury's verdict requires that we not reweigh the evidence and that we view the evidence in the light most favorable to appellees, where, as here, the evidence supporting that verdict falls so short of the standard required to sustain that verdict I believe it appropriate to point not only to the absence of evidence supporting the jury verdict but also to the considerable undisputed evidence contradicting that verdict.

50

(internal brackets omitted); see also Standard Oil Co. of Calif. v. United States, 337 U.S. 293, 306-07, 69 S.Ct. 1051, 1058-59 (1949) (listing advantages of requirements contracts to both buyers and sellers); Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997) ("There are . . . well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition.") (citation omitted). As we stated in Race Tires, "[i]t is well established that competition among businesses to serve as an exclusive supplier should actually be encouraged." 614 F.3d at 83 (citation omitted). "[C]ompetition to be an exclusive supplier may constitute 'a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress.'" Id. at 76 (quoting Menasha Corp. v. News Am. Marketing In-Store, Inc., 354 F.3d 661, 663 (7th Cir. 2004)). Of course, "exclusive agreements are not exempt from antitrust scrutiny." Race Tires, 614 F.3d at 76. "All exclusive dealing agreements must comply with section 1 of the Sherman Act." Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir. 1992) (citing Am. Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1239 (3d Cir. 1975)). "Contracts for the sale of goods . . . must also comply with the more rigorous standards of section 3 of the Clayton Act." Id.

While Section 3 requires that a plaintiff demonstrate that it is "probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected," Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628 (1961) (emphasis added), under a Section 1 rule-of-reason case such as this case "the plaintiff bears the initial burden of showing that the [alleged] agreement

51

produced an adverse, anticompetitive effect within the relevant geographic market," Burtch v. Milberg Factors, Inc., 662 F.3d 212, 222 (3d Cir. 2011) (quotations marks and citation omitted) (emphasis added). Accordingly, if an arrangement "do[es] not infringe upon the stiffer standards of anti-competitiveness under the Clayton Act, . . . [it] will also be lawful under the less restrictive provisions of the Sherman Act." Barr Labs., 978 F.2d at 110 (citing Am. Motor Inns, 521 F.2d at 1250); see also CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 79 (2d Cir. 1999) ("The conclusion that a contract does not violate § 3 of the Clayton Act ordinarily implies the conclusion that the contract does not violate the Sherman Act . . . .") (citation omitted); Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1304 n.9 (9th Cir. 1982) ("[A] greater showing of anticompetitive effect is required to establish a Sherman Act violation than a section 3 Clayton Act violation in exclusive-dealing cases.") (citation omitted).[25]

---

[25]In Tampa Electric, the Court indicated that if an arrangement is lawful under Section 3 of the Clayton Act it will be lawful under both Sections 1 and 2 of the Sherman Act. See 365 U.S. at 335, 81 S.Ct. at 632 ("We need not discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act, for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former.") (citing Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 608-09, 73 S.Ct. 872, 880 (1953)). In Barr Laboratories, however, we disposed of the plaintiff's Section 1 Sherman Act claim with its Section 3 Clayton Act claim but we addressed the plaintiff's Section 2

To determine whether it is "probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected" in violation of Section 3, Tampa Electric Co., 365 U.S. at 327, 81 S.Ct. at 628, logically a plaintiff first must establish the share of the market, expressed in a percentage, in which the exclusive dealing arrangement forecloses competition. As the Court of Appeals for the District of Columbia Circuit stated in one of the more notable antitrust cases of the recent past, "[t]hough what is 'significant' may vary depending upon the antitrust provision under which an exclusive deal is challenged, it is clear that in all cases the plaintiff must both define the relevant market and prove the degree of foreclosure." United States v. Microsoft Corp., 253 F.3d 34, 69 (D.C. Cir. 2001); see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 66 (1st Cir. 2004) ("For the exclusive dealing contract, the first step would be [for plaintiff] to show the extent of foreclosure resulting from the . . . contract . . . ."); R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 388 (M.D.N.C. 2002), aff'd, 67 F. App'x 810 (4th Cir. 2003) ("A plaintiff makes out a prima facie case of substantial foreclosure by demonstrating first that a

Sherman Act claim separately. See 978 F.2d at 110-12; see also Dentsply, 399 F.3d at 197 (concluding that the district court erred in stating that defendant had not violated Section 2 of the Sherman Act solely because it had concluded that defendant had not violated Section 3 of the Clayton Act) (citing LePage's, 324 F.3d at 157 n.10). For this reason, I subsume appellees' Section 1 Sherman Act claim within its Section 3 claim but I address separately appellees' Section 2 Sherman Act claim.

significant percentage of the relevant market is foreclosed by the provision challenged.").

"The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, 'the opportunities for other traders to enter into or remain in that market must be significantly limited.'" Microsoft Corp., 253 F.3d at 69 (quoting Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 628-29); see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45, 104 S.Ct. 1551, 1576 (1984) (O'Connor, J., concurring) ("Exclusive dealing is an unreasonable restraint on trade [under Section 1 of the Sherman Act] only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.") (citation omitted); Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1294 (4th Cir. 1987) ("[T]he courts' focus in evaluating exclusive dealing arrangements should be on their effect in shutting out competing manufacturers' brands from the relevant market."); Perington Wholesale, Inc. v. Burger King Corp., 631 F.2d 1369, 1374 (10th Cir. 1979) ("[A] complaining trader [challenging an exclusive-dealing arrangement] must allege and prove that a particular arrangement unreasonably restricts the opportunities of the seller's competitors to market their product.") (citation omitted). Thus, "[f]ollowing Tampa Electric, courts considering antitrust challenges to exclusive contracts have taken care to identify the share of the market foreclosed." Microsoft Corp., 253 F.3d at 69 (citation omitted); see also E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc., 637 F.3d 435, 451 (4th Cir. 2011) (noting that "the requirement of a significant degree of foreclosure serves a useful screening function") (internal quotation marks and citation omitted).

54

Nevertheless, the antitrust laws tolerate some degree of market foreclosure; Section 3 only condemns an agreement where the foreclosure represents a substantial share of the market. See Standard Fashion Co. v. Magrane Houston Co., 258 U.S. 346, 357, 42 S.Ct. 360, 362 (1922) ("That . . . [Section 3] was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial."). Thus, once the plaintiff demonstrates the portion of the market the exclusive-dealing arrangement forecloses, the court must ask whether that level of preemption constitutes a "substantial" share of the market. See Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 628 (In a Section 3 case, the Court must consider the degree of market foreclosure and "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market."). There is no fixed percentage at which foreclosure becomes "substantial" and courts have varied widely in the degree of foreclosure they consider unlawful. See R.J. Reynolds Tobacco Co., 199 F. Supp. 2d at 388 (collecting cases and noting that "[c]ourts have condemned provisions involving foreclosure as low as 24% while provisions involving foreclosure as high as 50% have been upheld") (citations omitted).

Under Tampa Electric, however, "the degree of market foreclosure is only one of the factors involved in determining the legality of an exclusive dealing arrangement." Barr Labs., 978 F.2d at 111 (citation omitted). Indeed, while a negligible degree of foreclosure "makes dismissal easy," a high degree of market foreclosure does not "automatically condemn" an exclusive-dealing arrangement. Stop & Shop Supermarket, 373 F.3d at 68. Rather, once a plaintiff identifies the degree of

55

market foreclosure, to determine whether that preemption is "substantial," a court considers not only the quantitative aspect of the foreclosure but also the qualitative conditions of the particular market, such as "the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area," and the effect "preemption of that share of the market might have on effective competition therein." Tampa Elec. Co., 365 U.S. at 329, 81 S.Ct. at 629; see also Barr Labs., 978 F.2d at 111. Courts employing Tampa Electric's market analysis also consider the duration of the agreement, the ease of its terminability, the height of any entry barriers, alternative outlets competitors may employ to sell their product, and the buyer's and seller's business justifications for the arrangement. See Concord Boat, 207 F.3d at 1059; Omega Envtl., 127 F.3d at 1163-65; Barr Labs., 978 F.2d at 111; Barry Wright Corp, 724 F.2d at 236-37; R.J. Reynolds Tobacco Co., 199 F. Supp. 2d at 389; see also XI Areeda & Hovenkamp, Antitrust Law ¶ 1821d, at 183-88.[26]

---

[26]In substance, the Tampa Electric standard for Clayton Act Section 3 claims differs very marginally, if at all, from the fact-intensive rule-of-reason analysis that applies to this case under Section 1 of the Sherman Act. Cf. Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010) ("The rule of reason requires the fact-finder to weigh [] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. The inquiry is whether the restraint at issue is one that promotes competition or one that suppresses competition.")

In considering whether Eaton's conduct violated Section 3, I note first that it is undisputed that the LTAs were not by their terms exclusive-dealing contracts. The LTAs did not require the OEMs to purchase any amount, much less all, of their transmission needs from Eaton, and they did not preclude the OEMs from purchasing transmissions from appellees or any other manufacturer. Additionally, the LTAs did not condition the rebates on the OEMs' purchase of 100% of their transmission needs from Eaton.

In the past, we have expressed doubt as to whether an agreement involving less than all of a customer's purchases even falls within the ambit of Section 3. See Barr Labs., 978 F.2d at 110 n.24 ("An agreement affecting less than all purchases does not amount to true exclusive dealing.") (citation omitted); see also W. Parcel Express v. United Parcel Serv. of Am., Inc., 190

_____

(quotation marks and citations omitted). Indeed, it appears more often than not that in a Section 1 case courts explicitly employ the Tampa Electric standard as the guiding framework for the rule-of-reason analysis. See, e.g. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., 592 F.3d 991, 996 (9th Cir. 2010) ("Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'") (quoting Omega Envtl., 127 F.3d at 1162); see also Jefferson Parish, 466 U.S. at 45, 104 S.Ct. at 1575 (O'Connor, J., concurring) ("Exclusive dealing arrangements are independently subject to scrutiny under § 1 of the Sherman Act, and are also analyzed under the Rule of Reason.") (citing Tampa Elec. Co., 365 U.S. at 333-35, 81 S.Ct. at 631-32).

57

F.3d 974, 976 (9th Cir. 1999) (concluding that because volume discount contracts did "not preclude consumers from using other delivery services, they [we]re not exclusive dealing contracts that preclude[d] competition"); Magnus Petroleum Co., v. Skelly Oil Co., 599 F.2d 196, 200 (7th Cir. 1979) ("Because the agreements contained no exclusive dealing clause and did not require plaintiffs to purchase any amounts of gasoline that even approached their requirements, they did not violate Section 3 of the Clayton Act.") (citations omitted).

Indeed, Section 3 explicitly applies only to those agreements entered into "on the condition, agreement, or understanding that the lessee or purchaser . . . shall not use or deal in the goods . . . of a competitor." 15 U.S.C. § 14; see also Standard Fashion Co., 258 U.S. at 356, 42 S.Ct. at 362 (Section 3 "deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only.").[27] I doubt whether a market-share

---

[27]Section 1 of the Sherman Act, which proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1 and Section 2 of the Sherman Act, which proscribes the monopolization or attempted monopolization of trade or commerce, 15 U.S.C. § 2, do not contain Section 3's "on the condition" language. Accordingly, the LTAs fall within the theoretical reach of those provisions. Nevertheless, appellees' Section 1 and 2 claims fail because appellees did not introduce sufficient evidence from which a jury could infer that the LTAs were exclusive dealing contracts that foreclosed competition in the marketplace.

discount program of the type here, which does not preclude the buyer from dealing in the goods of others and does not even condition the rebate on exclusivity, falls within the statutory reach of that provision. See IIIA Areeda & Hovenkamp, Antitrust Law ¶ 768, at 148 n.26 (noting that "only the Sherman Act applies" to a claim that a market-share discount amounts to exclusive dealing because "[w]hile § 3 of the Clayton Act, 15 U.S.C. § 14, expressly covers the seller who offers a 'discount from, or rebate upon' a sale in exchange for a promise not to deal with others, that is not the same thing as a quantity or market share discount, in which the buyer makes no promise not to deal with others").[28]

The majority bypasses this obstacle to appellees' success by stating that a plaintiff's allegation that a contract lacking an express exclusivity requirement nonetheless establishes an unlawful de facto exclusive dealing program sets forth a

---

[28]In fact, even if the LTAs had required the OEMs to purchase a certain share but not all of their transmissions needs from Eaton, as the majority interprets them to do, it is still unclear whether Section 3 would have reached that agreement. See Areeda & Hovenkamp, Fundamentals of Antitrust Law § 18.01c, at 18-17 ("Literally, a 'partial' exclusive dealing requirement appears not to be covered by § 3 of the Clayton Act at all. For example, if A requires B to purchase 'at least 60 percent' of its gasoline needs from A, B is still free to purchase the remaining 40 percent elsewhere. As a result, there is no condition that B not deal in the goods of a competitor, as the statute requires. Most of the courts take this position.") (citations omitted).

59

cognizable antitrust claim. In doing so, the majority also concludes that Section 3 encompasses contracts that require partial exclusivity.

The notion of de facto exclusive dealing has its roots in United Shoe Machinery Corp. v. United States, 258 U.S. 451, 457, 42 S.Ct. 363, 365 (1922), in which the Court held that a contract lacking an express agreement not to use the goods of a competitor falls within the ambit of Section 3 if "the practical effect is to prevent such use." As noted, the majority appears to interpret this statement as meaning that a contract that has the effect of causing the purchaser to buy most of its needs from one seller falls within Section 3 because it induces near-exclusivity. I disagree with this interpretation and believe instead that United Shoe and its "practical effect" standard stands for the proposition that a contract that is not facially exclusive may nonetheless fall within the ambit of Section 3 if, in the implementation of its terms, it induces actual exclusivity.

In United Shoe, the Court condemned as unlawful exclusive dealing a lease that included, among other things, a forfeiture provision to the effect that if the lessee failed to use exclusively machinery of certain kinds made by the lessor, the lessor had the right to cancel the lessee's right to use all such machinery, a provision that the lessee would not use the machinery on products that had not received particular operations upon certain of other lessor's machines, and a clause that required the lessee to purchase its supplies exclusively from the lessor. See id. at 456-57, 42 S.Ct. at 365. Lessees who used the lessor's competitors' machines in violation of the terms of the leases "had their attention called to the forfeiture provisions

60

in the leases, which was understood, by many of the lessees, as warnings, in the nature of threats, that unless discontinued these covenants of the leases would be enforced." United States v. United Shoe Mach. Co., 264 F. 138, 145 (D.C. Mo. 1920). These provisions, which the Court noted amounted in reality to "tying agreements," fell within the scope of Section 3 because they "effectually prevent[ed] the lessee from acquiring the machinery of a competitor of the lessor, except at the risk of forfeiting the right to use the machines furnished by the [lessor]." 258 U.S. at 457-58, 42 S.Ct. at 365. Thus, in practice, the lease induced actual, total exclusivity. Subsequent cases relying on United Shoe's "practical effect" formulation bear the point out.

In International Business Machines Corp. v. United States, 298 U.S. 131, 135, 56 S.Ct. 701, 703 (1936), the Court, relying on United Shoe, concluded that a lease for tabulating machines that required the lessee to use only the tabulating cards of the lessor on its machines fell within Section 3 because in practice it required the exclusive use of the lessor's cards. The Court explained that while "the condition is not in so many words against the use of the cards of a competitor, but is affirmative in form, that the lessee shall use only appellant's cards in the leased machines," because "the lessee can make no use of the cards except with the leased machines, and the specified use of appellant's cards precludes the use of the cards of any competitor, the condition operates [to prohibit the use of the cards of a competitor] in the manner forbidden by" Section 3 of the Clayton Act. Id. (citing United Shoe, 258 U.S. at 458, 42 S.Ct. at 365); but see FTC v. Sinclair Refining Co., 261 U.S. 463, 474, 43 S.Ct. 450, 453 (1923) (distinguishing United Shoe

61

and concluding that contract that required lessee of gasoline pumps not to use competitor's gasoline in lessor's pumps did not fall within Section 3 because the contract did not contain a provision "which obligate[d] the lessee not to sell the goods of another," and "[t]he lessee [wa]s free to buy [pumps] wherever he cho[se]"). Similarly, in Standard Oil, the Court assumed that Section 3 encompassed "[e]xclusive supply contracts" that the defendant had entered with its dealers, in which the dealer promised "to purchase from Standard all his requirements of one or more products."[29]  337 U.S. at 295-96, 69 S.Ct. at 1054.

Accordingly, while Section 3 encompasses agreements that do not contain express exclusivity provisions but in reality induce actual exclusivity, it does not, as the majority seems to believe, encompass agreements that do not contain express exclusivity provisions and do not induce actual exclusivity.[30]

---

[29]In Tampa Electric, the case most often cited for the "practical effect" standard, the Court considered a challenge to a requirements contract and "assume[d], but d[id] not decide, that the contract [wa]s an exclusive-dealing arrangement within the compass of § 3."  365 U.S. at 330, 81 S.Ct. at 629.

[30]LePage's and Dentsply, cases on which the majority relies, are not to the contrary.  Those cases dealt not with Section 3 of the Clayton Act but rather with Section 2 of the Sherman Act, which does not contain the same restrictive "on the condition" language as Section 3.  Furthermore, in LePage's, we concluded that 3M's bundled rebate agreements constituted unlawful de facto exclusive dealing arrangements because LePage's "introduced powerful evidence" that its prior customers refused

Here, not only did the LTAs lack any provision imposing a ban on the OEMs' purchase of Eaton's competitors' products, they did not contain a provision amounting to or having the effect of imposing such a ban. Moreover, the evidence adduced at the trial demonstrates that the LTAs actually did not induce de facto total exclusivity on the part of the OEMs. As noted, from July 2000 to October 2003, ZFM's share of the HD transmission market ranged between 8% and 14%. Thus, the majority, in interpreting the scope of Section 3 to encompass an agreement which neither explicitly forbids nor has the effect of precluding the OEMs from purchasing Eaton's competitors' products, has expanded the scope of Section 3 greatly beyond its intent. Section 3 only encompasses agreements that explicitly forbid or have the practical effect of precluding one party from using the goods of another. Nevertheless, despite my serious misgivings on this threshold exclusive-dealing issue, which could justify terminating this discussion now and thus reversing the District Court's denial of judgment as a matter of law as to appellees' Section 3 Clayton Act claim, I will assume that the LTAs fall

to meet with LePage's' sales representatives, refused to discuss purchasing LePage's products for "the next three years," and 3M offered bonus rebates to its customers upon achieving sole-supplier status. 324 F.3d at 158. And in Dentsply, we concluded that a provision that Dentsply imposed on its dealers that actually prohibited the dealers from adding its competitors' tooth lines as part of their product offering amounted to exclusive dealing. 399 F.3d at 193. Here, as explained below, appellees fell woefully short of introducing evidence that the LTAs induced anything approaching actual exclusivity.

63

within the theoretical reach of Section 3 and proceed to analyze the LTAs under that provision. My analysis, however, does not get very far before it becomes readily apparent that this fundamental flaw in appellees' case — that the LTAs were not, in fact, exclusive-dealing contracts — is fatal to their claim.

As noted above, under Tampa Electric a plaintiff first must identify the degree of market foreclosure. Despite a lengthy trial in the District Court, which has resulted in the creation of a nine-volume joint appendix and extensive briefing on this appeal, appellees do not identify clearly for us the precise degree of market foreclosure attributable to the LTAs. The majority, however, attempts to make up for appellees' deficiency in this regard by stating that appellees' expert, Dr. David DeRamus, testified that the LTAs left only 15% of the market remaining to Eaton's competitors, or stated another way, that the LTAs foreclosed competition in 85% of the market. In reality, however, Dr. DeRamus did not testify that the LTAs foreclosed competition in 85% of the market. The testimony on which the majority apparently relies for that figure deals not with Dr. DeRamus' opinion as to the extent to which the LTAs foreclosed competition in the HD truck transmission market but rather with Dr. DeRamus' calculation of Eaton's market share during the relevant time period in the context of his determination as to whether Eaton had monopoly power. See J.A. at 722 (Dr. DeRamus' testimony) (explaining the steps he took to ascertain whether "Eaton has monopoly power in the[] . . . [NAFTA HD truck transmission market"); see also J.A. at 4758, 4760 (Dr. DeRamus' expert report) (setting forth the data reflecting Eaton's market share). I think it obvious that the inquiry into Eaton's market share is a question separate and

64

apart from the LTAs' alleged foreclosure effect[31] and that we may not simply borrow Dr. DeRamus' testimony as to Eaton's market share to adduce evidence of the LTAs' foreclosure effect.

In point of fact, Dr. DeRamus aimed much higher with his estimation of the LTAs' alleged foreclosure effect by stating explicitly in his expert report that "Eaton's exclusionary agreements with all four of the heavy-duty truck OEMs — the only significant manufacturers of heavy-duty trucks in the relevant geographic markets at issue in this case — foreclosed nearly 100 percent of the North American market or markets for HD [t]ransmissions." J.A. at 4814 (Dr. DeRamus' expert report). Dr. DeRamus arrived at this foreclosure percentage on the basis of the market-share targets the LTAs required for the

---

[31]See, e.g., Barry Wright Corp., 724 F.2d at 229, 237 (observing that potential foreclosure effect of volume discount requirements contract between manufacturer, who had 83% to 94% market share, and purchaser of mechanical snubbers was 50% where purchaser's snubber purchases represented 50% of snubber market). The distinction between these two inquiries, the question of Eaton's market share and the question of the LTAs' alleged foreclosure effect, is particularly critical in a case such as this one since prior to 1989 Eaton was the only HD transmission manufacturer and thus possessed 100% market share at a time before appellees contend that it engaged in any alleged anticompetitive conduct.

OEMs to receive the rebates.[32]

In denying Eaton judgment as a matter of law, the District Court took a similar view that reliance on the market-share targets was an appropriate method to ascertain the LTAs' foreclosure effect, concluding that there was sufficient evidence "that the contracts foreclosed a substantial share of the market" not because ZFM identified a specific foreclosure percentage but because "each OEM was required to order 80% or more of its transmissions from" Eaton to receive the rebates. ZF Meritor, 769 F. Supp. 2d at 692.[33] While the majority's reliance on Dr. DeRamus' testimony regarding Eaton's market share to ascertain the LTAs' foreclosure effect is mistaken, it is clear that the majority likewise ultimately concludes that the market-share

[32]Although Dr. DeRamus did not set forth explicitly in his expert report how he arrived at his foreclosure percentage or his arithmetic in that regard — a shocking oversight in a case that hinges on this very question — his testimony at trial illuminates that he relied on the market-share targets to arrive at his estimation of the LTAs' foreclosure effect, though notably he testified as to a different foreclosure percentage than that which he set forth in his report. See J.A. at 858 (Dr. DeRamus' testimony) (explaining that he arrived at his opinion of the LTAs' foreclosure effect by relying on the market-share targets and opining that one could take a "simple average" of the market-share targets to yield a 90% foreclosure rate).

[33]The District Court's statement in this regard was inaccurate as Volvo's LTA granted it rebates beginning at a 65% market-share target.

targets may serve as a measure of the LTAs' foreclosure effect. For several reasons, however, the market-share targets do not reflect the LTAs' foreclosure effect, and, on this point, I find that the Court of Appeals for the Ninth Circuit's and the Court of Appeals for the Eighth Circuit's treatment of Sherman Act Section 1 challenges to non-exclusive market-share discount programs are instructive.

In Allied Orthopedic Appliances Inc. v. Tyco Health Care Group, 592 F.3d 991, 994-96 (9th Cir. 2010), a group of hospitals and health care providers alleged, among other things, that Tyco, a monopolist in the U.S. pulse oximetry sensor market, unlawfully foreclosed competition in the market in contravention of Section 1 of the Sherman Act through its offer of market-share discounts. As here, the market-share agreements provided discounts conditioned on the customers' purchase of a certain percentage of the product in issue, i.e., pulse oximetry sensors, from Tyco, the discount increasing with Tyco's increasing market share. "The agreements did not contractually obligate Tyco's customers to buy anything from Tyco . . . and [t]he only consequence of purchasing less than the agreed upon percentage of Tyco's products was loss of the negotiated discounts." Id. at 995.

The court of appeals concluded that the agreements did not foreclose competition in violation of Section 1 because the agreements did not require Tyco's customers to purchase anything from Tyco and because "[a]ny customer subject to one of Tyco's market-share discount agreements could choose at anytime to forego the discount offered by Tyco and purchase

from a generic competitor." Id. at 997.[34] Thus, Tyco's competitors "remained able to compete for Tyco's customers by offering their products at better prices." Id. at 998.

The Court of Appeals for the Eighth Circuit took a similar view of market-share discount agreements in Concord Boat. In that case, a group of boat builders that sold boats to dealers alleged that Brunswick, the market leader in the manufacture of stern drive engines, violated Section 1 through its offer of market-share discount agreements with the builders and dealers. The agreements offered reduced prices conditioned on market-share targets of 60% to 80%. See 207 F.3d at 1044.[35] As is true here with respect to the product in issue, none of Brunswick's programs "obligated boat builders and dealers to purchase engines from Brunswick, and none of the programs restricted the ability of builders and dealers to purchase engines from other engine manufacturers." Id. at 1045.

The court employed the standards of Tampa Electric to conclude that the plaintiffs had "failed to produce sufficient evidence to demonstrate that Brunswick had foreclosed a

---

[34]The court also found significant the plaintiffs' expert failure to explain why "price-sensitive hospitals would adhere to Tyco's market-share agreements when they could purchase less expensive generic sensors instead." 592 F.3d at 997.

[35]The plaintiffs also alleged that Brunswick had violated Section 7 of the Clayton Act and Section 2 of the Sherman Act, but the court likewise rejected these claims. See 207 F.3d at 1043, 1053, 1062.

substantial share of the . . . market through anticompetitive conduct" and failed to show that "Brunswick's discount program was in any way exclusive" in violation of Section 1. Id. at 1059. The court reached that conclusion because the builders were "free to walk away from the discounts at any time," and "Brunswick's discounts, because they were significantly above cost, left ample room for new competitors . . . to enter the engine manufacturing market and to lure customers away by offering superior discounts." Id.; see also Se. Mo. Hosp. v. C.R. Bard, Inc., 642 F.3d 608, 612-13 (8th Cir. 2011) (rejecting Sherman Sections 1 and 2 and Clayton Section 3 challenge to market-share discount program on the basis of Concord Boat where customers "were not required to purchase 100 percent of their . . . needs from . . . [defendant] or to refrain from purchasing from competitors" or indeed to purchase "anything from . . . [defendant]"); Stitt Spark Plug Co. v. Champion Spark Plug Co., 840 F.2d 1253, 1258 (5th Cir. 1988) (affirming district court's directed verdict in favor of defendant on Section 1 and Section 3 claims where plaintiff "proved no instance in which a distributor honored an exclusive dealing arrangement by refusing to purchase . . . [plaintiff's] plugs, . . . there was no testimony that any distributor agreed to refrain from selling competing plugs for any specific period of time, . . . [and] [t]here was no evidence that a distributor who failed to abide by the agreement would be subject to any sanction").

As was true of the contracts at issue in Allied Orthopedic and Concord Boat with respect to what are suggested to be, wrongly in my view, mandatory purchase obligations, the LTAs did not obligate the OEMs to purchase anything from Eaton, much less 100% of their transmission needs, nor did they

69

preclude the OEMs from purchasing transmissions from any other manufacturer. Rather, the agreements provided for increasing rebates and thus lower prices based on the percentage of an OEM's transmission needs that it purchased from Eaton. In such a circumstance, the LTAs did not foreclose competition in any share of the market because Eaton's competitors were able to compete for this business as the OEMs were at liberty to walk away from the LTAs at any time.

Indeed, this point is precisely where the Brooke Group price-cost test comes into play. In a situation such as this one, where the contract in terms is not exclusive and merely provides discounted but above-cost prices conditioned upon a market-share target, any equally efficient competitor, including ZFM, if it was an equally efficient competitor, had an ongoing opportunity to offer competitive discounts to capture the OEMs' business. If Eaton's discounts had resulted in prices that were below-cost, a charge that appellees do not make, then even an equally-efficient competitor might not have the opportunity to compete for the business the LTAs covered and thus it could be said that competition was foreclosed in that share of the market notwithstanding the non-obligatory and non-exclusive nature of the LTAs. But we do not need to address that unlikely circumstance because Eaton's discounts resulted in prices that were above-cost and thus the LTAs "left ample room" for ZFM or new competitors to enter the market and "to lure customers away by offering superior discounts." Concord Boat, 207 F.3d at 1059. As in Allied Orthopedic, "[t]he market-share discount agreements at issue here did not foreclose . . . [Eaton's] customers from competition because 'a competing manufacturer need[ed] only offer a better product or a better deal to acquire

70

their [business].'" 592 F.3d at 997 (quoting Omega, 127 F.3d at 1164); see also Areeda & Hovenkamp, Antitrust Law ¶ 768b, at 148-50 (concluding that above-cost market-share discounts do not exclude equally efficient rivals because "[a]s long as the discounted price is above cost and not predatory, it can be matched by any equally efficient rival"). Absent evidence that notwithstanding the above-cost prices of the LTAs the non-price aspects of the LTAs rendered them anticompetitive, we should conclude that as a matter of law Eaton's LTAs were not anticompetitive.

The majority dismisses as inapplicable the reasoning of Allied Orthopedic and Concord Boat by stating that "this is not a case in which the defendant's low price was the clear driving force behind the customer's compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price." Typescript at 33. But the reality is to the contrary as the testimony I have summarized establishes it is precisely the case that Eaton's low prices led the OEMs to enter the LTAs and to strive to meet the market-share targets. Likewise, it is clearly the case that the OEMs were free to walk away from the market-share rebates the LTAs offered at any time. In attempting to overcome this crucial defect in appellees' claim and concluding that notwithstanding the LTAs' terms the LTAs were in fact mandatory agreements to which the OEMs were beholden against their will the majority sets forth two justifications.

First, the majority downplays the possibility that ZFM could "steal" Eaton's customers by offering a superior product or lower price because that possibility did not "prove[] to be

71

realistic." Typescript at 47. In other words, the majority appears to assume that because ZFM did not lure away Eaton's customers through offering superior products or lower prices, it could not have done so and the reason for its inability to do so was the LTAs. I find the majority's treatment of this point to be an unpersuasive answer to the logic of Allied Orthopedic and Concord Boat.

I hardly need make the logical point that one cannot assume that because an event did not happen it could not have happened. It appears that ZFM did not lure away Eaton's customers. That does not mean, however, that ZFM was incapable of doing so. It is beyond dispute and indeed a central point to this case that ZFM did not offer lower prices than Eaton's prices and ZFM did not develop a full product line as it knew it had to do in order to compete effectively with Eaton.[36]

---

[36]The majority states, without elaboration, that Eaton assured that there would be no other supplier that could fulfill the OEMs' needs or offer a lower price. I note first that it is an undisputed fact that when Meritor entered into the joint venture with ZF AG at a time prior to any allegation of anticompetitive conduct by Eaton, Meritor did not offer a full product line of HD truck transmissions. Thereafter, ZFM explicitly identified its lack of a full product line as a barrier to its market success and yet it did not develop a full product line. There is no evidence that Eaton somehow prevented either Meritor or later ZFM from developing a full product line. Furthermore, there is no evidence in the record indicating that Eaton prevented ZFM from offering more attractive discounts to capture Eaton's business and there is no evidence that other firms tried to enter

72

In other words, ZFM did not even engage in the type of competitive conduct that potentially could have lured away Eaton's customers. Thus, we cannot say that it is not realistic to think that if it had engaged in that competition conduct ZFM could have been successful.[37]

the HD truck transmission market but were thwarted by Eaton.

[37]I recognize that appellees contend that "[f]ar from offering low prices to seek competitive advantages . . . Eaton broke the price mechanism, so that ZFM could not compete even by offering discounts or other incentives notwithstanding that ZFM had a better product." Appellees' br. at 44. But appellees' assessment of their product does not establish that the truck purchasers — the entities that actually made the ultimate decision as to which transmission to select for their trucks — would make the same assessment. Indeed, some of the evidence suggests that both OEMs and truck purchasers held the opinion that overall Meritor's products were inferior to Eaton's, and Meritor does not point to evidence foreclosing the possibility that its relatively unfavorable reputation in that regard persisted despite the emergence of ZF Meritor and thereby tainted truck purchasers' view of the FreedomLine. Moreover, even if the truck purchasers had come to the same conclusion as appellees regarding the FreedomLine's technical superiority, appellees' complaint holds no force as the purchasers' were at all times free to act on that opinion by selecting the FreedomLine for their trucks. Nevertheless, it is clear from the record that other factors beyond possible technical superiority, including such considerations as price, service, and availability of the product,

Second, the majority attempts to overcome this absolutely fundamental defect in appellees' case by concluding that notwithstanding the fact that the LTAs were not by their terms mandatory and the fact that Eaton's prices after consideration of the rebates were at all times above-cost such that appellees, were they equally efficient competitors, could have matched them, there nevertheless was sufficient evidence that the LTAs foreclosed competition in a substantial share of the HD truck transmission market because "the targets were as effective as mandatory purchase requirements." Typescript at 42. In this regard, the majority reasons that "[c]ritically, due to Eaton's position as the dominant supplier no OEM could satisfy customer demand without at least some Eaton products, and therefore no OEM could afford to lose Eaton as a supplier." Id. at 43. Therefore, the majority reasons, "a jury could have concluded that, under the circumstances, the market penetration targets were as effective as express purchase requirements because no risk averse business would jeopardize its relationship

could motivate a purchaser in making its decision as to the most advantageous transmission for it to purchase. Lest this fact be doubted I merely need to point out that consumers regularly purchase inexpensive automobiles even though more highly-priced automobiles might be technically better. Overall, the point remains that if ZFM was an equally efficient competitor the LTAs simply did not preclude it from competing with Eaton and did not foreclose competition in any portion of the market, and thus a jury verdict based on a contrary conclusion simply could not survive Eaton's motion for judgment as a matter of law.

74

with the largest manufacturer of transmissions in the market." Id. (internal quotation marks and citation omitted).

Undoubtedly, there is evidence in the record that the OEMs required Eaton's products, to the end that an OEM could not have afforded to lose Eaton as a supplier. However, there is not a scintilla of evidence that if an OEM did not meet its LTA's market-share target Eaton would have refused to supply it with transmissions. First, as the majority notes, only the Freightliner LTA and the Volvo LTA granted Eaton the right to terminate the LTA altogether if the OEM did not meet its market-share targets. Yet the fact that Eaton had the right to terminate those LTAs if those OEMs did not meet their targets — notably, a right that it did not exercise when Freightliner failed to achieve the market-share target in 2002 — is no more significant than the fact that Eaton would not have to pay the rebate if Freightliner did not meet the target. Termination of the LTA simply made unavailable the rebates to those OEMs; it did not, as the majority implies, mean that Eaton no longer would provide transmissions to those OEMs. It simply meant that those OEMs would not receive Eaton's transmissions at the discounted prices the LTAs offered.

I understand that the LTAs are supply agreements that ensure that Eaton will meet the OEMs' transmission needs and do so at a certain price and under certain conditions, and an OEM lacking a supply agreement may be in an unfavorable position as it would prefer a supply agreement to set the terms of its relationship with Eaton. Nevertheless, although an OEM with a cancelled LTA would have lacked a supply agreement with Eaton, at least temporarily, one cannot infer from that fact

75

that Eaton would not have supplied the OEM with its transmissions. Furthermore, the majority glosses over the fact that PACCAR's and International's LTAs did not include a provision granting Eaton the right to terminate the LTAs if those OEMs did not meet their respective market-share targets.

Nevertheless, regardless of whether the LTAs granted Eaton a right of termination, the majority's suggestion that the OEMs faced losing Eaton as a supplier if they failed to meet the market-share targets is contradicted by the market reality that while Eaton was the largest manufacturer of transmissions in the market there were only four OEMs that bought Eaton's transmissions. Accordingly, the idea that Eaton could or would have refused to deal with one of the OEMs in addition to being unsupported by the record is irrational from an economic viewpoint for if Eaton had done so it would have turned its back on a significant purchaser of its products measured in sales volume. The notion is completely unjustified.

Perhaps if appellees had produced evidence at the trial that Eaton had threatened to refuse to supply transmissions to an OEM that did not meet its market-share targets the non-mandatory market-share targets would have taken on an air of the mandatory threats that the majority insists they actually were. Literally the only evidence that I can identify relating to this contention is deposition testimony by a Volvo representative relaying an email he had received from one of his colleagues in which the colleague stated that Volvo needed to meet its market share target because if it was not successful it faced "a big risk of cancellation of the contract, price increases and shortages if the market is difficult," J.A. at 688, and a sentence from an

76

internal Volvo presentation in which it speculated that if Eaton terminated its LTA it would have "[n]o delivery performance commitment (possibly disastrous)," id. at 2101. While I understand that we view a jury's verdict through a deferential lens, even under that standard I cannot conclude that one sentence of second-hand speculation from a contracting party but not from Eaton as to whether Eaton might provide an OEM with an insufficient volume of transmissions in the event of a market shortage and an unidentified Volvo representative's statement that if it did not have a delivery performance commitment from Eaton it could be potentially disastrous is sufficient to sustain the inference that facially voluntary market-share targets were in reality the mandatory, almost extortionary, provisions the majority makes them out to be.[38]

I must address also an aspect of the majority's reasoning on this point that I find to suffer from a serious flaw with dangerous implications for antitrust jurisprudence. Perhaps the majority does not believe that any evidence was required to rebut the reality that even though the market-share targets were

---

[38]The majority appears to hang its hat to some extent on the notion that even if the OEMs did not actually face the threat of losing Eaton as a supplier they believed they might and that belief drove their compliance with the LTAs. While, as noted, there is scant evidence, indeed, for the proposition that the OEMs' efforts to meet the market-share targets was driven by such a belief, that belief, if unfounded as it was here, does not support the majority's repeated statements to the effect that Eaton actually coerced the OEMs into entering the LTAs and meeting the targets.

77

facially voluntary, the mere circumstances that Eaton was the dominant supplier in the market and that no OEM could afford to lose it as a supplier sufficed to render the LTAs mandatory. The majority's reasoning in this regard literally would mean that had Eaton not been the dominant supplier of HD truck transmissions in the NAFTA market, there would not have been sufficient evidence for the jury to conclude that the LTAs were de facto exclusive. While I realize that monopolists may face more constraints on their conduct under the antitrust laws than less dominant firms, see LePage's, 324 F.3d at 151-52, it is an unfair and unwarranted leap to create the specter of coercion out of reference to Eaton's market dominance, cf. R.J. Reynolds, 199 F. Supp. 2d at 392 ("The strong position of Marlboro, however, does not, standing alone 'coerce' retailers into signing . . . [market-share] agreements."). In sum, I cannot ascribe to the view that a non-mandatory, non-exclusive contract is transformed magically into a mandatory, exclusive contract by virtue of reference to the firm's market position alone such that dominant firms must be wary when they enter voluntary contracts that offer rebates or discounts lest a court later permit a jury to interpret those contracts as mandatory simply due to that firm's dominant position.

Apart from insinuating that Eaton's dominant market position coerced the OEMs into meeting the market-share targets, the majority adds to the picture of coercion it attempts to paint by stating that "there was evidence that Eaton leveraged its position as a supplier of necessary products to coerce the OEMs into entering into the LTAs." Typescript at 48. Relatedly, the majority states that appellees "presented testimony from OEM officials that many of the terms of the LTAs were unfavorable to

78

the OEMs and their customers, but that the OEMs agreed to such terms because without Eaton's transmissions, the OEMs would be unable to satisfy customer demand." Id.

In point of fact, there is not a trace of evidence beyond appellees' own baseless accusations and the majority does not bring our attention to any such evidence supporting its rather serious accusation that Eaton leveraged its position as a monopolist to force the OEMs to enter into agreements that the OEMs did not want to enter.[39] Eaton's offer of lower prices to

---

[39]Appellees contend that the OEMs did not want to enter the LTAs and did so only in response to Eaton's coercion by citing to testimony that in fact weakens their case. In this regard, appellees rely on a Volvo representative's testimony that it entered into the LTA with Eaton because ZFM did not have a full product line and thus Volvo would require Eaton's products even if it entered into an LTA with ZFM but if Eaton was not its standard partner it would not provide favorable pricing to Volvo. See J.A. at 522; see also J.A. 2098 (noting that Eaton would not provide favorable pricing to Volvo if it selected ZFM as its partner). In part for this reason, it elected to enter the LTA with Eaton.

In business as in life we rarely are presented with a perfect option. The fact that long-term supply agreements with ZFM and Eaton each had their respective advantages and disadvantages is hardly surprising and that Eaton would not have granted an OEM the generous discounts its LTA provided if it selected ZFM as its primary supplier is likewise not exactly an astonishing revelation. That the OEMs had to weigh these

79

the OEMs in the form of rebates and direct payments in an effort to gain their business is hardly coercion. Rather, it is nothing more than legitimate good business practice. See Race Tires, 614 F.3d at 79 ("[I]t is no more an act of coercion, collusion, or improper interference for [suppliers] . . . to offer more money to [customers] . . . than it is for such suppliers to offer the lowest . . . prices.").

Likewise, there is no evidence that the LTAs represented unfavorable arrangements for the OEMs such that the OEMs only agreed to enter the contracts out of fear of losing Eaton as a supplier.[40] Indeed, to the extent one may be tempted to infer

factors in deciding whether to enter into an LTA with Eaton hardly amounts to coercion.

[40]In their brief, appellees point to the testimony of two OEM representatives who testified to the hardly surprising fact that they would have preferred upfront price cuts with no strings attached as opposed to conditional market-share targets but that the OEMs entered the agreements because they nonetheless offered the best prices. See J.A. at 415-16 (deposition testimony of International representative) (stating that International preferred to have upfront discounts "in price" but "if a supplier is willing to offer [it] rebates" it would take that option if it believed it could meet the conditions for those rebates); see id. at 525 (deposition testimony of Volvo representative) (stating that during LTA negotiations Volvo "wanted no" market-share targets but it agreed to the 68% target because it believed it could achieve that target and it "wanted the savings and the equalization, and the rebates"). That the OEMs would have

that the market-share targets were so high as to be unfavorable to the OEMs I note that the targets were actually very close to or in fact below Eaton's preexisting market share at three out of the four OEMs measured at a time before the adoption of the LTAs during which appellees do not claim that Eaton was violating any law. See J.A. at 4779 (Dr. DeRamus' expert report) (Eaton's LTA with International began providing rebates at 80% market share but Eaton's market share of International's transmission needs prior to the LTA already was 79%); id. at 4785 (Eaton's LTA with PACCAR provided rebates beginning at 90% but Eaton's market share "consistently hover[ed] around 90% or higher for HD transmissions" with PACCAR prior to the LTA); id. at 4793 (Eaton's LTA with Volvo provided a rebate starting at 65% market share but Eaton's market share of Volvo's transmissions was 85% when they entered the LTA in 2002.). The reality that the market share levels that Eaton reached prior to the adoption of the LTAs makes it, in a word I do not like using but fits perfectly here, ridiculous to conclude that the LTAs had a coercive effect on the OEMs.

---

preferred that Eaton simply cut its prices is hardly surprising. Customers faced with a buy one at full price and get one for 50% off deal likely would prefer to have the option of buying one item for 50% off. Yet, in the same way that the customer who purchases the two items to receive the discount on one cannot be said to have been "coerced" into that transaction, the OEMs' preference for unconditional price cuts hardly can be used as evidence that the terms of the LTAs were "unfavorable" to them, much less so "unfavorable" as to warrant the inference that the OEMs must have entered them as a product of coercion.

81

After studying the majority's treatment of the LTAs I am left with the impression that it pictures Eaton representatives as using coercion when they handed the OEM representatives the LTAs. Yet the reality is that there is absolutely no evidence in the record suggesting that Eaton compelled the OEMs by the threat of punishment to agree to the LTAs or compelled them to meet the share targets.[41] Quite to the contrary, the record is replete with evidence, as I have summarized above, that shows that far from cowering under Eaton's "threats," the OEMs entered into the LTAs in furtherance of their own economic self-interests and because those agreements provided the best possible prices and assurance of a full product line supply. They worked to meet the market-share targets because by achieving those targets they received discounted prices.

Tellingly, the evidence also shows that the OEMs used those arrangements to their advantage. An illuminating example of this market reality is found in a letter an International representative wrote to ZFM in June 2002, in which the representative recounted the HD truck market's dramatic slump and stated to ZFM that:

> In the last 12 months, your competition has supported our need for cost control with price

---

[41]Of course, the lack of coercion associated with the LTAs is significant. While coercion is not "an essential element of every antitrust claim," it is an important consideration where the relevant market players adopt their own business practices and the parties "freely entered into exclusive contracts." Race Tires, 614 F.3d at 78.

> reductions consistent with the trend in new truck
> pricing. In addition, one of your competitors [i.e.,
> Eaton] has offered International a compelling
> incentive to increase their sales at your expense.
> As a result, International is seriously considering
> shifting your portion of our buy to alternative
> suppliers.
>
> International values the relationship our
> companies have created over the years. However,
> the relationship is in jeopardy if your lack of cost
> competitiveness cannot be overcome. We
> therefore require a 5% across the board price
> reduction effective August 1, 2002.

J.A. at 4596 (letter from Paul D. Barkus, International, to Robert
S. Harrison, ZFM (June 18, 2002)). In fact, the record shows
that six months prior to this correspondence, International had
attempted to use its relationship with Eaton as leverage to gain
further cost reductions from ZFM. See id. at 3727 (electronic
mail from Paul D. Barkus, International, to Galynn Skelnik,
International (Jan. 11, 2002)) ("I got a phone message from
[ZFM] . . . stating that after much internal discussion they have
decided not to offer any transmission reductions even though
their list prices could be increased. . . . Our strategy was to give
Meritor the impression that our Partnership with Eaton provided
us with HD reductions that would increase Meritor's list price if
they didn't offset the widened price gap. That started out as a
bluff, but when we look at our option prices between the two
supplier[s] there appears to be some cost/price inconsistency.").
In sum, because appellees failed to produce evidence to show

83

that the LTAs and their voluntary, above-cost market-share target rebates could have or did foreclose competition in any, much less a substantial, share of the market, notwithstanding the jury's verdict it is obvious that appellees' claims must fail under Tampa Electric.

Before moving on, I think it appropriate to make a final point on the importance of the Tampa Electric standard and to illuminate fully why I depart from the majority's application of that case. As I already have noted, exclusive-dealing contracts are not per se unlawful and, indeed, may lead to more competition in the marketplace as firms compete for such potentially lucrative arrangements. Accordingly, one must ask why antitrust law ever would forbid such contracts. The reason, as the Supreme Court's Tampa Electric standard makes clear, is that where there is such an agreement, the seller's competitors cannot compete for the percentage of the market that a purchaser needs because the purchaser has signed a contract to deal only in the goods of that particular seller (or has signed a contract that has that practical effect). Even if the seller's competitors can offer a better deal to the purchaser, the purchaser is precluded from accepting competing offers because they have entered the exclusive-dealing arrangement. Cf. Standard Oil, 337 U.S. at 314, 69 S.Ct. at 1062 (requirements contract violated Section 3 because "observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, and . . . the affected proportion of retail sales of petroleum products is substantial"). Therefore, competition is foreclosed in that percentage of the marketplace and under Tampa Electric the question is simply whether that foreclosure is substantial,

84

considering the quantity of the foreclosure and the qualitative aspects of the marketplace and the agreement itself.

It is that foreclosure of competition, the elimination of the possibility that the seller's competitors can capture that portion of the market through vigorous competition, with which Section 3 (and Section 1 of the Sherman Act in exclusive-dealing cases) is concerned. See Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 629 (emphasis added) (observing that "the ultimate question" is "whether the contract forecloses competition in a substantial share of the line of commerce involved"). The Tampa Electric market-foreclosure analysis thus assumes that a circumstance existed which appellees seek and fail to prove existed here: that there was an exclusive-dealing arrangement between a market seller and purchaser.

Now consider the case at hand. The parties do not dispute that the LTAs did not require the OEMs to purchase anything, much less 100% of their needs, from Eaton and appellees do not contend that Eaton's prices were below cost. Accordingly, appellees remained free at all times to compete for the OEMs' (and the truck purchasers') business. Appellees, if they were equally efficient competitors, were at liberty to offer lower prices, better products, more logistical and technical support, or any other myriad considerations to make their products more attractive to the OEMs, and the OEMs and the truck purchasers were at all times free to accept appellees' products and services. Accordingly, the LTAs did not foreclose competition in any portion of the market. This basic point — that the LTAs were not in fact exclusive-dealing arrangements that foreclosed competition in any portion of the market —

85

explains appellees' failure to identify before us any credible, precise percentage of market foreclosure. Appellees' failure to meet their burden under <u>Tampa Electric</u> to prove any quantitative degree of market foreclosure should spell the end of their Section 3 and Section 1 claims.

Although I believe that appellees' failure in this regard renders unnecessary discussion of the qualitative analysis under <u>Tampa Electric</u>, I note briefly that contrary to the majority's discussion, the qualitative inquiry elucidates further why the LTAs did not violate Section 3. Contrary to the majority's statement that the long duration of the contracts added to their alleged anticompetitiveness, the duration of the LTAs is of little to no significance because they did not actually preclude the OEMs from purchasing competitors' products at any time during the life of the LTA. Because the OEMs were free to walk away from the discounts at any time it does not matter how long Eaton promised to offer those discounts to the OEMs.

Moreover, a claim of lack of ease of terminability is likewise a non-starter given the LTAs were terminable at will; the agreements simply would have lost their force once the OEMs decided to seek Eaton's competitors' products and forego the market-share rebate.[42] The majority denies that the LTAs

---

[42]Although I conclude that the LTAs did not foreclose competition in any portion of the market, if as the majority concludes, the LTAs did foreclose competition in the market, that alleged foreclosure effect necessarily was diminished by the fact that the LTAs at most blocked only one avenue of reaching the end-users, i.e., the truck purchasers. Component part

86

were easily terminable by reasoning that "the OEMs had a strong economic incentive to adhere to the terms of the LTAs, and therefore were not free to walk away from the agreements." Typescript at 52. I reject the majority's ipse dixit reasoning on this point. While Eaton offered through the LTAs financial incentives that undoubtedly served as the OEMs' motivation to meet the market-share targets, the LTAs' promise of financial reward does not mean that the OEMs were not at liberty to leave the LTAs behind to take up a more attractive offer. Economic incentives are by their nature fluid and the OEMs' incentives might have shifted in the face of a more financially appealing option.

Additionally, "[t]he existence of legitimate business justifications for the contracts also supports the legality of the . . . contracts." Barr Labs., 978 F.2d at 111. In this regard, evidence that the defendant's actions were motivated by an ordinary business motive is significant. See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, 105 S.Ct. 2847, 2860 (1985) (noting that "[p]erhaps most significant . . . is the evidence related to [defendant] itself, for [defendant] did not persuade the jury that its conduct was justified by any normal business purpose"). Eaton contends that the LTAs were designed to meet the OEMs' demands to lower prices by consolidating their component part suppliers and that the OEMs

manufacturers, including ZFM, can and do advertise directly to truck purchasers and are able to offer discounts directly to those consumers as an incentive for them to select their parts from their data books, and truck purchasers were at all times free to select appellees' products.

87

entered the contracts because they afforded the best possible prices. As I noted above, the record supports this assertion as representatives from each of the OEMs testified that the OEMs entered into the LTAs because those agreements were financially attractive, and ZFM itself noted in 2001 that the OEMs sought a single-source supplier.[43] Additionally, an Eaton representative testified that when the OEMs increase their purchases of Eaton's products, Eaton is able to "translate that volume into [a] lower cost base, [and] come up with the funds and the revenue to give them [the OEMs] more competitive pricing, which is what they were asking for." J.A. at 1398.

In a similar circumstance, we concluded that a defendant drug manufacturer offered valid business justifications to defeat its competitor's Section 1 and Section 3 claims, which attacked the defendant's offer of contracts that provided volume-based discounts to warehouse chain drug stores. See Barr Labs., 978 F.3d at 104-05. We found that there were "legitimate business justifications for the contracts" because "the evidence established that the warehouse chains [that carried defendant's products] entered the contracts because of the inherent advantages they saw in them in price, convenience, and service" and "[t]he contracts also proved advantageous from Abbott's perspective in terms of reaping business goodwill, and as providing high volume, low transaction cost outlets for Abbott's

---

[43]The majority states that the procompetitive justifications of the LTAs are diminished by the fact that no OEM asked Eaton to be a sole supplier. My response to that assertion is as simple as remarking once more that the LTAs did not by their terms or by their effect make Eaton a sole supplier for any of the OEMs.

88

manufacturing capacity." Id. at 111; see also Virgin Atl. Airways, 257 F.3d at 265 (finding that defendant proffered pro-competitive justification for market-share incentive agreement because such agreements "allow firms to reward their most loyal customers" and "[r]ewarding customer loyalty promotes competition on the merits"); Barry Wright, 724 F.2d at 237 (finding legitimate business justification for requirements contracts because for the purchaser "the contracts guaranteed a stable source of supply, and, perhaps, more importantly, they assured [the purchaser] a stable, favorable price" and for the seller "they allowed use of considerable excess . . . [product] capacity and they allowed production planning that was likely to lower costs").

Undoubtedly, Eaton was motivated to tender the LTAs because of its desire to increase sales of its product. Although such a motivation could not excuse otherwise anticompetitive conduct, the desire to sell more product is an ordinary business purpose, and the antitrust laws do not prohibit such motivation. As the Supreme Court stated in Cargill, "competition for increased market share[] is not activity forbidden by the antitrust laws. It is simply . . . vigorous competition." 479 U.S. at 116, 107 S.Ct. at 492 (emphasis added); see also Concord Boat, 207 F.3d at 1062 (noting that defendant's proffered reason that it was "trying to sell its product" through market-share discounts constituted valid, pro-competitive business justification for program); Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 524 (5th Cir. 1999) (observing that defendant's explanation that "it was trying to sell its product" was valid business justification).

89

Tampa Electric makes clear that "it is the preservation of competition which is at stake" under Section 3. 365 U.S. at 328, 81 S.Ct. at 628 (emphasis added and internal quotations marks and citation omitted). Here, appellees remained free at all times to compete for the OEMs' business and directly for customers' business and yet the majority permits a jury to condemn the LTAs. I cannot join in that conclusion. Appellees failed to supply an evidentiary basis to establish that the LTAs had the probable effect of foreclosing competition in a substantial share of the market and thus they failed to produce evidence that could demonstrate that Eaton violated Section 3 of the Clayton Act. Because Section 3 of the Clayton Act sweeps more broadly than Section 1 of the Sherman Act, appellees likewise failed to show that Eaton violated Section 1.

C. Sherman Act Section 2 Claim

Appellees presented the same evidence and same de facto exclusive dealing theory on which they based their Section 2 claim as they did to support their Clayton Act Section 3 and Sherman Act Section 1 claims. In light of my lengthy analysis of appellees' other claims, I will abbreviate my discussion of their Section 2 claim.

Section 2 targets defendants who "monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. To establish a Section 2 violation, a plaintiff must show that: (1) the defendant possessed monopoly power in the relevant market and (2) the defendant willfully acquired or maintained

that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481, 112 S.Ct. 2072, 2089 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704 (1966)). Eaton acknowledges that it has monopoly power in the NAFTA HD truck transmission market, and thus I focus my discussion on whether it has maintained that monopoly through unlawful means.

A monopolist willfully acquires or maintains monopoly power in contravention of Section 2 if it "attempt[s] to exclude rivals on some basis other than efficiency." Aspen Skiing Co., 472 U.S. at 605, 105 S.Ct. at 2859. "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 308 (3d Cir. 2007) (citation omitted). "[E]xclusive dealing arrangements can be an improper means of maintaining a monopoly." Dentsply, 399 F.3d at 187 (citing Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698; LePage's, 324 F.3d at 157).

The District Court denied Eaton's motion seeking a judgment as a matter of law on appellees' Section 2 claim as it concluded that "[t]he jury found that [Eaton] had willfully acquired or maintained its monopoly power through LTAs that amounted to de facto exclusive dealing contracts having the power to foreclose competition from the marketplace." ZFM, 769 F. Supp. 2d at 697 (emphasis added). In this regard, the Court concluded that "'neither proof of exertion of the power to

exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.'" Id. (quoting LePage's, 324 F.3d at 148).

The District Court's finding on this point reflected its misunderstanding of the requirements of Section 2. As we recently stated in Dentsply:

> Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power. Predatory or exclusionary practices in themselves are not sufficient. There must be proof that competition, not merely competitors, has been harmed.

399 F.3d at 187 (citing LePage's, 324 F.3d at 162) (emphasis added) (citations omitted); see also Broadcom, 501 F.3d at 308 ("[T]he acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor.") (citing Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S.Ct. 872, 878-79 (2004)).

Indeed, in Dentsply we made clear that a plaintiff's demonstration that the defendant merely possessed the power to exclude is not a sufficient basis on which to build a claim that the defendant is culpable under Section 2; a plaintiff must show that the defendant used its power to foreclose competition. See

92

399 F.3d at 191 ("Having demonstrated that Dentsply possessed market power, the Government must also establish the second element of a Section 2 claim, that the power was used 'to foreclose competition.'") (quoting United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 945 (1948)) (emphasis added). As the Supreme Court explained in Trinko:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices — at least for a short period — is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.

540 U.S. at 407, 124 S.Ct. at 879 (emphasis in original).

"Conduct that merely harms competitors . . . while not harming the competitive process itself, is not anticompetitive." Broadcom, 501 F.3d at 308; see also Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S.Ct. 884, 892 (1993) (The Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."). To determine whether a practice is anticompetitive in violation of Section 2, we consider "whether the challenged practices bar a substantial

93

number of rivals or severely restrict the market's ambit." Dentsply, 399 F.3d at 191 (citations omitted). Thus, the standard for ascertaining whether certain conduct is anticompetitive under Section 2 is quite similar to the market-foreclosure analysis under Section 3 of the Clayton Act. "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." W. Penn Allegheny Health Sys., 627 F.3d at 108 (internal quotation marks and citation omitted).

Accordingly, for largely the same reasons that appellees' Section 3 and Section 1 claims fail, so, too, does their Section 2 claim. Because the LTAs did not obligate the OEMs to purchase anything from Eaton and did not condition the rebates on Eaton having a 100% market share and because its prices were at all times above-cost, the LTAs allowed any equally efficient competitor, including appellees, if they were equally efficient competitors, to compete. Thus, the LTAs did not bar Eaton's competitors from the market nor did the LTAs impair their opportunities to compete with Eaton for the business the LTAs covered. Cf. NicSand, Inc. v. 3M Co., 507 F.3d 442, 452 (6th Cir. 2007) (en banc) (plaintiff failed to demonstrate antitrust injury under Sherman Act Section 2 because defendant's rebates and up-front payments to retailers pursuant to exclusive dealing contract were above-cost).

In this regard, the LTAs stand in stark contrast to the contracts at issue in Dentsply, a case on which appellees and the majority rely heavily. In Dentsply we considered whether Dentsply, a monopolist in the field of the production of artificial

94

teeth, violated Section 2 of the Sherman Act through a provision called "Dealer Criterion 6" in its contracts with dealers, who, in turn, sold the products to dental laboratories. See 399 F.3d at 184-85. The provision, which Dentsply "imposed . . . on its dealers" prohibited the dealers from adding non-Dentsply tooth lines to their product offering. See id. Dealers who carried competing lines prior to the implementation of Dealer Criterion 6 were permitted to continue carrying non-Dentsply products, but Dentsply enforced Dealer Criterion 6 against all other dealers. See id.

We concluded that Dealer Criterion 6 violated Section 2 because "[b]y ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 ha[d] a significant effect in preserving Dentsply's monopoly." Id. at 191. We noted that "Criterion 6 impose[d] an 'all-or-nothing' choice on the dealers" and "[t]he fact that dealers ha[d] chosen not to drop Dentsply teeth in favor of a rival's brand demonstrates that they ha[d] acceded to heavy economic pressure." Id. at 196. Accordingly, we concluded that Dealer Criterion 6 harmed competition by "keep[ing] sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share." Id. at 191. Criterion 6 so limited competitors' sales because Dentsply's competitors realistically could not hope to compete solely through direct sales to laboratories and because "[a] dealer locked into the Dentsply line [wa]s unable to heed a request for a different manufacturers' product . . . ." Id. at 194.

Unlike Dealer Criterion 6, the LTAs did not impose an "all-or-nothing" choice on the OEMs because they did not

95

prohibit the OEMs from purchasing or from offering to its HD truck purchasers non-Eaton transmissions. Accordingly, the LTAs did not suppress sales of appellees' products because the OEMs were able to and, in fact, did heed truck purchasers' requests for ZFM's products. Critically, at all times, truck purchasers retained the freedom to make the ultimate decision with respect to the transmissions they would select. Thus, the situation here differs from that in Dentsply because the LTAs did not have the effect of making Eaton the only choice for truck purchasers nor did it impair the purchasers' choice in the marketplace. See J.A. at 1530 (deposition testimony of Paul D. Barkus, International) (indicating that International's LTA included a clause explicitly stating that International was not precluded from dealing in Eaton's competitors' products because International "would never jeopardize a condition of sale based on a customer specifying a product that [it] would refuse to provide").

Adding to the specter of restricted customer choice, the majority states that the OEMs worked with Eaton to force feed Eaton's products to customers and to shift truck fleets from using ZFM transmissions to Eaton transmissions. It appears that there is some evidence in the record for the unsurprising contention that the OEMs sought to meet the market share targets and thus obtain the rebates in part by persuading their customers to select Eaton's products. Indeed, in all walks of life if a salesperson has more to gain by selling a customer product X as opposed to product Y it is to be expected that the salesperson will push the customer to select product X. Ultimately, however, the majority does not and cannot dispute the fact that the HD truck purchasers at all times were free to

96

select any transmission, including ZFM's transmissions, for their truck orders.

Though appellees also assert that the LTA provisions that required the OEMs to list Eaton's products as the preferred and standard option in their data books constituted anticompetitive conduct, those provisions no more support appellees' case than the rebates that the LTAs provided. Appellees claim that the provisions were anticompetitive because they required the OEMs to charge artificially higher prices for ZFM's products than for Eaton's. This is not the case, however, because the terms of the LTAs only required that the OEMs ensure that Eaton was priced as the lowest-cost option, which, with respect to the OEMs, was at all times the case.

As a PACCAR representative explained, a component part manufacturer "is going to get a preferred position in the data book as long as . . . [it is] competitive in the marketplace, and being competitive in the marketplace means that . . . [it has] the lowest total cost to PACCAR, total cost, not just price, total cost." Id. at 1553. A competitor manufacturer's product will be listed "at a premium . . . because that other transmission . . . is at a higher cost to PACCAR." Id. at 1552. Indeed, that representative confirmed that data book positioning was in fact "a leverage point for [PACCAR] to negotiate . . . [to] manage [its] supply base." Id. at 1553. Accordingly, Eaton's demand that the OEMs preferentially price its products reflected the fact that those transmissions came at the lowest cost to the OEMs and the fact that Eaton had made certain price concessions to the OEMs in exchange for that favorable listing, a practice that was apparently commonplace in the HD truck transmission market.

97

Furthermore, the demand had the added consequence of assuring Eaton that it receive the favorable promotion for which it had bargained through its price concessions. If the LTAs did not include requirements regarding data book placement, an OEM would have been able to purchase Eaton's transmissions at a low cost while listing Eaton's products at a higher cost to the truck purchasers than ZFM's products in its data book, thereby reaping a greater profit on Eaton's transmissions. It was entirely reasonable for Eaton to avoid this scenario by insisting that the OEMs' data books reflect that Eaton's transmissions were the lowest-cost, highest-value product.

As the majority notes, it is unclear from the record whether the OEMs arrived at the preferential price by lowering the price of the preferred option or by raising the price of the non-preferred options until the preferred component part was the lowest-cost option. The LTAs simply required that the OEMs list Eaton as the preferred option but they did not require that the OEMs take either path in doing so, and thus it appears that the OEMs had the discretion to decide in which way they would make Eaton the preferred option. Of course, from the OEMs' perspective, keeping the price of Eaton's products stable and raising the price of Eaton's competitors' products was the more financially attractive option than keeping the prices of Eaton's competitors' products stable and dropping the price of Eaton's products and, as the majority points out it appears there is some evidence in the record that the OEMs took the first path.[44]

---

[44]Thus, as the majority notes, in an email exchange between Eaton and Freightliner representatives a Freightliner

98

Nevertheless, to the extent that the OEMs in some instances may have decided to  ZFM's raise the cost of transmissions to arrive at the preferential price for Eaton's transmissions or to make Eaton's transmissions appear more favorable to their customers in an effort to achieve the market-share targets and receive the rebates, such conduct reasonably cannot be attributed to Eaton as neither the LTAs nor Eaton elsewhere required that the OEMs do so.  Additionally, it is clearly telling with respect to data book placement provisions that prior to 2001 Meritor had a three-year LTA with

representative stated that its LTA with Eaton required it to price ZFM's products at a $200 premium.  Yet, Freightliner's LTA did not require that Freightliner price ZFM's products at a premium; it simply required that Eaton's products be the lowest-priced option.  In light of the silence of Freightliner's LTA as to this issue, I can interpret this exchange only to mean that Freightliner had elected to price Eaton's products preferentially by imposing the $200 premium on ZFM's products.  Likewise, it appears that International and PACCAR may have imposed charges on customers who selected ZFM's products but neither their respective LTA nor Eaton itself required them to do so.  In fact, as noted, at least in regard to International, there is evidence in the record that suggests that the data book price increases for ZFM's transmissions were a product of International's realization in 2002 that its current price for ZFM's products did not reflect accurately the cost of that product to International.  See J.A. at 3727 (e-mail from Paul D. Barkus, International, to Galynn Skelnik, International (Jan. 11, 2002)) (proposing that International increase ZFM's list prices to bring them "in line with where they should be").

Freightliner, under which Meritor reduced the prices of its component parts if Freightliner listed those parts as the standard option. Furthermore, there is evidence in the record that as of June 2002, ZFM itself was attempting to achieve exclusive listing in PACCAR's data book. See id. at 3394 (electronic correspondence from Tom Floyd, PACCAR, to Christian Benner, ZFM (June 4, 2002)) (noting that PACCAR was "extremely disappointed" with ZFM's business proposal in part because PACCAR was "very clear that" ZFM's proposal "should not include requirements regarding exclusive position[ing]" and that "it would require some extraordinary benefits for PACCAR in order [for ZFM] to receive consideration" in that regard).

While Meritor's prior LTA and ZFM's own attempts to achieve exclusive data book positioning do not, in themselves, defeat appellees' claim that those tactics are anticompetitive, their actions are of some significance. Cf. Race Tires, 614 F.3d at 82 (noting fact that plaintiff created and championed racing sanctioning bodies' rule that required the use of a single brand of tire during races and later alleged such rule violated the antitrust law); NicSand, 507 F.3d at 454 (plaintiff's prior use of exclusive-dealing contract undermined its attack on defendant's use of such arrangements). At a minimum, ZFM's conduct belies its contention that the LTAs were far afield from the normal practice of the HD truck transmission market.

In our consideration of this case we should remember that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." Trinko, 540 U.S. at 411, 124 S.Ct. at 881. Practices from industry to

industry do not come on a one-size-fits-all basis. Here, it appears that bargaining between the OEMs and their suppliers regarding data book positioning is quite typical of the marketplace with which we are dealing. See Race Tires, 614 F.3d at 79 (noting as relevant that it was "a common and generally accepted practice for a supplier to provide a sports sanctioning body . . . financial support in exchange for a supply contract"); Concord Boat, 207 F.3d at 1062 (observing that "Brunswick's competitors also cut prices in order to attract additional business, confirming that such a practice was a normal competitive tool within the . . . industry"); see also Trace X Chem., Inc. v. Canadian Indus., Ltd., 738 F.2d 261, 266 (8th Cir. 1984) ("Acts which are ordinary business practices typical of those used in a competitive market do not constitute conduct violative of Section 2.").

But appellees' case fails for one more reason than its failure to show that Eaton engaged in anticompetitive conduct, in that their case also did not include evidence that the LTAs harmed competition. See Dentsply, 399 F.3d at 187 ("There must be proof that competition, not merely competitors, has been harmed."). Appellees contend that the LTAs harmed competition by depriving truck buyers of access to the FreedomLine, which appellees believe was a technologically innovative product, and by causing truck buyers to pay higher prices.

With regard to the FreedomLine, it is enough to say once more that the OEMs and truck purchasers were at all times free to purchase that transmission as well as any other of ZFM's transmissions, whether or not those transmissions were listed in

101

the data books. Additionally, with the exception of International, the LTAs permitted the OEMs to list all of ZFM's transmissions, including the FreedomLine, in their respective data books and the OEMs continued to do just that.[45]

Appellees do not point to any evidence in support of their contention that truck purchasers paid higher prices as a result of

---

[45] I have not overlooked the fact that International's LTA required it to list Eaton's transmissions exclusively. Yet, International continued to list ZFM's manual transmissions, and it is thus not apparent whether its decision not to list ZFM's automated and automated mechanical transmissions is attributable to the LTA. Regardless, International's failure to list the FreedomLine, standing alone, did not deprive truck purchasers of access to the FreedomLine because truck purchasers were at all times free to specify the use of the FreedomLine transmission. Furthermore, it is important to note that HD truck purchasers in many cases were sophisticated customers in the HD truck market that were aware that ZFM's transmissions were available. Though I recognize that some purchasers likely were small operators perhaps owning only one HD truck who may have had limited knowledge of the differences in available transmissions, certainly the large purchasers, i.e., big trucking companies, would have been more knowledgeable with respect to available transmissions. In any event, we are, after all, not dealing with consumers buying motor vehicles for their personal use. The transmissions involved here were installed in vehicles intended for commercial use, and the owners did not acquire the vehicles to go to the grocery store.

the LTAs. The only evidence that I can find in the record relevant to appellees' allegation in this regard is Dr. DeRamus' statement in his expert report offered by appellees that after the LTAs went into effect Eaton reduced its "competitive equalization" or incentive payments that historically it had paid to truck buyers as an incentive to them to select Eaton's transmissions. See J.A. at 4830. While Dr. DeRamus put forth data demonstrating that Eaton decreased its competitive equalization payments on average by about $100 (dropping from roughly $500 on average to just below $400 on average) from 1999 to 2007, see id. at 4831, he did not present a scintilla of evidence that truck purchasers ultimately paid a higher price for Eaton's transmissions during the existence of the LTAs or following their expiration. Overall, it is clear that his testimony in this regard as an inadequate basis on which to predicate an antitrust case. In sum, appellees failed to put forth any — much less sufficient — evidence that Eaton engaged in anticompetitive conduct or that Eaton's conduct actually harmed competition, both of which are required elements of a claim under Section 2.[46]

---

[46]Even if a plaintiff establishes under Section 2 that "monopoly power exists" and that "the exclusionary conduct . . . ha[s] an anti-competitive effect," "the monopolist still retains a defense of business justification." Dentsply, 399 F.3d at 187; Concord Boat, 207 F.3d at 1062 ("A Section 2 defendant's proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits."); Stearns Airport Equip. Co., 170 F.3d at 522 ("The key factor courts have analyzed in order to determine whether

## III.  CONCLUSION

I offer a few final thoughts on this important case, which, though seemingly complicated, should have an obvious result. It is axiomatic that "[t]he antitrust laws . . . were enacted for 'the protection of <u>competition</u> not <u>competitors</u>.'" <u>Brunswick</u>, 429 U.S. at 488, 97 S.Ct. at 697 (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521 (1962)) (emphasis in original).  Yet as often as this refrain is repeated throughout antitrust jurisprudence, it appears increasingly that disappointed competitors, on the assumption that their deficient performances must be attributable to their competitors' anticompetitive conduct rather than their own errors in judgment or shortcomings or their competitors' more desirable products or business decisions, or on the assumption that they can convince a jury of that view, turn to the antitrust laws when they have been outperformed in the marketplace.  Of course, competitors can be and sometimes are harmed by their peers' anticompetitive conduct and when they show that is what happened they may have viable antitrust claims.  Yet often it is the case that a defeated competitor falls back on the antitrust laws in an attempt to achieve in the courts the goal that it could not reach in the

---

challenged conduct is or is not competition on the merits is the proffered business justification for the act.").  As with appellees' Section 3 and Section 1 claim, Eaton's valid business justifications for the LTAs undermines the notion that the LTAs constituted competition on some basis other than the merits in violation of Section 2.

104

properly-functioning competitive marketplace.  This case is a classic demonstration of that process, which so far with respect to liability even if not damages has been successful.  Indeed, I find it remarkable that appellees' case that is predicated on nothing more than smoke and mirrors has gotten so far.

But the basic facts are clear.  Appellees do not bring a predatory pricing claim because they cannot do so as Eaton's prices were above cost.  Instead, they seek refuge in the law of exclusive dealing to challenge the LTAs, which based on the record could not be found to be either facially or de facto exclusive or mandatory.  After stripping this case of appellees' baseless insinuations that Eaton engaged in coercive or threatening conduct in regards to the LTAs, it becomes apparent that the core of appellees' claim really is their belief they had a superior product in the FreedomLine and the disappointing sales of that product relative to their expectations must have been attributable to Eaton's anticompetitive conduct.  See appellees' br. at 32 ("Eaton's conduct harmed competition and ZFM.  For the first time in this market, a better product, even combined with offers of discounts, could not elicit additional sales because Eaton's LTAs and other conduct had broken the competitive mechanism.").  Appellees thus "appear[] to be assuming that if [Eaton's] product was not objectively superior, then its victories were not on the merits."  Stearns Airport Equip., 170 F.3d at 527.

As the Court of Appeals for the Fifth Circuit stated in Stearns Airport Equipment in confronting a similar type of claim, courts are "ill-suited . . . to judge the relative merits of" the parties' respective products.  Id.  "That decision is left in the

105

hands of the consumer, not the courts, and to the extent this judgment is 'objectively' wrong, the inference is not that there has been a[n] [antitrust] violation . . . , but rather that the winning party displayed superior business acumen in selling its product." Id. The truth is that neither judges nor juries have expertise in determining the best transmission to buy. Certainly, the purchasers of trucks and transmissions should make transmission decisions for themselves and so long as appellees manufactured their transmissions they had a chance to be their supplier.

I recognize that the record could support a finding that the FreedomLine was a technological innovation for which Eaton did not offer a technically comparable product, and I further recognize that Eaton engaged in vigorous competition through aggressive but above-cost methods to compensate for the possible deficiency of their transmission offerings in that regard. But in the absence of anticompetitive conduct, the antitrust laws do not forbid Eaton's response. See Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1339 (7th Cir. 1986) ("Even the largest firms may engage in hard competition, knowing that this will enlarge their market shares.") (citations omitted). In reality, however, the record compels that the conclusion that Eaton was able to maintain its dominant market position in the face of the availability of the FreedomLine for myriad reasons, including its capability of offering the OEMs a full product line, favorable pricing, its long-standing, positive reputation, and various market forces that favored an established market player such as Eaton. And it is also evident from the record, especially from ZFM's internal documents, that there were numerous intervening factors, such

106

as ZFM's precipitously falling market share, which tellingly predated the adoption of the LTAs, the market's drive towards full-product line manufacturers, the OEMs' hesitancy to purchase new products, and the severe market downturn, that disfavored ZFM.[47]  In the difficult market it faced, Meritor entered into a joint venture that needed to achieve an almost one-third market share within approximately four years of the venture's formation to maintain a viable business, an obviously ambitious goal indeed even when one overlooks the fact that the joint venture offered a limited product line and a flagship transmission that cost far more than other transmissions in the market.

I note finally that courts' erroneous judgments in cases such as this one do not come without a cost to the economy as a

---

[47]I recognize that as the majority points out, certain OEM representatives speculated that the LTAs damaged significantly ZFM's business and may have caused its ultimate demise.  As I have stated above, it is beyond peradventure to say that "[t]he antitrust laws . . . were enacted for 'the protection of competition not competitors.'"  Brunswick, 429 U.S. at 488, 97 S.Ct. at 697 (internal quotation marks and citation omitted); see also Virgin Atl. Airways, 257 F.3d at 259 ("[W]hat the antitrust laws are designed to protect is competitive conduct, not individual competitors.").  Even if the LTAs negatively affected ZFM's business, that circumstance is not the salient inquiry in an antitrust case.  The pivotal question is whether the LTAs negatively affected competition — not a particular competitor — in the marketplace, and for the reasons I have recited above, they could not be found to have done that.

107

whole. Discounts of all varieties, whether tied to the purchase of multiple products, exclusivity, volume, or market-share, are ubiquitous in our society. "Discounts are the age-old way that merchants induce customers to purchase from them and not from someone else or to purchase more than they otherwise would." Hovenkamp, Discounts and Exclusion, 2006 Utah L. Rev. at 843. Indeed, market-share discounts can be particularly pro-competitive because they can result in lower prices for a broader range of customers as they extend to smaller purchasers discounts typically reserved for the largest of purchasers under more common volume-discount programs. See IIIA Areeda & Hovenkamp, Antitrust Law ¶786b2, at 148. "[L]ower prices help consumers. The competitive marketplace that the antitrust laws encourage and protect is characterized by firms willing and able to cut prices in order to take customers from their rivals." Barry Wright Corp., 724 F.2d at 231. Accordingly, "mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect." Matsushita Elec. Indus. Co., 475 U.S. at 594, 106 S.Ct. at 1360.

Thus, as the Supreme Court has stressed, courts do not issue these decisions in a vacuum: once we file our opinion in this case firms that engage in price competition but seek to stay within the confines of the antitrust laws must attempt to use the precedent that we establish as a guide for their conduct, at least if they are subject to the law of this Circuit. This is serious business indeed.[48] For this reason, the Supreme Court has

---

[48]Of course, every decision we make is serious business and I do not imply otherwise. However, particularly in light of the

108

"repeatedly emphasized the importance of clear rules in antitrust law." Linkline, 555 U.S. at 452, 129 S.Ct. at 1120-21; see also Town of Concord v. Bos. Edison Co., 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, C.J.) (Antitrust rules "must be administratively workable and therefore cannot always take account of every complex economic circumstance or qualification."). I confess I can glean no such clear rule from the majority's opinion. I do not know how corporate counsel presented with a firm's business plan at least if it is a dominant supplier that seeks to expand sales through a discount program that might be challenged by competitors as providing for a de facto exclusive dealing program and asked if the plan is lawful under the Sherman and Clayton Acts will be able to advise the management. The sad truth is that the counsel only will be able to tell management that it will have to take a chance in the courtroom casino at some then uncertain future date to find out.

If Eaton's above-cost market-share rebate program memorialized in the LTAs, which were neither explicitly nor de facto exclusive or mandatory, can be condemned as unlawful de facto partial exclusive dealing on the basis of literally a handful of disjointed statements that amount at most to unsupported speculation as to the possibility that Eaton may have stopped supplying its transmissions if the OEMs did not meet the targets, firms face a difficult task indeed in structuring lawful discount programs. "Perhaps most troubling, firms that seek to avoid . . . liability [for market-share rebate programs] will have no safe harbor for their pricing practices." Linkline, 555 U.S. at 452,

current economic climax, the reasoning of a precedential opinion with such obvious economic repercussions is crucial.

129 S.Ct. at 1121 (citing <u>Town of Concord</u>, 915 F.2d at 22) (Antitrust rules "must be clear enough for lawyers to explain them to clients."). What I find most troubling is that firms will play it safe by not formulating discount programs and that the result of this case will be an increase of prices to purchasers and the stifling of competition, surely a perverse outcome. It is ironical that the very circumstance that the majority's opinion is so thoughtful and well crafted that the risk that it poses is so great. On the other hand, the approach I believe the Supreme Court's precedent compels — applying and giving persuasive effect to the <u>Brooke Group</u> price-cost test and granting a presumption of lawfulness to pricing practices that result in above-cost prices — provides clear direction to firms engaging in price competition but still allows for an antitrust plaintiff to allege that a defendant has engaged in attendant anticompetitive conduct that renders its practices unlawful.

In sum, I conclude that Eaton was entitled to judgment as a matter of law on liability in all respects. Accordingly, I would reverse the judgment of the District Court and remand this case for entry of a judgment in favor of Eaton. My view of this facet of the case renders it unnecessary for me to consider the numerous other issues raised on this appeal, including the District Court's decision that appellees suffered antitrust injury, and its decisions regarding damages and injunctive relief. Thus, I do not opine on the proper disposition of those matters.